**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 2:15-CR-080** |
| **Plaintiff,** | : | **Case No. 2:14-CR-127** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **ROBERT B. LEDBETTER,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter comes before the Court on several motions in limine regarding the first trial grouping ("Trial I") of this sprawling RICO-conspiracy case. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motions in limine.

## I. BACKGROUND

On March 2, 2016, Robert Ledbetter filed two motions in limine: (1) a motion to preclude the testimony of Tierra Days regarding a threat that Ledbetter made to her in 2010 (Doc. 946); and (2) a motion to exclude Leland Rowe's testimony regarding what she learned as a Verizon employee when she accessed Ledbetter's cell phone records in 2007 (Doc. 947).

On March 9, 2016, Christopher Harris filed a motion in limine raising five issues: (1) prohibiting the Government from referencing "the subject of abortion"; (2) excluding statements from Crystal Fyffe (a now-deceased potential witness) about Harris; (3) excluding Keith Maye's opinion that Harris was sent to kill him and excluding evidence that Harris attended a court proceeding in which Mr. Maye testified; (4) excluding statements that Marcus Peters made regarding his membership in the Short North Posse and other criminal activity; and (5) precluding testimony from Carl Gibbs regarding gang activity. (Doc. 968).

On March 2, 2016, Deounte Ussury filed two motions in limine: (1) a motion to exclude statements that a deceased unindicted co-conspirator, Marcus Peters, made to Columbus police officers concerning a shootout between Short North Posse members and rival gang members on November 20, 2006 (Doc. 943); and (2) a motion to preclude testimony from Latasha Barrett regarding statements that Peters made to her about Ussury (Doc. 948).

On March 28, 2016, the Government filed a motion in limine raising three issues: (1) how to handle evidence of prior convictions for government witnesses and Defendants; (2) excluding evidence of polygraph examinations for government witnesses; and (3) excluding Defendants from presenting evidence or argument about their potential sentences. (Doc. 1007).

## II.  LEGAL STANDARDS

### A.  Relevancy and Unfair Prejudice (Fed. R. Evid. 401 and 403)

Evidence is relevant, and therefore generally admissible, so long as it "has any tendency to make a fact more or less probable," and so long as "the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence can be relevant even if it does not relate to an element of an offense or to a fact in dispute, provided the evidence supplies background information about the defendant or the offenses. *See* Advisory Committee Notes to 1972 Proposed Rules ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding."). The Government thus faces a "low threshold" for establishing that evidence is relevant, *Tennard v. Dretke*, 542 U.S. 274, 285 (2004), and defendants "face[] a significant obstacle in arguing that evidence should be barred because it is not relevant," *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). *See generally United States v. Collins*, 799 F.3d 554, 578 (6th Cir. 2015) ("This Circuit applies an 'extremely liberal' standard for relevancy." (citation omitted)).

Assuming evidence is relevant, Rule 403 nonetheless grants trial courts discretion to exclude that evidence "if its probative value is substantially outweighed" by the risk of "unfair prejudice." Fed. R. Evid. 403; *United States v. Gibbs*, 797 F.3d 416, 422 (6th Cir. 2015). The term "unfair prejudice" does not, however, encompass "the damage to a defendant's case that results from the legitimate force of the evidence." *United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (quotation omitted). After all, most evidence is prejudicial in one way or another. Instead, the term "unfair prejudice" refers only to evidence which tends to lead jurors to make a decision on an improper basis. *Id.* District courts are "afforded great deference" in conducting the balancing inquiry required under Rule 403. *United States v. Howard*, 621 F.3d 433, 457 (6th Cir. 2010) (quotation omitted); *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008) (noting that balancing under Rule 403 is "highly discretionary").

### B. The Confrontation Clause

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Although the Confrontation Clause provides a bedrock principle of the criminal justice system— one essential to a fair trial—its protections are not absolute. Recently, the Supreme Court has clarified that the Confrontation Clause applies only to statements that qualify as "testimonial." *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004) (holding that the Constitution requires confrontation of a declarant only "[w]here testimonial statements are at issue"); *see also, e.g., Giles v. California*, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause."). Thus, the first step in any Confrontation Clause analysis involves determining whether the statements in question are "testimonial" within the meaning of *Crawford* and its progeny.

Although *Crawford* "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial,'" the Supreme Court provided some guidance for determining whether evidence is testimonial. *Crawford*, 541 U.S. at 68. First, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51. The Court next offered three "formulations of [the] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent . . . , [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (citations omitted). Finally, the Court provided examples of statements that qualify as "testimonial" under any definition, including "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [in response] to police interrogations." *Id.* at 68.

Following *Crawford*, the Supreme Court initially refused to "produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial" and expressly declined to consider "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" *Davis v. Washington*, 547 U.S. 813, 822-23 & n.2 (2006). Just last summer, however, the Court faced the question that it had previously reserved: "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." *Ohio v. Clark*, 135 S. Ct. 2173, 2181 (2015). Although the Court declined categorically to exclude statements to non-law enforcement personnel from the scope of the Confrontation Clause, the Court concluded that "such statements are *much less likely* to be testimonial than statements to law enforcement officers." *Id.* (emphasis added).

4

Accordingly, in the wake of *Crawford*, *Davis*, *Clark*, and other cases, courts must ask, "in light of all the circumstances," whether the "'primary purpose' of the conversation [at issue] was to creat[e] an out-of-court substitute for trial testimony." *Id.* at 2180 (quotation omitted). If the primary purpose of the conversation was *not* to create an out-of-court substitute for trial testimony, then the Confrontation Clause plays no role. *Id.*; *Michigan v. Bryant*, 562 U.S. 344, 359 (2011) ("Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."). In this Circuit, part of the "primary purpose" test includes asking whether the declarant "intended to bear testimony against he accused." *See Collins*, 799 F.3d at 585 (brackets and quotation omitted). That determination, in turn, "depends on whether a reasonable person in the declarant's position would anticipate [the] statement being used against the accused in investigating and prosecuting the crime." *Id.* (quotation omitted).

### C.  Prohibition on Hearsay

Assuming an out-of-court statement used to prove the truth of the matter asserted passes muster under the Confrontation Clause, it still must comply with the Federal Rules of Evidence, including the general prohibition on hearsay. *Bryant*, 562 U.S. at 359; *see* Fed. R. Evid. 802 ("Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules [of evidence]; or other rules prescribed by the Supreme Court."). The Federal Rules of Evidence provide several exceptions to this general prohibition on hearsay, however, including exceptions for certain statements from co-conspirators, *see* Fed. R. Evid. 801(d)(2)(E), and for remarks from unavailable declarants who make a "statement against [their own] interest," *see* Fed. R. Evid. 804(b)(3).

### 1. Co-Conspirators' Statements (Fed. R. Evid. 801(d)(2)(E))

Statements made by a defendant's co-conspirators "during and in furtherance of the conspiracy" are excluded from the bar on hearsay. Fed. R. Evid. 801(d)(2)(E). Before a court may admit a co-conspirator's statement, the government must establish the following by a preponderance of the evidence: "(1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the coconspirator's statement was made in the course of and in furtherance of the conspiracy." *United States v. Kone*, 307 F.3d 430, 440 (6th Cir. 2002). Admissible statements "can take many forms, such as keeping co-conspirators advised, or concealing aspects of the scheme." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quotation omitted). A statement is admissible under Rule 801(d)(2)(E) even if it seems "susceptible of alternative interpretations." *Id.* (quotation omitted). Indeed, a statement may be admissible "even if not exclusively, or even primarily, made to further the conspiracy." *Id.* (quotation omitted). That said, "idle chatter or casual conversation about past events" fall short. *Id.* (quotation omitted).

### 2. Statements Against the Declarant's Interest (Fed. R. Evid. 804(b)(3))

Under the exception for statements against the declarant's interest, hearsay statements are admissible if three conditions are satisfied: (1) "the declarant is unavailable"; (2) "from the perspective of the average, reasonable person, the statements were truly adverse to the declarant's penal interest"; and (3) "corroborating circumstances truly establish the trustworthiness of the statement[s]." *Id.* at 414. As the Sixth Circuit has explained, Rule 804(b)(3) permits the introduction of statements that incriminate not only the declarant, but also other individuals, provided the three conditions of the rule are satisfied. *Id.* at 415 & n.7; *see also United States v. Franklin*, 415 F.3d 537, 548 (6th Cir. 2005); *United States v. Thurman*, 915 F. Supp. 2d 836, 880 (W.D. Ky. 2013).

### III.  ANALYSIS

The Court will analyze the motions in limine on a party-by-party and issue-by-issue basis.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the pending motions in limine.

### A.  Robert Ledbetter's Motions in Limine

#### *1.  Testimony from Tierra Days Regarding Ledbetter's Threats*

In his first motion in limine, Ledbetter asks that the Court exclude testimony from Tierra Days, one of his ex-girlfriends, regarding threats that Ledbetter made when Ms. Days became pregnant with his child in 2010.  (Doc. 946).  According to the Government, Ledbetter did not want Ms. Days to have the baby, so he tried to force her into having an abortion by threatening to kill her mother.  When Ledbetter did not get his way, he allegedly held a gun to Ms. Day's head and made her agree to have an abortion.  The following day, Ms. Days had an abortion, after which she filed a report with the Columbus Police Department about Ledbetter's threats.

Ledbetter contends that evidence of these purported threats is inadmissible for the following reasons: (1) the threats are irrelevant (Fed. R. Evid. 401); (2) the threats do not constitute an admissible prior bad act (Fed. R. Evid. 404(b)); and (3) even if the threats are relevant and admissible as prior bad acts, the unfair prejudice stemming from evidence of those threats—which were predicated on Ledbetter's pro-abortion views—would substantially outweigh their probative value (Fed. R. Evid. 403).  The Government counters that evidence of Ledbetter's threats is relevant to the charged RICO conspiracy, in which members of the Short North Posse allegedly armed themselves, threatened to kill, and killed other members of the community to project a violent attitude and enhance the stature of their criminal enterprise.  Likewise, the Government contends that the threats are not unfairly prejudicial.

This Court agrees with Ledbetter. Even assuming that the evidence is relevant to the charged RICO conspiracy and otherwise admissible, the evidence concerns what some jurors might deem "violent or socially repugnant or politically controversial conduct" that, in turn, could lead to a determination of guilt on an improper basis. *See Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 600, 615 (E.D. Pa. 1998) (collecting cases), *rev'd in part on other grounds*, 207 F.3d 176, 204 (3d Cir. 2000); *see also Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 884-85 (8th Cir. 1998) (holding that failure to exclude evidence of an abortion constituted abuse of discretion due to evidence's "inflammatory effect" and "limited probative value" in emotional distress case; "Informing the jury that Nichols had an abortion presented the danger of provoking the fierce emotional reaction that is engendered in many people when the subject of abortion surfaces *in any manner*." (emphasis added) (quotation omitted)); *Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 418-19 (1st Cir. 1990) (affirming district court's exclusion of evidence regarding expert witness's work in abortion clinics; "[W]e will not poison the jury with any further references to abortion."). For these reasons, Doc. 946 is **GRANTED**.

### 2. *Testimony from Leland Rowe Regarding Ledbetter's Phone Records*

In his second motion in limine, Ledbetter asks that the Court exclude testimony from Leland Rowe regarding her review of his cell phone records from November 3, 2007—the night of Rodriccos Williams's murder. (Doc. 947). Ledbetter is accused of murdering Mr. Williams. Ms. Rowe was a personal friend or Mr. Williams's wife, Latonia Williams (now Latonia Boyce) and, while working as a Verizon employee, she accessed Ledbetter's phone records without proper authorization. She later told police about her findings, including alleged calls between Ledbetter's phone and Ms. Williams's phone and purported cell-site location data for Ledbetter's phone on the night of the murder. Verizon since has destroyed the records.

Ledbetter moves to exclude Ms. Rowe's statements to Detective David Kessler on October 30, 2012, or her testimony regarding the same subject matter. Ledbetter argues that Ms. Rowe's statements constitute inadmissible hearsay given her unauthorized investigation into his phone records at Ms. Williams's behest, the lack of access to the underlying records themselves, which were destroyed in connection with Verizon's document-retention policy, and the fact that Detective Kessler "fed" many of the pertinent details to Ms. Rowe. The Government counters that Ms. Rowe's statements are admissible for three reasons: (1) computer- or machine-generated data do not constitute "statements" within the meaning of Rule 801(a) and thus do not constitute hearsay; (2) Ms. Rowe's testimony does not constitute hearsay because the Government will elicit that testimony to show only the effect that Ms. Rowe's findings had on Ledbetter when he was confronted with it—not to prove the truth of the matter asserted; and (3) to the extent the cell phone records *are* hearsay, testimony about those records is admissible as secondary evidence of the records of a regularly conducted business activity, *see* Fed. R. Evid. 803(6); Fed. R. Evid. 1004(a).

The Government's first argument confuses matters by claiming that computer- or machine-generated data do not constitute "statements" for hearsay purposes under Rule 801(a). Although the Government may be correct in some instances, *see Patterson v. City of Akron*, 619 F. App'x 462, 480-81 (6th Cir. 2015) (holding that "a report of raw data produced by a machine" does not constitute hearsay), here, the Court is not solely concerned with admitting a lab report or other mechanical printout, because the phone records no longer exist. Rather, the Court must assess the admissibility of statements from a *person*, regarding data that she surreptitiously uncovered at the request of a murder victim's wife, some of which she may have plotted on a mapping software or website and then interpreted for law enforcement use.

Under these circumstances, the statements at issue are not solely "the statements of machines," which ordinarily fall outside of the definition of hearsay but, rather, include the "statements of [a] person[]," which constitutes classic hearsay. *See United States v. Lamons*, 532 F.3d 1251, 1263-65 & n.23 (11th Cir. 2008) (contrasting "fully automated" data or "wholly machine-generated statement[s]" with machine-generated data that a person compiles, manipulates, or interprets); *see also, e.g.*, *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015) (same); *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) (same); *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007) (same); *United States v. Crockett*, 586 F. Supp. 2d 877, 885 (E.D. Mich. 2008) (agreeing that "instrument readouts and printouts are not 'statements' within the meaning of . . . Federal Rule of Evidence 801(a)" but analyzing hearsay problems with "allowing a qualified witness to interpret those readouts for the jury" separately). Thus, the Government's first argument seems inapposite.

The Government next argues that the challenged statements do not meet the definition of hearsay because the statements "would not be offered for the truth of the matter asserted (*i.e.*, what the Verizon records showed), but rather to demonstrate the effect that [the] statements about the records had on the listener (*i.e.*, how Mr. Ledbetter responded to the information)." (Doc. 993). The Government alleges that, after Ms. Rowe accessed the phone records at Ms. Williams's request (because she "was hysterical" over her husband's death), Ms. Rowe conveyed the results to Ms. Williams, who then confronted Ledbetter over his whereabouts the night of the murder. (*Id.*). Ledbetter then allegedly "admitted to Robert Britt, a private investigator, that he had been in the vicinity of the Williams residence at the time of the murder (and during his phone call with Ms. [Williams] Boyce), though [he] claimed to be at a party at a residence on a nearby street." (*Id.*).

10

To be sure, statements constitute hearsay only when used to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(3). But here, the Government does not explain *how* its proffered use of Ms. Rowe's statements regarding the phone records goes to Ledbetter's reaction rather than his whereabouts or *why* Ledbetter's reaction (which was not fully explained) otherwise would be relevant. In either scenario, the Government will use the phone records to show that Ledbetter was *at* the Williams' residence on the night of the murder or, according to Ledbetter himself, *near* the Williams' residence that night. The statements thus "appear to be hearsay for the simple reason that notwithstanding the truth of the matter asserted, the statements would be irrelevant to any issue in the case." *See United States v. Hunerlach*, 197 F.3d 1059, 1067 (11th Cir. 1999); *cf. United States v. McGlory*, 968 F.2d 309, 332 (3d Cir. 1992) (expressing "disfavor[]" over "admission of statements which are not technically admitted for the truth of the matter asserted" whenever the matter asserted nevertheless "implies that the defendant is guilty of the crime charged"); *United States v. Mahar*, 801 F.2d 1477, 1490-91 (6th Cir. 1986) (similar).

Finally, the Government contends that even if the Verizon records constitute hearsay, they fall within an exception to the bar on hearsay as records of a regularly conducted activity (*i.e.*, business records). Federal Rule of Evidence 803(6) carves out an exception to the bar on hearsay for certain business records. To qualify for this exception, the record must satisfy four requirements: (1) the record must have been made "at or near the time by—or from information transmitted by—someone with knowledge"; (2) the record must have been "kept in the course of a regularly conducted activity of a business"; (3) "making the record" must have been "a regular practice of that activity" and (4) a records custodian or another qualified witness must testify or certify all of these conditions. Fed. R. Evid. 803(6)(A)-(D).

11

The Government represents that it will call a Verizon employee who will testify that the records: "(1) were made at or near the time the data arose, (2) by a person (the company) with knowledge of activity, (3) were kept in the course of regularly conducted business activity, and (4) that it was the regular practice of Verizon to compile such data." (Doc. 993). Assuming that the Government's proffered foundation holds up, the records would fall under Rule 803(6)—at least insofar as Ms. Rowe's testimony remains confined to phone records that Verizon regularly compiles.[1]  *See United States v. Salgado*, 250 F.3d 438, 451-53 (6th Cir. 2001) (affirming admission of telephone call records under business-records exception).

The fact that printouts or electronic copies of the phone records no longer exist does not change the business-records analysis.  *See* Fed. R. Evid. 1004(a) (explaining that other evidence of contents of writing or recording is admissible if "all originals are lost or destroyed, and not by the proponent acting in bad faith"); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1085 (6th Cir. 1994) (affirming admission of testimony regarding plaintiff's work "even though no physical copies of those records were produced"), *overruled on other grounds as recognized by Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009).  Secondary evidence admitted under Rule 1004 "can be in *any* form," *In re Sol Bergman Estate Jewelers, Inc.*, 208 F.3d 215, 2000 WL 263338, at *5 (6th Cir. 2000) (unpublished table decision), including by "oral evidence of the contents [of the record]," *Wiley v. United States*, 257 F.2d 900, 909 (8th Cir. 1958).

---

[1] It is not clear whether Ms. Rowe intends to testify *solely* about the records she accessed in their original form (*i.e.*, subscriber information, call logs, and cell-tower data) or also about any extra investigative or interpretive work she may have performed (*i.e.*, plotting the towers on a map, determining distances, etc.). The first category of information qualifies under the business records exception.  The second category, however, may not, depending on Verizon's business practices and whether Ms. Rowe is qualified to offer testimony "on the technical matter of how cell phone calls are routed through a company's towers." *See United States v. Burgos-Montes*, 786 F.3d 92, 119-21 (1st Cir. 2015).  The Court reserves ruling on this matter until the Government lays a foundation for the records in question.  At that time, Ledbetter may renew any objection to Ms. Rowe's testimony under Rule 702, Rule 803(6)(B)-(C), or Rule 803(6)(D), which bars business records if the opponent shows "that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(D).

As the Government notes, "[t]he party who is challenging the secondary evidence has the burden of showing that the evidence is inadmissible" under Rule 1004. *See In re Sol Bergman*, 2000 WL 263338, at *5 (citing *United States v. Ross*, 33 F.3d 1507, 1513 (11th Cir. 1994)). Here, the Government contends that the phone records were destroyed in the ordinary course of Verizon's document-retention practices, and the Government represents that its Verizon representative will testify to that effect. In the absence of evidence of bad faith on the *Government's* behalf in losing or destroying the phone records (of which there is none), secondary evidence of the records remains admissible at trial. *Id.*; *see also Ross*, 33 F.3d at 1513 (finding secondary evidence admissible because "the prosecution was not at fault for the absence of the cassette tapes, which the Spanish National Police destroyed as part of routine procedure").

Any lingering questions over the quality or reliability of Ms. Rowe's testimony regarding the contents of the phone records—including her personal relationship to Ms. Williams, whether she violated Verizon policies by accessing the records in the first place, or whether Detective Kessler improperly suggested facts to her—"go to the weight of the evidence," and not its admissibility. *See In re Sol Bergman*, 2000 WL 263338, at *5 (collecting cases). Accordingly, Ledbetter's second motion in limine (Doc. 947) is **DENIED**.

### 3. Testimony of Melissa Leslie Regarding Ledbetter's Attorney

In his third motion in limine, Ledbetter asks that the Court exclude testimony from Melissa Leslie, a government witness, regarding Ledbetter's lead attorney, Jeffrey Berndt. (Doc. 1009). On March 19, 2014, Ms. Leslie spoke with investigators in this case regarding the 2011 murder of Crystal Fyffe, for which Ledbetter stands accused. During that meeting, Ms. Leslie informed investigators that she believed Mr. Berndt is "dirty" and acted in concert with Ledbetter as to portions of his alleged criminal activity.

Ledbetter contends that Ms. Leslie's accusations are false, irrelevant, and unfairly prejudicial. As such, he asks that the Court exclude any testimony from Ms. Leslie to that effect at trial under Rules 401 and 403. The Court agrees. Mr. Berndt is not on trial in this case and, from the Court's vantage, his character and reputation are not at issue. The Government has never alleged that Mr. Berndt was a co-conspirator of other Short North Posse members or that his conduct is relevant to any of the charges at issue in Trial I. Under these circumstances, Ms. Leslie's opinions of Mr. Berndt are both irrelevant and unfairly prejudicial. *See, e.g., United States v. Pungitore*, 910 F.2d 1084, 1142 (3d Cir. 1990) (agreeing that, "as a general rule, a prosecutor should refrain from attacking the integrity and ethical standards of defense counsel"); *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) ("[T]he prosecutor may not challenge the integrity and ethical standards of defense counsel *unless the prosecutor has certain proof* of an offense *and the matter is relevant to the case being tried*." (emphasis added)). Loosely supported "suggestion[s]" regarding defense counsel's credibility or character may "prompt[] the jury to summarily reject defense counsel's arguments on the facts and the law." *See Murrah*, 888 F.2d at 27. The Court will not allow that in this case. Accordingly, the Court **GRANTS** Ledbetter's third motion in limine (Doc. 1009).

### B. Christopher Harris's Motion in Limine

#### *1. References to the Subject of Abortion*

Harris first moves to exclude "references to the subject of abortion at trial," including testimony "that an abortion took place at the insistence of a member of the alleged enterprise." (Doc. 968). Harris's motion presumably relates to Overt Act Number 36, which alleges that on January 11, 2007, he fired shots into a car owned by D.T., the mother of India Hawk, who was carrying his unborn child at the time.

Harris contends that evidence of this shooting, to the extent that it relates to his desire for Ms. Hawk to have an abortion, or to evidence of his views on abortion more generally, is inadmissible under Federal Rules of Evidence 401 and 403. As with Ledbetter's first motion, discussed in Section III.A.1., *supra*, the Court agrees that evidence of Harris's pro-abortion views in general, or as motivation for the January 11, 2007 shooting of D.T.'s car more specifically, remains inadmissible under Rule 403, even assuming its relevance. When the subject of abortion "surfaces in any manner," courts risk "provoking the fierce emotional reaction that is engendered in many people." *Nichols*, 154 F.3d at 885 (quotation omitted). This is precisely the type of unfair prejudice that Rule 403 aims to avoid. Thus, while the Government may introduce evidence of the January 11, 2007 shooting and that Harris and his associates called Ms. Hawk to take credit for it, the Government may *not* introduce evidence tying that shooting to Ms. Hawk's pregnancy or to Harris's views on abortion. Accordingly, the Court **GRANTS IN PART** Harris's motion in limine (Doc. 968).

### 2. Statements from Crystal Fyffe Regarding Harris

Harris next moves to exclude a pair of statements that Crystal Fyffe made to her attorney, Stephen Palmer. (Doc. 968). Ms. Fyffe, who was Co-Defendant Robert Ledbetter's girlfriend and a potential star witness in this case, was murdered on October 19, 2011. Her murder now forms the basis for several substantive murder counts and overt acts in the charged RICO conspiracy. Specifically, Harris seeks to exclude the following statements: (1) Fyffe's statements to Mr. Palmer that she "was in fear of being murdered and that she gave her counsel a list of names of people who would actually kill her," including "[t]he name O-Dog," which is Harris's nickname; and (2) Fyffe's statements to Mr. Palmer and detectives "that Defendant Brandon Ledbetter told her to talk to O-Dog if anyone messed with her." (*Id.*).

Harris contends that these statements are irrelevant and thus inadmissible under Rule 401. Alternatively, Harris argues that admitting Ledbetter's statements, by way of Ms. Fyffe's conversation with her attorney, would unfairly prejudice his trial under Rule 403. The Government counters that Ms. Fyffe's statements are admissible for two reasons. First, the Government contends that Ledbetter showing Ms. Fyffe a telephone list of his "crew," including "O-Dog," and advising Ms. Fyffe that she should contact O-Dog if she "ever needed anything," has a tendency to make the existence of the racketeering enterprise and these two defendants' participation in it more probable than it would without this evidence. Second, the Government argues that Harris's inclusion in Ledbetter's phone list of known associates makes it more likely that Harris and Ledbetter acted in concert to murder Rodriccos Williams, as alleged. After all, Ms. Fyffe was providing information about the Williams murder to law enforcement in the summer of 2011, shortly before her murder. Finally, the Government argues that the probative value of these statements is not substantially outweighed by the risk of unfair prejudice.

The statements in question, which connect Ledbetter and Harris as known associates, or as members of the same "crew," certainly shed some light on whether the charged racketeering enterprise existed and on whether these two men participated in it. Nothing more is required under this Circuit's "extremely liberal" standard for relevancy. *See Collins*, 799 F.3d at 578 (quotation omitted); *see also United States v. Zemek*, 634 F.2d 1159, 1172 (9th Cir. 1980) (relying, in part, on fact that RICO-conspiracy defendant had "home phone numbers" of two co-conspirators in his possession in rejecting a sufficiency-of-the-evidence challenge to his conviction); *accord United States v. Eufrasio*, 935 F.2d 553, 560 (3d Cir. 1991) (citing evidence that defendants had an associate's "address and phone number" in sufficiency-of-the-evidence challenge to RICO-conspiracy conviction).

16

Moreover, although Harris makes a passing reference to unfair prejudice under Rule 403, the Court finds none. To be sure, Harris was in jail the night that Ms. Fyffe was murdered and thus, he did not fire the shot that killed her. That said, the Government has not charged Harris as a defendant in either of Ms. Fyffe's substantive murder counts. Moreover, after convening a two-day pretrial hearing on Ms. Fyffe's murder to determine the admissibility of her statements as to Co-Defendant Robert Ledbetter under the forfeiture-by-wrongdoing doctrine, the Court anticipates that the trial evidence regarding her death will focus primarily, if not exclusively, on Ledbetter, not Harris. Finally, co-conspirators remain liable for the actions of their fellow travelers so long as those actions occur during the course of the conspiracy and were reasonably foreseeable. As such, Harris cannot claim unfair prejudice from any evidence regarding Ms. Fyffe's murder that might apply to him as well. For these reasons, the Court finds that the probative value of the statements in question is not substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403. Accordingly, the Court **DENIES IN PART** Harris's motion in limine (Doc. 968) insofar as it relates to Ms. Fyffe's statements.

### 3. Testimony from Keith Maye

Harris also asks the Court to exclude testimony from Keith Maye regarding two topics: (1) whether Harris was sent to kill Mr. Maye; and (2) whether Harris observed a court proceeding in a separate Short North Posse case in which Mr. Maye testified against members of that gang. (Doc. 968). The Government alleges that Mr. Maye is an associate of the Short North Posse who previously testified on behalf of the Government in a separate prosecution of members of that gang. Harris allegedly attended trial on the day that Mr. Maye testified, and Mr. Maye apparently believes it was possible that Harris was going to kill him on behalf of the Short North Posse in retaliation for testifying.

Harris contends that Mr. Maye's fear that Harris was going to kill him, or the fact that Harris observed trial on the day that Mr. Maye testified, are both irrelevant and unfairly prejudicial. The Government counters that it "does not intend to reference Mr. Maye's opinion that Mr. Harris was going to kill him during its voir dire or opening statement or to introduce evidence of Mr. Maye's belief during its case-in-chief" in Trial I. (Doc. 993). The Government argues, however, that evidence of Harris's trial attendance in another Short North Posse case on the day that Mr. Maye testified against the gang is both relevant to the charges in the Superseding Indictment and not unfairly prejudicial. (*Id.*).

Harris stands accused of being a member of the Short North Posse—an alleged racketeering enterprise whose purposes included promoting and enhancing the authority and reputation of the enterprise through intimidation and violence, protecting the enterprise and its members and associates from detection and prosecution, punishing those who did not comply with its codes and rules, and retaliating against those who committed acts against the enterprise. (*See* Doc. 300). The Superseding Indictment also alleges that to achieve these goals, members and associates of the Short North Posse used various means, including violence and intimidation, to protect the enterprise's ability to engage in criminal activity and to deter witnesses from providing information to law enforcement as part of a "no snitching" code. (*Id.*). Among the Short North Posse's predicate racketeering acts are tampering with a witness, victim, or informant, in violation of 18 U.S.C. § 1512, and retaliation against a witness, victim, or informant, in violation of 18 U.S.C. § 1513. (*Id.*). Thus, evidence that Harris attended a trial on the same day that an associate of the Short North Posse was set to testify against fellow gang members seems relevant to Count One from the Superseding Indictment, which charged Harris with RICO conspiracy. *See* Fed. R. Evid. 401.

18

Further, the risk of unfair prejudice does not substantially outweigh the probative value of Harris's trial attendance on the day that Mr. Maye testified against the Short North Posse in a separate case. *See* Fed. R. Evid. 403. Harris briefly suggests that "[a]llowing a witness, or any counsel, to refer to or comment upon the persons observing this trial would chill the rights of friends and family members to attend the trial and further deny Mr. Harris a fair trial." (Doc. 968). But Harris conflates the issue. The Government does not seek to elicit testimony regarding "the persons observing *this trial*." (*Id.* (emphasis added)). Rather, the Government seeks to elicit testimony regarding *Harris's* observation of a *separate* trial. (Doc. 993). The Court fails to see how *that* evidence unfairly prejudices Harris's defense. Accordingly, the Court **DENIES IN PART** Harris's motion in limine (Doc. 968) insofar as it relates to Keith Maye's testimony regarding Harris's attendance at a separate Short North Posse trial.[2]

*4. Statements from Marcus Peters Regarding his Membership in the Short North Posse and Other Criminal Activity*

Harris next moves to exclude certain statements from a now-deceased and unindicted co-conspirator, Marcus Peters. Specifically, Harris asks the Court to preclude the following testimony: (1) Rico Maye's testimony that Mr. Peters admitted to killing Alan Johnson, one of the murder victims in this case; (2) Terikia Patterson's testimony that Mr. Peters claimed to be a member of the Short North Posse; and (3) AJ Ford's testimony that Mr. Peters told him that he and Harris planned to participate in a robbery. (Doc. 968). Marcus Peters was killed on October 6, 2007, and the Superseding Indictment charges Harris and one of his co-defendants, Deounte Ussury, with the murder.

---

[2] The Court takes the Government at its word that it will not introduce evidence or make argument about Keith Maye's opinion that Harris intended to kill him but, rather, will restrict Mr. Maye's testimony to the facts surrounding Harris's trial attendance. Accordingly, Harris's motion in limine (Doc. 968) is **DENIED AS MOOT** insofar as it relates to Keith Maye's opinion regarding Harris's intent to murder him.

Harris contends that allowing this testimony would deprive him of his Sixth Amendment right to confront the witnesses against him and run afoul of the general bar on hearsay. The Government counters that the statements were not testimonial and thus, not barred by the Confrontation Clause. The Government further argues that the challenged testimony falls under hearsay exceptions for statements of a co-conspirator, *see* Fed. R. Evid. 801(d)(2)(E), and as statements against the declarant's penal interests, *see* Fed. R. Evid. 804(b)(3). (Doc. 993).

The challenged statements do not run afoul of the Confrontation Clause because those statements do not qualify as "testimonial" evidence. *See Giles*, 554 U.S. at 376 ("[O]nly *testimonial* statements are excluded by the Confrontation Clause."). In each conversation, Mr. Peters spoke in confidence to his friends or associates and admitted that he or one of his co-conspirators had engaged, or were planning to engage, in criminal activity. Considering "all of the relevant circumstances," the Court is hard-pressed to see how, in confessing to his role in a murder, his membership in a gang, or his plan to commit a robbery, Marcus Peters's "primary purpose" was to create an out-of-court substitute for damning trial testimony. *See Clark*, 135 S. Ct. at 2180 (quotation omitted). Statements made in confidence to friends, rather than to the police or other authorities, rarely, if ever, qualify as "testimonial" evidence. *Id.* at 2181 ("[S]uch statements are much less likely to be testimonial than statements to law enforcement officers."); *see also, e.g.*, *Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008) ("We find that [declarant's] 'statements to friends and neighbors about abuse and intimidation' allegedly inflicted by [defendant] are nontestimonial . . . and are not subject to the Confrontation Clause."); *Franklin*, 415 F.3d at 545 (holding that statements in question were not testimonial because witness "was privy to [declarant's] statements only as his friend and confidant" (collecting cases)).

Indeed, as the Ninth Circuit recently observed, "[t]he Supreme Court has *never* found a statement made outside of a law enforcement context to be testimonial." *Lara v. Allison*, 617 F. App'x 769, 770 (9th Cir. 2015) (per curiam) (emphasis added). Although the Court has declined to adopt a categorical rule that statements to individuals other than law-enforcement officers can *never* count as testimonial, the conversations at issue still fall on the non-testimonial side of the ledger. Where, as here, there was no interrogation or no known law-enforcement involvement of any kind when the conversation occurred, the "primary purpose" test necessarily focuses on "whether the declarant intended to bear testimony against the accused." *See, e.g., United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (brackets and quotation omitted) ("Our precedent makes clear that the intent of O'Reilly, the declarant, determines whether the statements on the tape-recording are testimonial."); *United States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2005) ("This court . . . has stated that the focus of the testimonial inquiry is on the declarant."). And, as explained, nothing indicates that Mr. Peters's primary purpose in confiding to his friends or associates about a murder that he helped commit, his gang membership, or his criminal plans was to bear testimony against Harris or to assist law enforcement in investigating or prosecuting the crimes. *See Johnson*, 581 F.3d at 325 (holding that statements made unwittingly to confidential informant were not testimonial); *Johnson*, 440 F.3d at 843 (holding that a declarant's statements to his "long-standing" and "close" friend were not testimonial). Therefore, Harris's Confrontation Clause argument fails.

Because the statements in question are not testimonial, but nevertheless hearsay, their admissibility turns on whether they qualify for an exception to the bar on hearsay under the Federal Rules of Evidence. *See Bryant*, 562 U.S. at 359; *United States v. Arnold*, 486 F.3d 177, 192 (6th Cir. 2007) (en banc).

The Government argues that Mr. Peters's statements qualify under the co-conspirator exception from Rule 801(d)(2)(E) and the exception for statements against a declarant's penal interests under Rule 804(b)(3). Because the Court already advised the parties that it will defer ruling on the admissibility of co-conspirator statements until trial (*see* Doc. 732), the Court will rule only on the Government's alternate argument under Rule 804(b)(3).

The Court agrees that Mr. Peters's statements to Mr. Maye, Ms. Patterson, and Mr. Ford fall under the hearsay exception from Rule 804(b)(3). The Government has demonstrated all three conditions for admissibility. *See Tocco*, 200 F.3d at 414. First, Mr. Peters is dead, and thus, he is unavailable to testify at trial. Second, the contents of his statements—including statements admitting his involvement in a murder, a criminal enterprise, and he and Harris's plan to commit a robbery—work against his penal interests, even if they inculpate other participants in the conspiracy. *Id.* Finally, the circumstances surrounding the statements corroborate their trustworthiness. For example, in each instance, Mr. Peters spoke to someone with whom he had a personal relationship, and not to law-enforcement officials. He had no reason to believe that his statements would later be shared with law enforcement. And when he was speaking to his friends and associates, Mr. Peters did not demonstrate self-interested motives such as seeking to shift blame, curry favor, or minimize his own role in any criminal activity. Thus, his conversations bear many typical hallmarks of trustworthiness. *See id.* at 416; *see also Franklin*, 415 F.3d at 548; *Johnson*, 581 F.3d at 327.[3] The reliability of Mr. Peters's admission that he killed Alan Johnson gains support from the reality that "individuals do not lightly admit to committing murder." *See Desai v. Booker*, 732 F.3d 628, 631 (6th Cir. 2013).

---

[3] Although some of the cases cited in this section refer to "particularized guarantees of trustworthiness" under the no-longer-applicable Confrontation-Clause standard from *Ohio v. Roberts*, 448 U.S. 56, 65 (1980), rather than the standard set forth in Rule 804(b)(3), "the two analyses are similar, and under either standard the circumstances in this case [are] sufficient to corroborate the reliability of [Peters's] statement[s]." *See Johnson*, 581 F.3d at 327.

In sum, the Mr. Peters's statements do not violate the Confrontation Clause and fall under a hearsay exception for statements against his penal interests, and thus, remain admissible at trial.  Accordingly, the Court **DENIES IN PART** Harris's motion in limine (Doc. 968) insofar as it relates to the challenged statements from Marcus Peters.

### 5.  Testimony from Carl Gibbs Regarding Gang Activity and Related Subjects

Finally, Harris asks that the Court exclude testimony from Carl Gibbs regarding the following topics: (1) criminal street activity that occurred in the 1990s; (2) gang activity in Columbus that took place while he lived in Kansas; and (3) statements made to him by Shawan Johnson regarding Michael Teague, one of the murder victims in this case.   (Doc. 968). The Government responded that it "does not intend to reference Mr. Gibbs' statements during its voir dire or opening statement or to introduce Mr. Gibbs' statements into evidence during its case-in-chief" in Trial I.  (Doc. 993).  The Court takes the Government at its word on this point. Accordingly, Harris's motion in limine (Doc. 968) is **DENIED AS MOOT** insofar as it relates to the challenged testimony from Carl Gibbs.

### C.  Deounte Ussury's Motions in Limine

### 1.  Statements from Marcus Peters to Law Enforcement Regarding a Gangland Shootout

In his first motion in limine, Ussury asks that the Court exclude "any statements made by Marcus Peters (deceased) during the course of a custodial investigation conducted by Detective Harrington of the Columbus Division of Police on November 20, 2016."   (Doc. 943). The Government responded that it "does not intend to introduce Mr. Peters' statements [to Detective Harrington] during its voir dire or opening statement or to introduce Mr. Peters' statements into evidence during its case-in-chief" in Trial I.  (Doc. 993).  Accordingly, Ussury's first motion in limine (Doc. 943) is **DENIED AS MOOT**.

### 2. *Statements from Marcus Peters to Latasha Barrett Regarding Ussury*

In his second motion in limine, Ussury asks that the Court exclude "any statements purportedly made by Marcus Peters (deceased) to Latasha Barrett regarding Mr. Ussury." (Doc. 948). During the investigation of Marcus Peters's murder, Columbus Police Detective Kathie Justice interviewed Latasha Barrett, a friend and former girlfriend of Mr. Peters. Ms. Barrett indicated that Mr. Peters "had been talking about hanging out with Deonte a lot." Ms. Barrett was able to provide a physical description of "Deonte" and, when shown a photo array, she identified "Deonte" as the Deounte Ussury standing trial this case.

Ussury contends that allowing Ms. Barrett's testimony would violate the Confrontation Clause and Federal Rule of Evidence 801. The Government counters that the statements in question were not testimonial and thus, not barred by the Confrontation Clause. The Government further argues that the challenged testimony falls under hearsay exceptions for statements of a co-conspirator, *see* Fed. R. Evid. 801(d)(2)(E), and as statements against the declarant's penal interests, *see* Fed. R. Evid. 804(b)(3). (Doc. 993).

The Confrontation Clause does not bar the statements to Ms. Barrett because they were not "testimonial." Mr. Peters made the statements by happenstance to a friend and former lover. As such, those statements are "*much less likely* to be testimonial than statements to law enforcement officers." *Clark*, 135 S. Ct. at 2181 (emphasis added). Nothing indicates that Mr. Peters's "primary purpose" was "to creat[e] an out-of-court substitute for trial testimony." *Id.* at 2180 (quotation omitted); *see also, e.g.*, *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (explaining that "comments . . . made to loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"). As such, the Confrontation Clause plays no role.

24

Moreover, the Court agrees that Mr. Peters's statements fall under the hearsay exception for statements against the declarant's penal interests. *See* Fed. R. Evid. 804(b)(3). Mr. Peters is dead and, therefore, unavailable to testify. Ussury does not contest that the statements in question—including Ms. Barrett's comment that "all Marcus would talk about would be the Short North area" and that he "had been talking about hanging out with Deonte a lot"—although "on their face neutral," were truly adverse to his penal interests. *See Williamson v. United States*, 512 U.S. 594, 603 (1994) (explaining, by way of example, that the statement "Sam and I went to Joe's house" might go against declarant's penal interest "if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy"). (*See* Doc. 948).[4] And, as described in Section III.B.4, *supra*, the circumstances surrounding the statements corroborate their trustworthiness. Mr. Peters was speaking to a friend and former lover, not to law-enforcement officials; he had no reason to believe that Ms. Barrett would share his statements to law enforcement; and when he was speaking to her, he did not demonstrate self-interested motives suck as seeking to shift blame, curry favor, or minimize his own role in any criminal activity. Thus, his statements bear many typical hallmarks of trustworthiness. *See Tocco*, 200 F.3d at 416 (agreeing that "statements made to a perceived ally rather than to police officers during an interrogation are trustworthy" (quotation omitted)); *see also Franklin*, 415 F.3d at 548; *Johnson*, 581 F.3d at 327.

---

[4] Context matters when assessing a statement to determine whether it goes against the declarant's penal interests, and here, Mr. Peters repeatedly warned Ms. Barrett that "she had better get her t-shirt with his name on it," in an apparent reference to him being killed for his involvement with the Short North Posse and for her to wear the t-shirt to his funeral. (*See* Columbus Police Dep't Investigative Summ., Rep. No. 07090577, Summ. No. 22). Mr. Peters apparently "knew that his time was coming to an end because he was telling everyone to get their t-shirts ready." Put simply, his statements regarding the Short North Posse's territory and his involvement with Ussury, although neutral on their face, "linked himself to others in the [Short North Posse] conspiracy and were therefore against his own penal interest." *See Tocco*, 200 F.3d at 416.

Accordingly, the Court **DENIES** Ussury's second motion in limine (Doc. 948) regarding the statements made by Marcus Peters to Latasha Barrett. Because the Court finds those statements admissible under Rule 804(b)(3), the Court need not reach the Government's alternative argument that the statements are admissible under the co-conspirator exception.

### D. The Government's Motion in Limine

#### 1. Impeachment Evidence from Criminal Convictions

The Government first moves the Court to "remind the defendants to carefully adhere to the requirements of Rule 609," apparently out of concern that "the issue of impeachment of a witness with evidence of a prior conviction likely will arise many times" during Trial I. (Doc. 1007). The Court sees no need to "remind" any counsel in this case how the Federal Rules of Evidence operate. Counsel for *all* parties are highly capable attorneys, well-versed in both the Federal Rules of Criminal Procedure and Evidence and the Local Rules for the Southern District of Ohio. Indeed, defense counsel were hand selected by the Court due to their skills and acumen as trial lawyers and their reputation within the federal defense bar. Accordingly, the Government's motion in limine (Doc. 1007) is **DENIED IN PART** to the extent it asks the Court to issue a reminder of how Federal Rule of Evidence 609 operates.

#### 2. Evidence from Polygraph Examinations

The Government next moves the Court to preclude the defendants "from presenting any evidence or argument concerning the taking of, or results from, . . . polygraph tests." (Doc. 1007). The Government intends to call several witnesses who took polygraph examinations in connection with the investigations of some of the crimes at issue in this case and, due to the questionable reliability of polygraph results, seeks to exclude evidence or argument regarding those tests or results at trial. (*Id.*).

Our criminal justice system is based on the notion "that the *jury* is the lie detector." *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (quotation omitted).  By their very nature, polygraph examination results "may diminish the jury's role in making credibility determinations" due to "the aura of infallibility attending polygraph evidence."  *Id.*; *see also King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999) (finding no error in trial court's refusal to allow polygraph results).  Moreover, "[e]xcluding polygraph results is a legitimate purpose given [their] questionable reliability."  *Hudson v. Curtin*, 371 F. App'x 607, 611 (6th Cir. 2010). Accordingly, "the results of polygraph examinations [generally] are inadmissible into evidence." *United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994) (quotation omitted); *see also United States v. Thomas*, 167 F.3d 299, 308 (6th Cir. 1999) (noting that Sixth Circuit "generally disfavor[s] admitting the results of polygraph examinations").  District courts thus properly exercise their discretion under Rule 403 by excluding evidence of polygraph examinations or their results "in the absence of a prior agreement between the parties that [such evidence] would be admissible."  *United States v. Sherlin*, 67 F.3d 1209, 1217 (6th Cir. 1995) (finding that district court did not abuse its discretion in refusing to admit polygraph evidence under Rule 403).

Here, the parties have not reached any agreement regarding the admissibility of polygraph evidence.  And the Court maintains serious reservations over both the reliability of polygraph examinations and their capacity to usurp the role of the jury in assessing witness credibility.  *Scheffer*, 523 U.S. at 309-13.  Accordingly, and consistent with Federal Rules of Evidence 403 and 707, the Court **GRANTS** the Government's motion in limine (Doc. 1007) to the extent that it seeks to exclude evidence or argument concerning the taking of, or results from, any polygraph examinations.

*3. Evidence Regarding Possible Punishment*

Finally, the Government moves to preclude the defendants "from presenting any evidence or argument regarding the criminal penalties they are facing."  (Doc. 1007).  The Government contends that sentencing lies in the hands of the judge, not the jury, and that allowing the jury to consider the defendants' possible punishment in determining guilt or innocence runs afoul of Sixth Circuit Pattern Jury Instruction 8.05(2).  Indeed, this is a correct statement of the law of this Circuit.  *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) (affirming trial court's decision to grant government's motion in limine concerning potential penalties that applied to defendant).  Thus, the Court **GRANTS** the Government's motion in limine (Doc. 1007) regarding mention of possible punishment.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS** Robert Ledbetter's first motion in limine (Doc. 946), **DENIES** Ledbetter's second motion in limine (Doc. 947), **GRANTS** Ledbetter's third motion in limine (Doc. 1009), **GRANTS IN PART** and **DENIES IN PART** Christopher Harris's combined motion in limine (Doc. 968), **DENIES AS MOOT** Deounte Ussury's first motion in limine (Doc. 943), **DENIES** Ussury's second motion in limine (Doc. 948), and **GRANTS IN PART and DENIES IN PART** the Government's combined motion in limine (Doc. 1007).

**IT IS SO ORDERED.**


**    s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 31, 2016**