```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
   PLAINTIFF,                    )      CASE NO. 2:14-CR-127
                                 )
         vs.                     )      MAY 12, 2016
                                 )
ROBERT B. LEDBETTER, ET AL.,     )      9:00 A.M.
                                 )
   DEFENDANTS.                   )      VOLUME 20
_____ )
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                              - - -


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
APPEARANCES CONTINUED:



FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
     KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215



FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


                         -  -  -
```

TRIAL ONE – VOL. 20 –  3769

1                    THURSDAY MORNING SESSION

2                    MAY 12, 2016

3                         – – –

4          (Jury in at 9:18 a.m.)

5          THE COURT:  Good morning, ladies and gentlemen.

6    Welcome back.

7          I got your message about a little longer morning, and

8    that's fine.  We will now alter our schedule and go 9:00 to

9    12:30 before breaking for lunch and proceed more efficiently

10   that way.  So thank you for that suggestion and recommendation.

11         Mr. Kelley, are you ready to proceed with the

12   government's next witness?

13         MR. KELLEY:  We are, Your Honor.  We would call

14   Latiesa McNeil.

15             THE COURT:  All right.

16             THE CLERK:  Ma'am, come forward and be sworn, please.

17       (Witness sworn.)

18             THE COURT:  Please proceed, Mr. Kelley.

19             MR. KELLEY:  Thank you, Your Honor.

20

21

22

23

24

25

TRIAL ONE – VOL. 20 – 3770

1                              – – –

2                         LATIESA MCNEIL

3    Called as a witness on behalf of the Plaintiff,

4    being first duly sworn, testified as follows:

5                      DIRECT EXAMINATION

6      BY MR. KELLEY:

7    Q.   Will you please state your name and spell your first and

8    last name?

9    A.   Latiesa, L-A-T-I-E-S-A, McNeil, M-C-N-E-I-L.

10   Q.   Ms. McNeil, what kind of work do you currently do?

11   A.   I work at FedEx.

12   Q.   And going back to October of 2007, where were you living

13   and working generally?

14   A.   I was living out east on Penfield.  I was working at

15   McDonald's and Wendy's.

16   Q.   Did you know someone by the name of Desean Jones?

17   A.   Yes.  That's my son's godfather.

18   Q.   And how long had you known Mr. Jones?

19   A.   For about 15, 20 years.

20   Q.   Okay.  Drawing your attention to a specific night,

21   October 6, 2007, in the early morning hours did something

22   unusual happen when you were with Mr. Jones?

23   A.   Yes.

24   Q.   Can you tell us how that night began?

25   A.   He came and picked me up because, you know, we knowing

TRIAL ONE - VOL. 20 -   3771

1   each other.  He came and picked me up to, you know, just chill

2   and watch movies and stuff.  So when we got to his uncle's

3   house where we usually chill at, it was just something about

4   this car that was there, and just I had this funny feeling,

5   like, what's up with this car.

6        So then when we got to go into the house --

7   Q.   Let me stop you.  Let me slow you down.

8        Couple things.  Had you been to this place before?

9   A.   Yes.

10  Q.   Do you remember the complex?  Can you describe it for

11  us?

12  A.   It's, like, a gated complex.  Like, you have to use a

13  key pad to get in.

14  Q.   Uh-huh.

15  A.   Like, a key word, like, they have a pad you have to type

16  in and it opens up the gate and it let's you in, and then you

17  go around a little curve to the apartments.

18  Q.   And you mentioned his uncle.  That was his place?

19  A.   Yes.

20  Q.   You knew about that how?

21  A.   Because I been around.  I been around the family for,

22  like, 15, 20 years.

23  Q.   And then this car drew your attention.  What about it

24  drew your attention?

25  A.   It was just some -- I don't know.  It just was weird.

TRIAL ONE - VOL. 20 -  3772

1    It was -- like, it was dark, it was running, it was tinted, but

2    I didn't see nobody inside.  I didn't hear music or anything.

3    It was just a funny feeling just came over me.

4        Q.   Okay.  What happens when you go up to the door?

5        A.   When we get up to the door, Shawn goes to try to unlock

6    the door to get in, and somebody pushed the door back.

7        Q.   You could see that happen?

8        A.   Yeah.  And I'm, like, what the heck?  He was, like,

9    somebody's in there.  So then he's, like, wait a minute, wait a

10   minute.  Maybe I'm tripping.  Maybe I'm tripping.

11           So then he get the key and went to put it in, and it

12   pushed the door back again.  So then after that he was like,

13   hold on, hold on, something ain't right.

14           And then by then somebody was trying to snatch the door

15   open and he's pulling it with all his might, and then shots

16   just started ringing and I just ran.

17       Q.   Do you remember what direction you ran?

18       A.   Okay.  Like, the apartment complex, his house is right

19   here (indicating).  You run, it's a pond right here

20   (indicating).  I went this way (indicating), and I end up

21   inside another pond, some woods and another set of apartments.

22   I end up over there on Stelzer Road.

23       Q.   What did you do after that?

24       A.   I had called the police and the police had brought me

25   back to the scene.

TRIAL ONE – VOL. 20 – 3773

1    Q.   Did you hear any more shots --

2    A.   As I was running, I did.  I heard about maybe five or

3    six.

4    Q.   Okay.  Did you tell the police what had happened?

5    A.   Yes.

6    Q.   Do you remember some of the specifics regarding the car?

7    Can you describe the car for us?

8    A.   The car, I just remember the license plate said RIP SNP.

9    Q.   Okay.

10    A.   It was a gold car.  I couldn't see inside of it.

11    Q.   Did you share the information with the officers that

12    night?

13    A.   Yes.

14    Q.   For some reason that license plate stuck out for you?

15    A.   Yes.

16    Q.   And if I tell you that the officer's report has just a

17    little bit of difference in the license plate, is there

18    something that might help you remember the specific details as

19    to that license plate?

20    A.   No.  I just know it was, like, a gold car.  I don't know

21    what make and model.  I just know it said RIP SNP.  That's --

22    Q.   Okay.

23    A.   I couldn't see if nobody was in the car because, like I

24    said, the windows were dark tint.

25    Q.   Did you try to look inside the car?

TRIAL ONE – VOL. 20 – 3774

1     A.   I just glanced, like (indicating).  But, you know, you

2   just get that funny feeling.  You just turn around like

3   (indicating).  And then I just turned around and he's, like,

4   just don't worry about it, just come on.  So we went on up to

5   the door.

6          MR. KELLEY:  Okay.  If I may have a moment,

7   Your Honor?

8          THE COURT:  Yes.

9          MR. KELLEY:  I have no further questions, Your Honor.

10  Thank you.

11         THE COURT:  Mr. Durden, any questions?  Any cross?

12         MR. DURDEN:  No, thank you.

13         THE COURT:  Mr. Gatterdam, any cross?

14         MR. GATTERDAM:  Yes.  Thank you.

15                         -  -  -

16                    CROSS-EXAMINATION

17    BY MR. GATTERDAM:

18   Q.   Good morning, Ms. McNeil.

19   A.   Good morning.

20   Q.   Do you have any reason to doubt if the photographs of

21  that vehicle show the license to be RIP SNS?  Do you have any

22  reason to doubt that that's what the license was?

23   A.   It might.  It just did look like it said RIP SNP.  I

24  might have glanced, too.  I knew it was RIP SN.  I thought it

25  was P, it could have been S.

TRIAL ONE - VOL. 20 -  3775

1    Q.    Whatever you told the officers that night is what it

2    was, correct?

3    A.    Yes.

4    Q.    And if photographs show it as SNS, you have no reason to

5    doubt the photographs, do you?

6    A.    Right.

7    Q.    Okay.  Now, when you met with Mr. Jones that night, you

8    ended up driving the vehicle that he had?

9    A.    Yes.

10   Q.    Okay.  Did he drive it over to your place?

11   A.    No.  He was with a friend, another friend.  I don't know

12   his name.

13   Q.    Okay.

14   A.    And we dropped his friend off, and then I drove from

15   there.

16   Q.    And you had been over -- this was his uncle's place?

17   A.    Yes.

18   Q.    And you had been over there before?

19   A.    Yes.

20   Q.    Okay.  And when you got there, you were just testifying

21   to seeing this vehicle and there was something about it.

22         What time of night was it?

23   A.    I'm not -- I can't remember what time it was.

24   Q.    Okay.

25   A.    Oh, I don't know.  I can't remember.  I just know it was

1  pretty late.

2  Q.   Like, early morning hours maybe?

3  A.   Like, it wasn't even quite 1 o'clock at the time, I

4  don't think.

5  Q.   Okay.  And you mentioned calling the police.  And you

6  gave a statement to the police that night, correct?

7  A.   Yes.

8  Q.   In fact, they recorded it, correct?

9  A.   Yes.

10  Q.   Okay.  And this may be the way they just wrote it down

11  so you tell me if this is what really happened or not.

12        She then -- she being you -- she then stated that she

13  observed what she believed to be a gray-colored vehicle back

14  into that parking spot and that vehicle was running.

15  A.   Uh-huh.

16  Q.   Okay.  So did you actually see the vehicle back into the

17  parking spot?

18  A.   Because I was going -- I was driving.  I was getting

19  ready to park right beside it, and then it moved.  And then I

20  just backed into a different spot, and then it just went to the

21  spot right here in front of the apartments.

22  Q.   Okay.

23  A.   And they sat there and it was just running.  I don't --

24  I didn't get to see who was in it or anything.

25  Q.   Right.

TRIAL ONE – VOL. 20 –  3777

1    A.    It was just there.

2    Q.    I'm sorry.  I didn't mean to interrupt you.

3    A.    It was just some, like, weird feeling.

4    Q.    Okay.  And there was at least another car in that

5   parking lot, correct?

6    A.    Yes.  It was other cars, but it was just that one that

7   just stuck out.

8    Q.    Right.  Because when you spoke to the police on the

9   tape, it indicates, correct me if I'm wrong, you said it

10  sounded like one was running, but I couldn't see which of the

11  two it was.

12   A.    Yeah.

13   Q.    Okay.  Now, do you know an individual or did you know an

14  individual by the name of Marcus Peters?

15   A.    No, sir.

16   Q.    Did you know whether he had any friends that lived in

17  that complex?

18   A.    Not that I know of.

19   Q.    Okay.  And when this door got -- when Desean was trying

20  to get into the apartment, did you indicate that you weren't

21  really paying much attention because you didn't know anything

22  was up?

23   A.    Yeah.  At first I wasn't -- until he was like

24  something -- because I had to pee so I'm thinking, like, come

25  on.  He was, like, I don't know if somebody's in here.  I'm,

1    like, hurry up and get the door open.  I got to pee.  And

2    that's when he was, like, I don't know if somebody's in there,

3    and that's when I was, like, what?  And then by then I'm

4    like -- and I just seen the door just went -- he opened it,

5    like, you know, you go and open the door, and it's like

6    somebody just slammed it back.  I'm, like, what the heck?  I

7    mean, you know that I didn't say what the heck, you know, a

8    cuss word came out, but I'm in court.

9         And after that they was trying -- whoever was in there,

10   they was trying to pull it.  Because the way the door is made

11   up, you have to take your key and you have to push to get in.

12   Q.   Right.

13   A.   So by this time when I realized whoever was in there,

14   they're trying to pull the door open and he's holding it with

15   both his hands with all his might, and then that's when they

16   started shooting.

17        After that I just ran and everything in my hands just

18   dropped, keys, everything.

19   Q.   Okay.  And that's another question.  So whatever you had

20   with you -- obviously you kept your phone --

21   A.   Yes.

22   Q.   -- because you were able to call the police.

23   A.   Yeah.

24   Q.   And you and Desean went in separate directions, right?

25   A.   Uh-huh.  We, like, ran, and it was just like --

TRIAL ONE - VOL. 20 - 3779

1    Q.   Okay.  He went around one side of the pond and you

2    went -- did you go out towards the front or did you --

3    A.   I don't know if you could say it's the front or the

4    like -- I don't know.  I just ran.  It's a pond here

5    (indicating), and then you go this way and it's dumpsters and,

6    like, the little other streeted apartment complex, and then

7    it's another set of apartments, and that's the way I just ran.

8    And I ended up being in another pond, and then this was some

9    little tiny woods right here (indicating), and it was another

10   set of apartments, and I ran through them.  And I end up

11   getting on Stelzer Road, and that's where the police had picked

12   me up at because they almost hit me in the middle of the road

13   and asked me if I had something to do with the -- was I the one

14   that called, and they took me back around to the scene.

15   Q.   And you still had to go to the bathroom, didn't you?

16   A.   Yeah.  I really had to go then.

17   Q.   The couple of seconds you were at the door and you -- it

18   was pushed open slightly, could you see anything in there?  Was

19   it dark inside the apartment?

20   A.   Yes, it was dark so you couldn't see -- you couldn't see

21   anything.  Like, the door was open very little.  It was like a

22   little crack, and they just slammed it.

23   Q.   Okay.  And the police have never come to you and asked

24   you to try and pick out or identify anybody that was inside the

25   apartment, correct?

TRIAL ONE – VOL. 20 –  3780

1    A.    No, sir.

2    Q.    You couldn't identify anybody, correct?

3    A.    I couldn't because --

4    Q.    All right.

5    A.    -- I never got in there.  They actually had told me the

6    person that I guess was in there dead, they actually told me it

7    was Desean.

8    Q.    Oh, okay.  And you knew that wasn't the case because you

9    saw him run?

10   A.    Then I'm, like, wait a minute, no, no.  Are you sure?  I

11   found out later that it wasn't.

12         MR. GATTERDAM:  Can I have a moment, Your Honor?

13         THE COURT:  Yes, you may.

14         MR. GATTERDAM:  Nothing further, Your Honor.

15         THE COURT:  Thank you, Mr. Gatterdam.

16      Ms. Dixon?

17         MS. DIXON:  No questions, Your Honor.

18         THE COURT:  Mr. McVay?

19         MR. MCVAY:  Yes, Your Honor.

20                        - - -

21                  CROSS-EXAMINATION

22     BY MR. MCVAY:

23   Q.    Good morning, Ms. McNeil.

24   A.    Good morning.

25   Q.    My name is Kirk McVay.  How are you doing?

TRIAL ONE – VOL. 20 –  3781

1    A.    I'm all right.

2    Q.    Now, you testified when questioned by Mr. Kelley that

3  you had known Desean Jones for a number of years, right, nine

4  or ten years?

5    A.    Longer than that.

6    Q.    Longer than that?

7    A.    Uh-huh.  For about 15, 20.

8    Q.    He's your son's godfather?

9    A.    Uh-huh.  Yes, I'm sorry.

10    Q.    I'm sorry?

11    A.    I meant to say yes instead of uh-huh.

12    Q.    You're doing fine.

13          How old is your son?

14    A.    He's 20.  He'll be 20 in October.  He's 19.  He'll be 20

15  October 9.

16    Q.    So at that time he would have been nine or ten --

17    A.    He was --

18    Q.    -- in 2007?

19    A.    Yeah.

20    Q.    Okay.

21    A.    He was in elementary school.

22    Q.    I presume that with Desean being your son's godfather,

23  that's because he's an upright man of moral character?

24    A.    Yeah.

25    Q.    And a nice guy all around, right?

TRIAL ONE – VOL. 20 –   3782

1    A.   (Witness nods head.)

2    Q.   Okay.

3         THE COURT:  You have to answer verbally.

4         THE WITNESS:  I'm sorry.  Yes.

5         MR. MCVAY:  All right.  I just want to show you a few

6    pictures just to maybe give a little bit of background for the

7    jury to understand what it is you said.

8         If we could look at Series 46-2#-11.

9         Your Honor, I believe these have all been admitted into

10   evidence, if we could publish them to the jury.

11        THE COURT:  For whatever reason mine is not appearing,

12   but I can see it.  That has been admitted, and you may publish

13   it.

14        MR. MCVAY:  Thank you.

15     BY MR. MCVAY:

16   Q.   Okay.  Ms. McNeil, is that the vehicle that was Desean

17   Jones?

18   A.   Yes.

19   Q.   And you had driven it to that parking spot --

20   A.   Yes.

21   Q.   -- on that evening, right?

22   A.   Yes.

23   Q.   And you had parked it where it is parked --

24   A.   Yes.

25   Q.   -- right?

TRIAL ONE – VOL. 20 – 3783

1          And I think you described that when you pulled in, there

2    were two other cars that were parked there?

3    A.    Yes.

4    Q.    One being the one that you said had the license plate

5    which I think we've clarified is RIP SNS?

6    A.    Yes.

7    Q.    And you said that was backed in?

8    A.    Yes.

9    Q.    And there was a second car there as well, and it was

10   backed in; correct?

11   A.    Yes.

12   Q.    And I believe you testified when Mr. Gatterdam asked you

13   that one of the cars is running, you weren't exactly certain

14   which one it was.

15   A.    Yes.

16   Q.    But, nevertheless, you thought that was a little strange

17   at that time of night?

18   A.    Yeah.  Yes.

19        MR. MCVAY:  Okay.  And if we could look at the same

20   series number 16.

21        And, again, I assume these will all be published?

22        THE COURT:  Yes.

23        MR. MCVAY:  Okay.  Thank you.

24    BY MR. MCVAY:

25   Q.    Is that the walkway and the breezeway to get to

TRIAL ONE – VOL. 20 – 3784

1    DeShawn's uncle's apartment?

2    A.    Yes.

3    Q.    Okay.  And, as you recollect, would that apartment be

4    just beyond that staircase --

5    A.    Yes.  The apartment --

6    Q.    -- to the right-hand side?

7    A.    Yes, sir.

8            MR. MCVAY:  And then if we could go to number 20, same

9    series.

10           So, for the record, 46-2#-20.

11      BY MR. MCVAY:

12    Q.    And is that the door to DeShawn's uncle's apartment?

13    A.    Yes.

14    Q.    And is it fair to say in light of the fact that you

15    wanted to get in in a hurry, that you were standing very close

16    to Desean as he tried to open the door, correct?

17    A.    Yes.

18    Q.    Okay.  And is it fair to say that you were positioned

19    probably just to the right of that door?

20    A.    Yes.

21    Q.    Okay.  As you see it on the screen there?

22    A.    Yes.

23    Q.    So maybe somewhere just below where that light appears?

24    A.    Yes, sir.

25    Q.    Okay.  And from that position, again, you're anxious to

TRIAL ONE - VOL. 20 - 3785

1   get inside, correct?

2   A.   Yes.

3   Q.   And you're watching him --

4   A.   Yes, sir.

5   Q.   -- as he's inserting the key and turning the doorknob?

6   A.   Yes, sir.

7   Q.   As he shoves the door open, you notice that it's pitch

8   dark or pitch black inside, correct?

9   A.   Yes, sir.

10  Q.   Okay.  Thank you.

11       And you said at that point you heard two shots?

12  A.   Yes.

13  Q.   Okay.  And then in your statement to the police on that

14  night, you indicated that as you were running, you heard two

15  shots.

16  A.   Yes, sir.

17  Q.   Okay.  For a total of four?

18  A.   About four or five.  I mean, I don't know if it was the

19  same person or -- when I heard shots, I was on the phone with

20  police when they was hearing the shots also.

21  Q.   You indicated that you did not hear any glass breaking,

22  correct?

23  A.   No, sir.

24  Q.   When I say correct, it's correct that you did not hear

25  glass?

TRIAL ONE - VOL. 20 -  3786

1    A.    Yeah.  No, sir, I didn't hear it.

2         MR. MCVAY:  All right.  Thank you.

3         And then, lastly, if we could see 46-2#-18.

4      BY MR. MCVAY:

5    Q.    Okay.  Is that a continuation of that breezeway past

6    that staircase that we saw on the left?

7    A.    Yes.  That's the pond.

8    Q.    And that's the pond?

9    A.    Yes.

10   Q.    All right.  So when you heard the gunshots and you took

11   off running, you ran towards that pond and then to the left?

12   A.    And to the left, yes, sir.

13   Q.    As we look at that picture?

14   A.    Yes.

15   Q.    And you see the cone there that as a number 3?

16   A.    Yes, sir.

17   Q.    Is that -- well, do you recall what happened to

18   DeShawn's keys?

19   A.    Yeah.  I dropped them when I got there, and I just -- I

20   had my phone in my pocket, and I just dropped the keys.  I

21   don't even know exactly where they went, but that's probably

22   where they went because they found the keys, the cops did.

23   Q.    Okay.  But you ran to the left?

24   A.    Yes, sir.

25   Q.    And DeShawn's uncle's apartment would have been to the

TRIAL ONE – VOL. 20 – 3787

1    right, correct?

2    A.    Yeah.  Like, you go out his apartment is on this side; I

3    just went up and (indicating).

4    Q.    So, in effect, you ran the opposite direction from the

5    apartment?

6    A.    Yes.

7    Q.    And you don't know which direction Desean ran at that

8    point, do you?

9    A.    No, sir.

10   Q.    Okay.  At that time you were living, you said, where?

11   A.    I was staying out east.

12   Q.    You were staying out east?

13   A.    Yes, sir.

14   Q.    And Desean had friends that were up in the area, and

15   perhaps you had friends as well who were up in the area of

16   Morse and Karl?

17   A.    Yes, sir.

18   Q.    And Karl and Shanley?

19   A.    Yes, sir.

20   Q.    Which, for those who are familiar with Columbus, would

21   be the old Northland shopping center area?

22   A.    Yes, sir.  I have family up there and friends, and he

23   does too.

24   Q.    Okay.  And would you describe that for those who -- the

25   members of the jury who aren't from Columbus, that would be the

TRIAL ONE – VOL. 20 – 3788

1   northeast side of town?

2    A.   Yes, northeast.

3    Q.   And is it fair to say it's not in the Short North part

4   of town?

5    A.   No.  No, sir.

6    Q.   As a matter of fact, it's --

7    A.   I mean, it's 20 minutes away from the Short North.

8    Q.   Okay.  Several miles from the Short North?

9    A.   Yes.

10       MR. MCVAY:  All right.  Thank you, ma'am.

11       I have no further questions, Your Honor.

12       THE WITNESS:  You're welcome.

13       THE COURT:  Thank you.

14      Mr. Nolder, any cross?

15       MR. NOLDER:  No, sir.

16       THE COURT:  Mr. Kelley, any redirect?

17       MR. KELLEY:  Just one, Your Honor.

18       THE COURT:  All right.

19                      - - -

20                  REDIRECT EXAMINATION

21    BY MR. KELLEY:

22    Q.   I just want to make sure I'm sure on this.

23       The car that had the license plate RIP SNS, was that car

24   still there when you came back to the apartment?

25    A.   No, sir.

TRIAL ONE – VOL. 20 –  3789

1           MR. KELLEY:  Okay.

2        Thank you, Your Honor.

3                         – – –

4                   RECROSS-EXAMINATION

5     BY MR. GATTERDAM:

6    Q.   It's going to sound obvious, but you have no idea when

7  that car left, correct?

8    A.   No, sir.

9           MR. GATTERDAM:  Thank you.

10          THE COURT:  Mr. McVay, anything?

11          MR. MCVAY:  No, Your Honor.  Thank you.

12          THE COURT:  Mr. Kelley, I'm assuming that you have

13  nothing further?

14          MR. KELLEY:  Correct, Your Honor.

15          THE COURT:  Ms. McNeil, thank you very much, ma'am.

16  You may be excused.

17          THE WITNESS:  Okay.

18          MR. DEVILLERS:  Your Honor, the government calls

19  Donald Paden to the stand.

20        May we approach, Your Honor?

21          THE COURT:  Yes.

22                         – – –

23     Thereupon, the following proceeding was held at sidebar out

24  of hearing of open court:

25          MR. DEVILLERS:  I intend to show some photographs.

TRIAL ONE - VOL. 20 -  3790

1    What I intend is show is two photographs, this photograph of

2    the -- this is the Stephen Austin homicide where the victim was

3    located on the porch.  It is 135-28#-015 and 135-2#-060, which

4    shows the victim's face.

5              THE COURT:  This one?

6              MR. DEVILLERS:  Yes, Your Honor.

7              MR. DURDEN:  Which one?

8              MR. DEVILLERS:  (Indicating).

9              MR. NOLDER:  This is Steve Austin?

10             MR. DEVILLERS:  Those are the only two photographs I

11   intend is show this witness.

12             MR. DURKIN:  On behalf of Mr. Harris, we would object

13   to the second photograph being shown as unnecessarily

14   inflammatory.  The first one shows the body, but it's covered.

15   I don't think the fact that he's dead is in dispute.

16             MR. DURDEN:  Your Honor, I'll join in just for the

17   record.

18             MS. DIXON:  I'll join in for the record as well.

19             MR. NOLDER:  I will as well.

20             MR. MCVAY:  Might as well make it unanimous.

21             THE COURT:  Well, I'm going to overrule the objection

22   because the second photograph is the only one that shows the

23   actual body.  I mean, it's not the most graphic of all of the

24   pictures of the decedent.  The first photograph doesn't show

25   the decedent, and so the fact that it's not in dispute that

TRIAL ONE - VOL. 20 - 3791

1    he's dead is a null moment due to the fact that he is dead and

2    the prosecution has the right to show the body.  There are four

3    photographs.  Mr. DeVillers is only requesting to show one.

4    His request is granted.

5         (The following proceedings were had in open court.)

6              THE COURT:  Ladies and gentlemen, when your -- when

7    the exhibits were just displayed with Ms. McNeil as a witness,

8    did everyone's monitor work adequately?  It may be just two of

9    them.

10             Go ahead.  Please proceed, Mr. DeVillers.

11                            - - -

12                        DONALD PADEN

13     Called as a witness on behalf of the Plaintiff,

14     being first duly sworn, testified as follows:

15                      DIRECT EXAMINATION

16       BY MR. DEVILLERS:

17     Q.   Good morning, Officer.

18     A.   Good morning.

19     Q.   Can you please state your full name and spell your last

20   name?

21     A.   Yeah, Donald W. Paden, P-A-D-E-N.

22     Q.   What do you do for a living?

23     A.   I'm a Columbus police officer.

24     Q.   How long have you worked with the Columbus police

25   department?

TRIAL ONE - VOL. 20 - 3792

1    A.    21 years.

2    Q.    What do you do now with the Columbus police department?

3    A.    I'm assigned to the freeway patrol, third shift.

4    Q.    Back in 2013 were you with the freeway patrol?

5    A.    Yes, sir.

6    Q.    What's freeway patrol?

7    A.    Freeway patrol, generally we just handle the

8    interstates, the freeways through Columbus.  I'm kind of a

9    different freeway patrol.  I tend to go off the freeway and go

10   to the precincts that -- I've worked the precincts, the inner

11   city precincts for years and, I don't know, I just go there to

12   help them out, my officers.

13   Q.    So you don't write as many tickets to me as the rest of

14   them?

15   A.    A few.

16   Q.    All right.  I want to take you back to July 4 of 2013.

17   A.    Yes.

18   Q.    Do you recall being dispatched to a scene of a homicide?

19   A.    Yes, sir.

20   Q.    Do you remember where you were at the time that the call

21   came through?

22   A.    Well, it was actually Red, White and Boom night so we

23   were downtown handling the traffic and so forth.  It was right

24   around -- right around shift change and I just happened to be,

25   you know, in the right place.  And I immediately responded and

TRIAL ONE – VOL. 20 –  3793

1    was the first one to respond to the scene.

2        Q.   About what time is shift change?

3        A.   Well, shift change is right around 11:00 p.m. so it was

4    around that time.  You know, by the time they have roll call,

5    get loaded up and everything else, usually it's at least a half

6    hour before they're out and about.

7        Q.   Do you recall where you got dispatched to?

8        A.   It was over on 6 precinct.  It's now 7 precinct, but I

9    don't know the exact address.

10       Q.   Would something refresh your recollection as to what

11   address you were at?

12       A.   Yes, sir.

13           MR. DEVILLERS:  May I approach the witness,

14   Your Honor?

15           THE COURT:  Yes, you may.

16     BY MR. DEVILLERS:

17       Q.   I'm going to hand you a typed report of what you gave to

18   detectives.

19       A.   Yes, sir.

20       Q.   And does that refresh your recollection about where you

21   were dispatched to?

22       A.   Yes, sir.

23       Q.   Where was that?

24       A.   608 East Fourth Avenue.

25           MR. DURDEN:  Your Honor, sidebar, please?

TRIAL ONE – VOL. 20 – 3794

1                              – – –

2        Thereupon, the following proceeding was held at sidebar out

3    of hearing of open court:

4            MR. DURDEN:  That's not a clean copy.  It has notes on

5    here.  I wanted to make sure.  I don't know what all these

6    were.

7            MR. DEVILLERS:  I just showed them to you.

8            MR. DURDEN:  Well, we didn't see them.

9            MR. DEVILLERS:  Why didn't you tell me that before I

10   handed it to the witness?

11        I'm sorry, Judge.

12        THE COURT:  There is a reason that I have people only

13   talk to me because Mr. Durden isn't going to make the decision

14   and nor are you so that's a waste of words.

15           MR. DURDEN:  I saw writing on the docket when it was

16   up here earlier.  I didn't know how much writing it was.  And

17   when he showed it to the witness, I didn't know what that was.

18           THE COURT:  My preference for everybody is always

19   to -- if you're going to hand the witness a document, hand the

20   witness the same document that you've given other counsel,

21   whether it's the defense giving it to the prosecutor or vice

22   versa.  But I want clean copies to the extent possible.

23        Now, if this is the condition of the document when it

24   was produced through discovery, that's fine; otherwise, I would

25   prefer a clean copy without the marginalia.

TRIAL ONE - VOL. 20 - 3795

1      Nobody is suggesting that you, Mr. DeVillers, or any of

2  the other lawyers in this case would give a witness a document

3  that has hints or, you know, instructions as to how to answer

4  the questions.  But, you know, the well-established rule is

5  give them a clean copy.  So give him a clean copy if we have

6  it.  If we don't have it, we'll have to go with what we've got.

7      Do we not have a clean copy?

8      MR. DEVILLERS:  I mean, I could print one off,

9  Your Honor.  But, for the record, this is the officer's phone

10 number.  I knew I couldn't -- I had to get them before May 1.

11     THE COURT:  Right.  Right.  And this is totally

12 innocuous.  And five times out of seven it may be totally

13 innocuous, but I'm concerned with the two other times.

14     And I want to make it real simple for everybody.

15     When I ask you to do something, it's not aspirational.

16 It's an order.  So give him a clean copy.

17     MR. DEVILLERS:  Can we take a break, Your Honor, to

18 print off a clean copy?

19     THE COURT:  Yes.

20   (The following proceedings were had in open court.)

21     THE COURT:  We're going to take a brief break to get a

22 clean copy of the exhibit.  So I don't know that there is any

23 reason to stand.  Or, you know what we can do, Mr. DeVillers,

24 if you'll give me that exhibit, I'll get you back a clean copy

25 in short order.  So just hand it to me.  Or, actually, give it

TRIAL ONE – VOL. 20 – 3796

1    to Mr. Litton.

2          We'll make this more like the seventh inning stretch.

3    If you want to do so, you may.

4          Mr. DeVillers, please proceed.

5          MR. DEVILLERS:  Thank you, Your Honor.

6          May I approach the witness, Your Honor?

7          THE COURT:  Yes, you may.

8      BY MR. DEVILLERS:

9      Q.   Officer, I'm going to show you what I think you

10   described before as a summary of what you provided the

11   detectives in this case.

12     A.   Yes.

13     Q.   And it -- does that refresh your recollection as to

14   where you were dispatched to?

15     A.   Yes, sir.

16     Q.   And where was that?

17     A.   608 East Fourth Avenue.

18     Q.   And do you know who the victim was in this case?

19     A.   I didn't personally know him.  I later found out who he

20   was.

21     Q.   And who was that?

22     A.   Stephen Austin.

23     Q.   You can put that down.

24          Okay.  Tell us what happened.  You get to the scene.

25   What did you see?

TRIAL ONE - VOL. 20 -  3797

1    A.    When I get to the scene, there was several people that

2   were screaming at the residence.  And as I approached -- as I

3   approached the porch, there were multiple people, there were a

4   lot of people running from out of the house and were on the

5   porch right there, and a lot of people were crying.  And I

6   found a male black, the victim, on his back.  And his eyes were

7   open, and he was not breathing.  He had some blood on his neck,

8   and they had said that he had been shot.

9        You know, I basically wanted to make sure there was no

10  one else as a threat that was there.  And with talking to

11  everyone, there was no other threat so at that time I went

12  ahead and attended to him in an attempt to save him.

13   Q.    At the time you attempted to save him, was he already

14  dead?

15   A.    Well, I checked for a pulse, there was no pulse.  And at

16  that time I proceeded -- I started CPR until Columbus fire

17  arrived.

18   Q.    Did you call other police officers at that point?

19   A.    I'm sorry?

20   Q.    Did you call other police officers?

21   A.    Yeah, there were other officers already at the scene.  I

22  advised, you know, radio that I was, you know, at the scene.  I

23  was with the victim.  I was conducting CPR.  And, obviously,

24  there were already cars that were already coming because it was

25  a shooting.  But now with me being there and what I was doing,

TRIAL ONE – VOL. 20 –  3798

1    they were -- there was a lot more coming.

2    Q.   Okay.  I want to show you a photograph marked as

3    Government's Exhibit 135-2#-015.

4    A.   Okay.

5    Q.   Do you see that, Officer?

6    A.   Yes, sir.

7    Q.   What are you looking at there?

8    A.   That's the porch that -- where the victim was shot.

9    Q.   Does that accurately reflect the scene as you saw it?

10   A.   Yes.

11        MR. DEVILLERS:  Okay.  May I publish this to the jury,

12   Your Honor --

13        THE COURT:  Yes, you may, Mr. DeVillers.

14        MR. DEVILLERS:  -- and enter it into evidence?

15     BY MR. DEVILLERS:

16   Q.   When you initially approached the victim, was there a

17   white towel on him?

18   A.   No.

19   Q.   Who placed that on him, do you know?

20   A.   I placed it on him.

21   Q.   Okay.  I now want to show you what's been marked as

22   Government's Exhibit 135-2#-060.

23        Do you see that, Officer?

24   A.   Yes.

25   Q.   What are we looking at here?

                                    TRIAL ONE – VOL. 20 –  3799

1    A.    The victim.

2          MR. DEVILLERS:  May I publish this to the jury,

3    Your Honor?

4          THE COURT:  Yes, you may.

5          MR. DURKIN:  Your Honor, will you note our previous

6    objection?

7          THE COURT:  Your objection has been preserved.

8          MR. DURKIN:  Yes, Your Honor.

9      BY MR. DEVILLERS:

10   Q.    And again, who is this?

11   A.    This is the victim, Stephen.

12         MR. DEVILLERS:  You can take it off.

13         May I have a moment, Your Honor?

14         THE COURT:  Yes, you may.

15         MR. DEVILLERS:  No further questions, Your Honor.

16         THE COURT:  Thank you.

17         Any questions?

18         MR. DURDEN:  No, Your Honor.

19         THE COURT:  Any cross, Mr. Durkin?

20         MR. DURKIN:  No, Your Honor.

21         THE COURT:  Ms. Dixon?

22         MS. DIXON:  No, Your Honor.

23         THE COURT:  Mr. McVay?

24         MR. MCVAY:  No, Your Honor.

25         THE COURT:  Mr. Nolder?

TRIAL ONE - VOL. 20 - 3800

1    MR. NOLDER:  No, sir.

2    THE COURT:  Thank you very much, Officer.  You may be

3  excused.

4    THE WITNESS:  Thank you.

5    MR. DEVILLERS:  Your Honor, the government's next

6  witness is Lieutenant Smith Weir.

7    THE CLERK:  Sir, come forward and be sworn, please.

8    (Witness sworn.)

9    THE COURT:  Please proceed, Mr. DeVillers.

10    - - -

11    SMITH WEIR

12  Called as a witness on behalf of the Plaintiff,

13  being first duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. DEVILLERS:

16  Q.  Good morning, Lieutenant.

17  A.  Good morning.

18  Q.  Can you please state your full name and spell your last

19  name?

20  A.  Smith Weir, W-E-I-R.

21  Q.  And who do you work for?

22  A.  I work for the Columbus Division of Police.

23  Q.  What do you do for the Columbus Division of Police?

24  A.  I'm currently a lieutenant assigned to patrol.  I

25  work -- my assignment is lieutenant of Zone 1 C-Company, which

TRIAL ONE - VOL. 20 -  3801

1    in layman's terms is the far north side zone on third shift.

2    Q.    Do lieutenants get fancier uniforms?

3    A.    They do.

4    Q.    I want to take you back to -- how long have you been a

5    lieutenant for?

6    A.    I've been a lieutenant since last June.

7    Q.    And before that what were you?

8    A.    I was a sergeant.

9    Q.    And before that what were you?

10   A.    I was an officer.

11   Q.    Okay.  And where were you -- how long have you been a

12   police officer?

13   A.    I was hired by the Columbus Division of Police on

14   December 12, 1999.  I initially was assigned to patrol in the

15   South Linden area on third shift until about 2005 to 2006, I

16   did a temporary assignment with the Violent Crime Impact Team

17   which became my permanent assignment in 2007.  And then from

18   2007 until 2010, I was assigned to the Violent Crime Impact

19   Team.  At that time that was a task force comprised of members

20   of the ATF and Columbus Division of Police.

21   Q.    So from 2005 to approximately 2010, you were assigned to

22   the Violent Crimes Task Force?

23   A.    Yes.  For most of 2005, I was actually in direct patrol

24   for our cold-case squad, and then that transitioned into an

25   assignment with the task force.

TRIAL ONE - VOL. 20 - 3802

1   Q.   Okay.  During that time period 2005 on, were there

2   particular areas of town that you were working?

3   A.   Yeah.  We did investigations in weapons and narcotics

4   and gang-related crimes in South Linden, Weinland Park, and the

5   near east side.

6   Q.   The Weinland Park area, where is that?

7   A.   Weinland Park is kind of what we refer to as the Short

8   North area.  It's north of Fifth Avenue, south of Eleventh

9   Avenue, east of High Street -- or really east of Indianola to

10  Grant or the railroad tracks.

11  Q.   Describe the Weinland Park/Short North area in the 2005,

12  2006, 2007 era as far as the kind of crimes that were being

13  committed in that area?

14  A.   Weinland Park during that time had a reputation for

15  having violent crime.  There was shootings, robberies,

16  assaults.

17  Q.   Were there additional resources that Columbus police

18  devoted to that area of town to try to combat that?

19  A.   Yes, there were.  In addition to the regular patrol

20  officers, we had investigators, we had our task force that

21  investigated the Short North Posse and related crimes in 2006.

22  We even had different programs, special duty programs like

23  Eliminate the Elements with the CPO properties that increased

24  officer presence in the neighborhoods.

25  Q.   What's a CPO property?

TRIAL ONE - VOL. 20 - 3803

1    A.    CPO properties, originally they were properties owned by

2    what we called Broad Street Management, I think was the

3    company.  In the early 2000s a company called CPO, Community

4    Properties of Ohio, purchased those properties.  They worked in

5    conjunction with the campus partners and OCCH, which is the

6    Ohio Capital Housing Corporation.  I might be mistaken on the

7    exact words there.  But they worked in conjunction with that to

8    rehabilitate properties in Weinland Park and the near east

9    side.

10   Q.    In the Weinland Park/Short North area during this time

11   period, did you see any graffiti?

12   A.    Yes.

13   Q.    What sort of graffiti would you see?

14   A.    We saw tagging and then we saw gang-related graffiti.

15   Q.    What's the difference between tagging and gang-related?

16   A.    Tagging is usually an individual that is making their

17   mark sometimes artistically, sometimes not.  Normally they have

18   a tag sign or a name that they put on whatever property that

19   they're vandalizing.

20   Q.    What's gang-related graffiti?

21   A.    Gang-related graffiti is just that.  It's normally

22   members of a gang or associates of a gang spray painting names

23   or messages or just their gang initials.

24   Q.    And what did you -- as far as the Short North area, what

25   sort of gang-related graffiti did you see?

TRIAL ONE – VOL. 20 –  3804

1    A.   We would see messages, we would see people's names, and

2   sometimes we would see just messages saying Short North Posse

3   or SNP or something to that effect.

4    Q.   Did you ever see any kind of CT graffiti?

5    A.   Yes.  We -- around that 2005, 2006 time frame we started

6   seeing things saying Cut Throat.

7    Q.   Did you have interaction with members of the community?

8    A.   Yes, I did.

9    Q.   Okay.  And were some of those members of the community

10   people related to the Short North Posse?

11    A.   Yes.

12    Q.   All right.  Did you ever see any of these individuals,

13   like, throw sort of hand signs or anything of that nature?

14    A.   Yes, I did.

15    Q.   And what sort of hand signs would you see?

16    A.   You would see them throw what we would consider -- what

17   I considered or knew to be a Crip gang sign.

18    Q.   Could you give us an example?

19    A.   Something to that effect (indicating).  I might not be

20   doing it exactly correctly.

21    Q.   Do you know what that means?

22    A.   Rollin 20s Crip.

23        MS. DIXON:  I'm sorry.  I couldn't see.

24        THE COURT:  I'll tell you what, Officer, stand up so

25   that not only the jury but defense counsel can see and the

TRIAL ONE – VOL. 20 – 3805

1    defendants.

2          THE WITNESS:  So, typically, it would be something to

3    that effect (indicating).

4      BY MR. DEVILLERS:

5    Q.   And you said Crip.  What's a Crip?

6          THE WITNESS:  Do you want me to remain standing, sir?

7          THE COURT:  No.  No.  I'm sorry, Officer.  You may be

8    seated.

9          THE WITNESS:  Thank you.

10         A Crip is a name of a national gang that originated in

11   Los Angeles.  There are different sets throughout the country

12   that claim affiliation to the original gang that was formed in

13   Los Angeles.

14     BY MR. DEVILLERS:

15   Q.   Is the Short North Posse a set of a national Crip gang?

16   A.   Yes.

17   Q.   Do you know if there's any sort of a relationship

18   between the individuals in Columbus and the original Crips in

19   LA?

20   A.   None that I have ever heard of.

21   Q.   Okay.  As far as anything indicative of the local set,

22   any hand signs or gang signs you've seen thrown in regards to

23   that?

24   A.   Yes.

25   Q.   What's that?

TRIAL ONE – VOL. 20 –  3806

1   A.   (Indicating).  This is a four designating North Fourth

2   Street.

3   Q.   And, for the record, you're basically throwing up your

4   hand and putting your thumb down and showing four fingers?

5   A.   That's correct.

6   Q.   Okay.  Would it be common to see that?

7   A.   Yes.

8   Q.   During your interaction with individuals in the Short

9   North, have you ever had occasion to talk to a person by the

10  name of Deounte Ussury?

11  A.   Yes, I have.

12  Q.   And would you recognize his voice?

13  A.   I possibly might.  I'm not positive.

14  Q.   Okay.  How often have you had contact with him?

15  A.   Numerous times between, I'd say, 2003 through 2010.

16  Q.   Okay.  Have you ever heard of a gang called 218?

17  A.   Yes.

18  Q.   And do they still exist?

19  A.   They're technically, as far as I know, classified as an

20  inactive gang.  The members -- the original members of 218,

21  some of them are still, you know, around and active.

22  Q.   What area of town did 218 -- what part of town?

23  A.   East Long Street.  Originally it was between North

24  Twenty-First and North Eighteenth Street.

25  Q.   Was there -- in the late '90s, was there a sweep of 218?

TRIAL ONE – VOL. 20 –  3807

1    A.   Yes, there was.

2    Q.   And were a number of those individuals investigated and

3    prosecuted?

4    A.   Yes, they were.

5    Q.   You indicated Short North Posse.  During your time

6    period, during your investigation, did you see Mr. Ussury

7    associate with members of the Short North Posse?

8    A.   I did.

9    Q.   Have you had occasion to meet Brandon Ledbetter?

10   A.   I have.

11   Q.   Have you talked to Brandon Ledbetter?

12   A.   Yes.

13   Q.   Have you had occasion to talk to Rashad Liston?

14   A.   Yes.

15   Q.   Do you know his -- his street name or nickname?

16   A.   Buck or Buckwheat.

17   Q.   Let's go back to Mr. Ussury.  Do you know if he had a

18   street name or nickname?

19   A.   D Frog.

20   Q.   Okay.  Do you know a person by the name of Chris Harris?

21   A.   Yes.

22   Q.   Have you had occasion to talk to him?

23   A.   Yes.

24   Q.   And do you know if he has a street name or a nickname?

25   A.   O-Dog.

TRIAL ONE – VOL. 20 –  3808

1    Q.   I would like to show you some photographs and see if you

2    can tell us about some of the individuals we're going to be

3    looking at.  I'm going to show you what's been marked as

4    Government's Exhibit 1-2-002.

5            MR. DEVILLERS:  Can I have a moment, Your Honor?

6            THE COURT:  Yes.

7       BY MR. DEVILLERS:

8    Q.   Do you see that photograph?

9    A.   I do.

10   Q.   Do you recognize the individual in that photograph?

11   A.   That's Freddie "Freeze Pop" Johnson.

12   Q.   And is he wearing something?

13   A.   Yes.  Mr. Johnson is wearing a shirt that says Cut and

14   then Let's Get It in quotes underneath.  The picture on the

15   T-shirt is of the original four members of the Cut Throat

16   Committee.

17   Q.   Who are the pictures of?

18   A.   Richard "Le Le" Willis, Malik Willoughby, Kinyatta Glass

19   and Freddie.

20           MR. DEVILLERS:  Your Honor, may I publish this to the

21   jury?

22           THE COURT:  Yes, you may.

23       Any objection, Mr. Berndt?

24           MR. BERNDT:  No, Your Honor.  Thank you.

25           THE COURT:  Mr. Gatterdam?

TRIAL ONE - VOL. 20 - 3809

1      MR. GATTERDAM:  No.

2      THE COURT:  Ms. Dixon?

3      MS. DIXON:  No, sir.

4      THE COURT:  Mr. Meyers?

5      MR. MEYERS:  No, Your Honor.

6      THE COURT:  Mr. Nolder?

7      MR. NOLDER:  No, your Honor.

8      THE COURT:  You may publish it, Mr. DeVillers.

9    BY MR. DEVILLERS:

10   Q.   You indicated a person by the name of Le Le.

11   A.   Yes.

12   Q.   And what's his real name?

13   A.   Richard Willis.

14   Q.   Do you know what happened to Mr. Willis?

15   A.   He was murdered.

16   Q.   I now want to show you what's been marked as Government

17   Exhibit 1-2-004.  Can you tell me what we're looking at here,

18   Lieutenant?

19   A.   Yes.  These are the pants, and the C/T stands for Cut

20   Throat.  And then underneath it says representer, which just

21   means somebody that represents the Cut Throat Committee.

22        MR. DEVILLERS:  May I publish this, Your Honor, to the

23   jury?

24        THE COURT:  Yes, you may.

25        Any objection, Mr. Berndt?

TRIAL ONE – VOL. 20 – 3810

1        MR. BERNDT:  No, Your Honor?

2        THE COURT:  Mr. Gatterdam?

3        MR. GATTERDAM:  No, Your Honor.

4        THE COURT:  Ms. Dixon?

5        MS. DIXON:  No, Your Honor.

6        THE COURT:  Mr. Meyers?

7        MR. MEYERS:  No, Your Honor.

8        THE COURT:  Mr. Nolder?

9        MR. NOLDER:  No, Your Honor.

10       MR. DEVILLERS:  And enter it into evidence,

11  Your Honor?

12       THE COURT:  Yes.

13     BY MR. DEVILLERS:

14   Q.   Would it be unusual for you as a detective at the time

15  or another officer to take photographs of individuals wearing

16  clothes like this?

17   A.   No, it would not.  Normally if we -- if we run into a

18  person that we recognized as a gang member or a gang associate

19  and they were wearing clothing that basically documented that

20  gang activity, we would, you know, document that through taking

21  photographs and noting it through that.

22   Q.   Would you have conversations with these individuals when

23  you were taking the photographs?

24   A.   Yes.

25   Q.   Would they mind that you were taking these photographs?

TRIAL ONE – VOL. 20 –  3811

1   A.   Depends on the individual.

2   Q.   Okay.  I want to show you what's been marked as

3  Government's Exhibit 1-2-011.  Can you tell me what we're

4  looking at here?

5   A.   Yes.  This is a photo of Rakeisha Allen.  She's wearing

6  an outfit that is adorned with CTs with the -- you know,

7  documenting Cut Throat.

8   Q.   And does she have anything on her legs?

9   A.   Yeah, the same -- obviously, the CT for Cut Throat, and

10  it's photos of Richard Willis who was -- she had a relationship

11  with.

12   Q.   At this time when this photograph -- do you recall this

13  outfit she's wearing?

14   A.   Yes.

15   Q.   Okay.  At this time do you know if Mr. Willis had passed

16  at this point?

17   A.   Yes, he had.

18        MR. DEVILLERS:  Your Honor, may I publish this to the

19  jury?

20        THE COURT:  One more foundational question,

21  Lieutenant.  Did you take this photo?

22        THE WITNESS:  I did not take the photo.

23        THE COURT:  Do you know when this photo was taken?

24        THE WITNESS:  I believe it was taken in early 2006,

25  but I was not -- I don't know the exact date.

TRIAL ONE – VOL. 20 –  3812

1          THE COURT:  No, I'm sorry.  Go ahead, finish your

2     answer.

3          THE WITNESS:  I do not know the exact date it was

4     taken.

5          THE COURT:  And approximately when did Mr. Willis

6     expire?

7          THE WITNESS:  I believe it was December of 2005.

8          THE COURT:  The answer to your question is yes.

9        Any objection, Mr. Berndt?

10         MR. BERNDT:  No, Your Honor.  Thank you.

11         THE COURT:  Mr. Gatterdam?

12         MR. GATTERDAM:  No, Your Honor.

13         THE COURT:  Ms. Dixon?

14         MS. DIXON:  No, Your Honor.

15         THE COURT:  Mr. Meyers?

16         MR. MEYERS:  No, Your Honor.

17         THE COURT:  Mr. Nolder?

18         MR. NOLDER:  No, Your Honor.

19         THE COURT:  You may publish it, if you wish,

20    Mr. DeVillers.

21         MR. DEVILLERS:  I do, Your Honor.  And I would also

22    like to enter it into evidence.

23         THE COURT:  It will be in.

24       BY MR. DEVILLERS:

25       Q.   Thank you, Lieutenant.

TRIAL ONE – VOL. 20 –  3813

1          Who is this?

2     A.   Rakeisha Allen.

3     Q.   I now want to show you what's been marked as

4   Government's Exhibit 1-2-014.

5          Do you see that, Lieutenant?

6     A.   I do.

7     Q.   Do you recognize individuals in that photograph?

8     A.   I do.

9     Q.   And who do you recognize?

10    A.   The individual straight ahead with his back -- or

11  straight ahead in the photo at 12 o'clock, for lack of a better

12  term --

13    Q.   Why don't you just tell me who you recognize first, and

14  then we'll try to figure out who's who?

15    A.   Jermonte Fletcher, AKA Chin, and Tysin Gordon.

16    Q.   Do you recognize any of the other individuals in there?

17    A.   I -- the two males on the right I know are from Nelson

18  Park, but I can't remember their names off the top of my head.

19         MR. DEVILLERS:  May I publish this to the jury,

20  Your Honor?

21         THE COURT:  Yes, you may.

22         Any objection, Mr. Berndt?

23         MR. BERNDT:  No, Your Honor.

24         THE COURT:  Mr. Gatterdam?

25         MR. GATTERDAM:  No, Your Honor.

TRIAL ONE - VOL. 20 -  3814

1          THE COURT:  Ms. Dixon?

2          MS. DIXON:  No, Your Honor.

3          THE COURT:  Mr. Meyers?

4          MR. MEYERS:  No, Your Honor.

5          THE COURT:  Mr. Nolder?

6          MR. NOLDER:  No, Your Honor.

7          THE COURT:  And it will be received.

8       BY MR. DEVILLERS:

9     Q.   The individual that you identified as Jermonte Fletcher,

10    Chin, can you circle him?  Just circle his head, if you will.

11         No, Lieutenant, stop touching the screen.

12         All right.  Can you just describe where he is in the

13    photograph?

14    A.   He is directly in front of the camera.  He's wearing a

15    black T-shirt with white writing.  He's got a hat on backwards.

16    It's a black hat.

17    Q.   Okay.  And is there someone standing next to him?

18    A.   Yes.  Mr. Gordon is in what appears to be a red shirt

19    directly to our right from Mr. Fletcher on Mr. Fletcher's

20    left-hand side.

21    Q.   All right.  I'm going to show you now what's been marked

22    as Government's Exhibit 1-2-015.

23    A.   Okay.

24    Q.   Do you see this photograph, Lieutenant?

25    A.   I do.

TRIAL ONE – VOL. 20 – 3815

1    Q.   All right.  Don't touch it.

2         Do you recognize individuals in this photograph?

3    A.   Yes.  The individual on the far left is --

4    Q.   Let's go with this, first.  Who do you recognize in it?

5    A.   Jaquel Gore, Deounte Ussury, Jeremiah Frazier, and Tysin

6    Gordon.

7         MR. DEVILLERS:  Your Honor, may I publish this to the

8    jury?

9         THE COURT:  Yes, you may.

10        Any objection, Mr. Berndt?

11        MR. BERNDT:  No, Your Honor.  Thank you.

12        THE COURT:  Mr. Gatterdam?

13        MR. GATTERDAM:  No, Your Honor.

14        THE COURT:  Ms. Dixon?

15        MS. DIXON:  No, Your Honor.

16        THE COURT:  Mr. Meyers?

17        MR. MEYERS:  No, Your Honor.

18        MR. DEVILLERS:  I would also like to move it into

19   evidence, Your Honor.

20        MR. NOLDER:  No objection.

21        THE COURT:  It will be received, and you may publish

22   it.

23        MR. DEVILLERS:  Thank you.

24     BY MR. DEVILLERS:

25    Q.  Can you tell us where the person you described as

TRIAL ONE - VOL. 20 - 3816

1   Deounte Ussury, where he is in this photograph?

2      A.   Standing in the back row second from the left wearing a

3   black blazer, looks like a blue vest with a blue tie.

4      Q.   All right.  The person that you described as Jaquel

5   Gore, where is he?

6      A.   Far left, white tank top.

7      Q.   The person you described as Tysin Gordon, where is he?

8      A.   He's on the far right.  He's wearing a white dress

9   shirt, looks like a bluish vest with a blue tie, and he's

10   holding a shirt up.

11      Q.   I now want to show you a photograph marked as

12   Government's Exhibit 1-2-017.  Can you tell me who these two

13   individuals are?

14      A.   Yes.  The individual on the left is Dominic Holt-Reed.

15   He went by Nic Nic.  And the individual on the right is Deounte

16   Ussury.

17          MR. DEVILLERS:  May I publish this to the jury,

18   Your Honor?

19          THE COURT:  Yes, you may.

20          Any objection, Mr. Berndt?

21          MR. BERNDT:  No, Your Honor.  Thank you.

22          THE COURT:  Mr. Gatterdam?

23          MR. GATTERDAM:  No, Your Honor.

24          THE COURT:  Ms. Dixon?

25          MS. DIXON:  No, Your Honor.

TRIAL ONE – VOL. 20 – 3817

1      THE COURT:  Mr. Meyers?

2      MR. MEYERS:  No, Your Honor.

3      THE COURT:  Mr. Nolder?

4      MR. NOLDER:  No, sir.

5      THE COURT:  All right.  It will be received,

6  Mr. DeVillers, and you may publish.

7    BY MR. DEVILLERS:

8   Q.   And I now want to show you what's been marked

9  Government's Exhibit 1-2-018.

10      MR. DEVILLERS:  And I believe this is already in

11  evidence, Your Honor.

12      THE COURT:  Yes, it is.

13      MR. DEVILLERS:  May I publish this to the jury?

14      THE COURT:  Yes, you may.

15    BY MR. DEVILLERS:

16   Q.   Who are we looking at here, Lieutenant?

17   A.   Christopher Harris is on the left-hand side, and Rashad

18  Liston is on the right.

19   Q.   During your time period of working in the Short North

20  area, have you ever known Christopher Harris or Rashad Liston

21  to have gainful employment?

22   A.   No, I have not.

23   Q.   How about Mr. Ussury?

24   A.   No.

25   Q.   And, for the record, what do they have in their hands?

TRIAL ONE - VOL. 20 -  3818

1    A.   It appears to be U.S. currency.

2    Q.   I now want to show you what's been marked as

3    Government's Exhibit 1-2-021.  Can you tell me who these

4    individuals are?

5    A.   Yes.  The individual on the left is Tommy Coates, Jr.,

6    the individual in the middle is Tysin Gordon, and the

7    individual on our right-hand side is Cornelius Poo Allen.

8         MR. DEVILLERS:  May I publish this to the jury?

9         THE COURT:  What was the last individual's name,

10   Officer?

11        THE WITNESS:  Cornelius Allen, Your Honor.  His

12   nickname was Poo.

13        THE COURT:  Okay.  All right.  That's what I didn't

14   understand.

15        Yes, Mr. DeVillers.

16        Any objection, Mr. Berndt?

17        MR. BERNDT:  No, Your Honor.  Thank you.

18        THE COURT:  Mr. Gatterdam?

19        MR. GATTERDAM:  No, Your Honor.

20        THE COURT:  Ms. Dixon?

21        MS. DIXON:  No, Your Honor.

22        THE COURT:  Mr. Meyers?

23        MR. MEYERS:  No, Your Honor.

24        THE COURT:  Mr. Nolder?

25        MR. NOLDER:  No, Your Honor.

TRIAL ONE - VOL. 20 - 3819

1      THE COURT:  And you may publish it, if you wish.

2      MR. DEVILLERS:  I do, Your Honor.

3      THE COURT:  Okay.

4    BY MR. DEVILLERS:

5    Q.   I now want to show you what's been marked as

6  Government's Exhibit 1-2-023.

7        What are we looking at here, Detective?

8    A.   We're looking at a picture of Lance Green, AKA Jiggs.

9  He's got his right arm around a cardboard cutout of Richard

10  Willis.

11      MR. DEVILLERS:  May I publish this to the jury,

12  Your Honor?

13      THE COURT:  Yes, you may.

14    BY MR. DEVILLERS:

15    Q.   I now want to show you what's been marked as

16  Government's Exhibit 1-2-055.

17        What are we looking at here, Detective?

18    A.   We're looking at an individual that's wearing a memorial

19  shirt for Elijah Ledbetter.

20    Q.   Who is Elijah Ledbetter?

21    A.   He was a Short North Posse member that was killed in, I

22  believe, 2005 or 2006.

23      MR. DEVILLERS:  Your Honor, may I publish this to the

24  jury?

25      THE COURT:  Yes, you may.

TRIAL ONE – VOL. 20 – 3820

1    Any objection, Mr. Berndt?

2        MR. BERNDT:  No Your Honor.  Thank you.

3        THE COURT:  Mr. Gatterdam?

4        MR. GATTERDAM:  No, Your Honor.

5        THE COURT:  Ms. Dixon?

6        MS. DIXON:  No, Your Honor.

7        THE COURT:  Mr. Meyers?

8        MR. MEYERS:  No, Your Honor.

9        THE COURT:  Mr. Nolder?

10       MR. NOLDER:  No, sir.

11  BY MR. DEVILLERS:

12  Q.   What is he doing with his hands on this shirt in this

13  photograph?

14  A.   He's throwing a four sign representing the Short North.

15  Q.   Now, I want to show you what's been marked as

16  Government's Exhibit 1-2-066.  Can you tell me who this is?

17  A.   I believe that's Rashad Liston.

18  Q.   Can you tell what he's doing in this photograph?

19  A.   With his right hand he's throwing a four, and it appears

20  that he's holding money in his left hand.

21       MR. DEVILLERS:  Your Honor, may I publish this to the

22  jury?

23       THE COURT:  Yes, you may.  I believe this photograph

24  is already in evidence.

25  BY MR. DEVILLERS:

TRIAL ONE - VOL. 20 - 3821

1    Q.   And I now want to show you what's been marked as

2    Government's Exhibit 1-2-079.

3         MR. DEVILLERS:  And I believe -- may I publish this to

4    the jury?  I believe this is already in.

5         THE COURT:  Yes, this is already in.  You may publish

6    it.

7      BY MR. DEVILLERS:

8    Q.   Who are we looking at here, Lieutenant?

9    A.   Christopher Harris on the left, Rashad Liston in the

10   middle, and Antonio Harris on the right.

11   Q.   Do you know if Antonio Harris is related to Christopher

12   Harris?

13   A.   Yes.

14   Q.   How so?

15   A.   I believe they're brothers.

16   Q.   I now want to show you what's been marked as

17   Government's Exhibit 1-2-080.  Can you tell me what this is?

18   A.    It was a car that was -- I believe it was owned -- I

19   know it was driven by Christopher Harris.  It's got a painting

20   of Elijah Ledbetter on the hood.

21        MR. DEVILLERS:  I believe this is also in evidence,

22   Your Honor.  May I publish this to the jury?

23        THE COURT:  Yes, it is.  Yes, you may.

24      BY MR. DEVILLERS:

25   Q.   I now want to show you what's been marked as

TRIAL ONE – VOL. 20 –  3822

1   Government's Exhibit 1-2-125.  Can you tell me what we're

2   looking at here, Lieutenant?

3    A.   This is a photograph of Christopher Harris driving that

4   car.

5    Q.   Did you take this photograph?

6    A.   I did.

7    Q.   Do you remember about when, as far as the year?

8    A.   I believe it was 2006.

9        MR. DEVILLERS:  May I publish this to the jury?  I

10  believe it's already in.

11       THE COURT:  Yes, it's already in.  You may.

12    BY MR. DEVILLERS:

13    Q.   I'd now like to show you what's been marked as

14  Government's Exhibit 1-2-096.

15       MR. DEVILLERS:  And, Agent, if you could, the top left

16  photograph, if you could blow that up.

17    BY MR. DEVILLERS:

18    Q.   We'll start off with that one.  Who are we looking at

19  here, Lieutenant?

20    A.   Okay.  On the left in the tan New York Yankee's hat, I

21  believe that it's DeShawn Carpenter.  In the middle in the

22  green and beige top with the matching hat is Troy Locke.  And

23  on the right in the white outfit is Dawan Franklin, D-Nice.

24    Q.   Dawan Franklin, he has a street name?

25    A.   Yes.

TRIAL ONE – VOL. 20 –  3823

1   Q.   And what is that?

2   A.   D-Nice.

3   Q.   Mr. Locke, do you know his street name?

4   A.   Pauley.

5   Q.   And is Mr. Locke related to -- brothers to anybody that

6   you can think of?

7   A.   Yeah.  He's related to Tommy Coates, Jr. and then the

8   late Tyejuan Locke.

9         MR. DEVILLERS:  Your Honor, may I publish this to the

10   jury?

11         THE COURT:  Yes, you may.

12         MR. DEVILLERS:  Lieutenant, I'd now like to show you

13   the same exhibit, but can you go to the original formation of

14   the exhibit, the top left-hand?

15     BY MR. DEVILLERS:

16   Q.   Do you see that, Lieutenant?

17   A.   Yes, I do.

18   Q.   What are we looking at here?

19   A.   Terhun Jones on the left, Deounte Ussury on the right,

20   and Kenneth Slaughter in the middle seated in the wheelchair.

21   Q.   Okay.  Did you know Mr. Slaughter?

22   A.   I did.

23   Q.   Did he have a street name?

24   A.   Goldie.

25   Q.   Okay.  Any other street names that you can think of?

TRIAL ONE – VOL. 20 – 3824

1     A.    Rayshawn.

2     Q.    All right.  Do you know what happened to him?

3     A.    He sustained a gunshot wound and was paralyzed.

4           MR. DEVILLERS:  May I publish this to the jury,

5     Your Honor?

6           THE COURT:  Yes, you may.

7       BY MR. DEVILLERS:

8     Q.    I now want to show you what's been marked as

9     Government's Exhibit 1-2-097.

10          MR. DEVILLERS:  And if you could blow up the top left

11    again.

12      BY MR. DEVILLERS:

13    Q.    Do you see this photograph, Lieutenant?

14    A.    Yes, sir.

15    Q.    Were you going to sneeze?

16    A.    No, I just --

17    Q.    Okay.  Can you tell us who's in this photograph?

18    A.    On the left is Cornelius Allen, in the middle is Deounte

19    Ussury, and on the right is Dawan Franklin.

20    Q.    And the nickname for Dawan Franklin?

21    A.    D-Nice.

22          MR. DEVILLERS:  May I publish this to the jury,

23    Your Honor?

24          THE COURT:  Yes, you may.

25      BY MR. DEVILLERS:

TRIAL ONE – VOL. 20 – 3825

1    Q.   Okay.  I would now like to show you what's been marked

2    as Government's Exhibit 1-2-099.

3         MR. DEVILLERS:  And, Agent, if you could take the top

4    right photo and flip it vertically -- horizontally?

5      BY MR. DEVILLERS:

6    Q.   Okay.  Lieutenant, can you see this photograph?

7    A.   Yes.

8    Q.   All right.  And who are we looking at here?

9    A.   The individual in the --

10   Q.   Why don't you just tell me who they are first.

11   A.   There's Jerell Russell, AKA Shoe Shine, Cornelius Allen,

12   Deounte Ussury, Terrel "T-Patt" Patterson, Kevin Gray and

13   Freddie Johnson.

14        And I can't -- I'm sorry, I can't tell who the person on

15   the left-hand side next to Cornelius Allen is.

16        MR. DEVILLERS:  All right.  May I publish this to the

17   jury, Your Honor?

18        THE COURT:  Yes, you may.

19     BY MR. DEVILLERS:

20   Q.   Okay.  Again, give us the names.

21   A.   Jerell Russell.

22   Q.   Okay.  From left to right the best you can.

23   A.   The far left of the picture, I can't tell who the

24   individual dressed in the dark clothing is.

25   Q.   Okay.

TRIAL ONE - VOL. 20 - 3826

1    A.    Backwards hat with the black and white designed top is

2    Jerell Russell.  To his left to our right is Cornelius Allen.

3    Then Deounte Ussury and Kevin Gray, then Freddie Johnson.  And

4    then kneeling in the middle is Terrel "T-Patt" Patterson.

5    Q.    And Freddie Johnson, is he wearing anything in

6    particular?

7    A.    He's wearing the Cut Throat sign that we -- or the Cut

8    Throat T-shirt that we previously talked about.

9    Q.    Okay.  I now want to show you what's been marked as

10   Government's Exhibit 1-2-100.

11         MR. DEVILLERS:  And, Agent Lauber, if you could take

12   the bottom one and blow it up and turn it.

13      BY MR. DEVILLERS:

14   Q.    Do you see this photograph, Lieutenant?

15   A.    I do.

16   Q.    Can you tell us -- just tell us who is in this

17   photograph.

18   A.    I believe -- I think that's Rashad Liston on the far

19   left, and Dawan Franklin, Deounte Ussury, Chris Harris, and I

20   believe that's Watia Gannell down below.

21   Q.    Is there anyone you're certain of who it is?

22   A.    Dawan Franklin in the white shirt with the white top,

23   Deounte Ussury in the beige and blue, Chris Harris in the

24   striped top with the white and dark-colored hat.

25         MR. DEVILLERS:  Your Honor, may I publish this to the

TRIAL ONE - VOL. 20 -  3827

1    jury?

2         THE COURT:  Yes, you may.

3      BY MR. DEVILLERS:

4    Q.   Okay.  One more time, Lieutenant.  As far as the people

5    you're certain of, could you tell us who you see here?

6    A.   Dawan Franklin in the white outfit.  To his left is

7    Deounte Ussury in the beige and blue outfit.  To his left is

8    Chris Harris in the striped outfit with the blue and white hat.

9    Q.   Okay.  And, for the record, do they have anything in

10   their hands?

11   A.   I believe they have money.

12   Q.   I now want to show you what's been marked as

13   Government's Exhibit 1-2-107.

14        MR. DEVILLERS:  And, Agent Lauber, if you can blow up

15   the bottom photograph.

16      BY MR. DEVILLERS:

17   Q.   Who are we looking at here, Lieutenant?

18   A.   Tommy Coates, Jr. seated on the left, "T-Patt" Terrel

19   Patterson in the middle, and Deounte Ussury on the right.

20        MR. DEVILLERS:  May I publish this to the jury,

21   Your Honor?

22        THE COURT:  Yes, you may.

23        MR. DEVILLERS:  And enter it into evidence,

24   Your Honor.

25        THE COURT:  Yes.

TRIAL ONE – VOL. 20 –  3828

1          MR. DEVILLERS:  And, Your Honor, for the –– I guess

2     for the record, I would move to enter all the photographs that

3     I've published to the jury into evidence.

4          THE COURT:  They were moved.  I wouldn't have allowed

5     them to be published otherwise.

6          MR. DEVILLERS:  Understood, Your Honor.  Thank you.  I

7     just know if I sit down, that Mr. Kelley will scold me.

8          THE COURT:  I understand.

9       BY MR. DEVILLERS:

10    Q.   Again, I'm sorry, who is in this photograph?

11    A.   Tommy Coates, Jr., Terrel Patterson and Deounte Ussury.

12    Q.   And Mr. Tommy Coates, Jr., he's to the what part of the

13    photograph?

14    A.   He is on the left-hand side in the black top with what

15    looks to be a white hat.  Terrel Patterson is wearing a green

16    top with a green and orange hat, and Deounte Ussury is in a

17    beige and blue top with a white and blue hat.

18    Q.   I now want to show you what's been marked as

19    Government's Exhibit 1–2–112.

20         MR. DEVILLERS:  And to start off with can you, Agent,

21    blow up the bottom photograph?

22         MR. BERNDT:  Your Honor, could I have a sidebar?

23         THE COURT:  Yes, you may.

24

25

TRIAL ONE - VOL. 20 - 3829

1                              - - -

2          Thereupon, the following proceeding was held at sidebar out

3      of hearing of open court:

4              MR. BERNDT:  Thank you, Judge.

5          Judge, I would object to the publishing and the

6      admission of the photos which Mr. DeVillers just put up.  I

7      recognize --

8              THE COURT:  You mean this one?

9              MR. BERNDT:  Yes.

10             THE COURT:  What was the number of it, Mr. DeVillers?

11     Well, the record will reflect it.

12             THE COURT REPORTER:  1-2-112.

13             MR. BERNDT:  And, Your Honor, I recognize that this

14     photo has been shown to the jury already and possibly even

15     admitted.

16             THE COURT:  I believe it's already in evidence, but I

17     can confirm it though.  But go ahead, Mr. Berndt.

18             MR. BERNDT:  My understanding is that this is a photo

19     that was taken in 2003 of my client after he was released from

20     prison.

21             THE COURT:  Yes.

22             MR. BERNDT:  That would be outside the time frame of

23     the indictment.  Also, I don't believe that this witness can be

24     qualified to talk about who took this picture, when this

25     picture was taken, and to put it in the proper time frame.

TRIAL ONE - VOL. 20 - 3830

1       I recognize that I missed it previously, but I shouldn't

2    have, and that's why I think any further display of it to the

3    jury would be inappropriate.

4            THE COURT:  Go ahead, Mr. DeVillers.

5            MR. DEVILLERS:  Your Honor, the -- I want him to pick

6    out who is in these photographs, and in this particular

7    photograph it's Ricco Maye, Keith Maye, Elijah Ledbetter and

8    Brandon Ledbetter.  And we've already heard testimony that they

9    associated, and I wanted to show a photograph of all of them.

10       There is another part of this exhibit that is in

11   evidence, I believe, and that's where Brandon Ledbetter is

12   throwing fours.  And I'm sure the Lieutenant can't say when

13   this picture was taken, but the fact that he's throwing fours

14   indicating membership in the Short North Posse, which has

15   already testified to, I think it's relevant no matter when it

16   was.  It doesn't necessarily have to be in the conspiracy time.

17   We're not saying it's an overt act, but he's identifying

18   himself as a member of the Short North Posse.

19           THE COURT:  That's the basis of the relevance?

20           MR. DEVILLERS:  Yes, Your Honor.

21           MR. BERNDT:  Your Honor, I would suggest to the Court

22   that any relevance that that photo may have is outweighed by

23   the prejudice.  The government has probably shown in excess of

24   a hundred photographs allegedly depicting gang activity.  They

25   have one photograph of Mr. Ledbetter sitting on the front porch

TRIAL ONE - VOL. 20 - 3831

1   of his house on the west side of Columbus with his mother and

2   his little brother, and he is sitting there putting the four

3   down, not holding money, not dressed in any type of Cut Throat.

4   There's no indicia whatsoever of anything other than the four.

5        And, again, between the parties, the place, the timing,

6   I think that any relevance that it may have is outweighed by

7   the undue prejudice.

8        THE COURT:  Well, as is axiomatic, all relevant

9   evidence is prejudicial to somebody and so -- but it's not

10  unduly prejudiced.

11       And I think that it is correct that it doesn't -- it

12  could be relevant -- everything that's relevant doesn't have to

13  be within the time period of the conspiracy because the

14  relevance of this photo, I think, adheres in its ability to

15  demonstrate that Mr. Ledbetter was affiliated with the gang

16  that has been prominently featured in the superseding

17  indictment so in that respect it's relevant.

18       Besides, it is already in evidence.  That photo or one

19  of those photos of that series is already in evidence so your

20  objection is duly noted but overruled.

21       MR. BERNDT:  Your Honor, I would like to make it clear

22  for the record that that was a mistake and an error on my part

23  not to object to it previously.

24       THE COURT:  The record will speak for itself.  But

25  given the weight of evidence that has come in already, I'm sure

TRIAL ONE – VOL. 20 – 3832

1    that it will be considered harmless.

2            MR. BERNDT:  I understand, Your Honor.  Thank you.

3        (The following proceedings were had in open court.)

4            THE COURT:  Mr. DeVillers, please continue.

5        BY MR. DEVILLERS:

6    Q.    Lieutenant, do you recognize the individuals in this

7    photograph?

8    A.    I do.

9    Q.    Can you tell -- first, initially just tell me the

10   individuals you recognize.

11   A.    Ricco Maye, Robert Ledbetter, Keith Maye.

12           MR. DEVILLERS:  May I publish this to the jury,

13   Your Honor?

14           THE COURT:  Yes, you may.  It's already in evidence.

15       BY MR. DEVILLERS:

16   Q.    Okay.  The individual you have described as Ricco Maye,

17   where is he?

18   A.    He's on the far left.

19   Q.    All right.  And the individual you indicated is Brandon

20   Ledbetter?

21   A.    He's in the middle.

22   Q.    And the person you indicated was Keith Maye?

23   A.    Far right.

24   Q.    Do you recognize anyone else in that photograph?

25   A.    I do not.

TRIAL ONE – VOL. 20 – 3833

1    Q.   I want to show you what's been marked as Government's

2  Exhibit 1-2-112.

3          THE CLERK:  You just did that one.

4          MR. DEVILLERS:  I'm sorry, you're already on there.

5  Can you get out of that particular one, and I want to show the

6  top right.  I believe this is already in evidence, Your Honor.

7          THE COURT:  Yes, it is.

8          MR. DEVILLERS:  May I publish to the jury?

9          THE COURT:  Yes, you may.

10    BY MR. DEVILLERS:

11   Q.   All right.  And do you see any individuals in this

12  photograph you recognize?

13   A.   Yes.

14   Q.   And who do you see?

15   A.   I see Robert Brandon Ledbetter.

16   Q.   I would now like to show you what's been marked as

17  Government's Exhibit 1-1-143.

18          MR. DEVILLERS:  And, Agent, if you could blow up the

19  photograph.

20    BY MR. DEVILLERS:

21   Q.   Do you recognize this photograph, Lieutenant?

22   A.   I do.

23   Q.   What is this?

24   A.   It's a Chevrolet Caprice that was driven by Christopher

25  Harris.

TRIAL ONE – VOL. 20 –  3834

1    Q.    Have you seen it driven by Christopher Harris?

2    A.    Yes.

3    Q.    Did you take this photograph?

4    A.    No.

5    Q.    Is there anything unusual about this car as you look at

6    this photograph?

7    A.    The -- at the time it was very popular with members of

8    the Short North Posse to use or have stripes put on their cars.

9         MR. DEVILLERS:  Okay.  May I publish this to the jury,

10   Your Honor?

11        THE COURT:  Yes, you may.

12     BY MR. DEVILLERS:

13   Q.    I now want to show you what's been marked as

14   Government's Exhibit 1-1-136.

15        MR. DEVILLERS:  And if you could blow up the left

16   photograph.

17     BY MR. DEVILLERS:

18   Q.    Do you see that, Lieutenant?

19   A.    I do.

20   Q.    Do you recognize that?

21   A.    I do.

22   Q.    What is that?

23   A.    Chevy Caprice.  I believe that it was registered to

24   Antonio Harris, but it was operated by Chris Harris as well.

25   Q.    Have you seen Chris Harris in this vehicle?

1    A.    Yes.

2    Q.    Have you seen him driving this vehicle?

3    A.    Yes.

4         MR. DEVILLERS:  May I publish this to the jury,

5    Your Honor?

6         THE COURT:  Yes, you may.

7      BY MR. DEVILLERS:

8    Q.    And, Lieutenant, do you see anything unusual about this

9    vehicle?

10   A.    This vehicle also has a stripe on the back quarter

11   panel.

12   Q.    I want to play for you a phone call, see if you

13   recognize the voice in this phone call.

14        MR. DEVILLERS:  150-1324, and please start at 3:38.

15     (Audiotape played in open court.)

16     BY MR. DEVILLERS:

17   Q.    Do you recognize who the voice is?

18   A.    I don't recognize the female's voice, but the male's

19   voice is Christopher Harris.

20        MR. DEVILLERS:  All right.  Can you continue?

21     (Audiotape played in open court.)

22     BY MR. DEVILLERS:

23   Q.    Did you hear that?

24   A.    I did.

25   Q.    Did you hear anything about stripes?

TRIAL ONE – VOL. 20 –  3836

1    A.    I did.

2    Q.    What did you hear?

3    A.    He indicated that when people from other neighborhoods

4  see vehicles with the stripes, that they are scared.

5         MR. DEVILLERS:  May I have a moment, Your Honor?

6         THE COURT:  Yes, you may.

7    BY MR. DEVILLERS:

8    Q.    Lieutenant, I want to show you a photograph --

9         MR. MEYERS:  Your Honor, if I may, do we have the stop

10  time for that last phone call?

11        MR. DEVILLERS:  I'm sorry.  It was 3:58.

12    BY MR. DEVILLERS:

13    Q.    I now want to show you a photograph marked as 48-11.

14        MR. DEVILLERS:  And if you could just blow up that one

15  section.

16    BY MR. DEVILLERS:

17    Q.    Do you see this, Lieutenant?

18    A.    I do.

19    Q.    Do you recognize that?

20    A.    It's a van.

21    Q.    If you don't --

22    A.    I don't, no.

23    Q.    You don't recognize that?

24        MR. DEVILLERS:  Okay.  May I have a moment,

25  Your Honor?

TRIAL ONE - VOL. 20 -  3837

1          THE COURT:  Yes, you may.

2          MR. DEVILLERS:  Nothing further, Your Honor.

3          THE COURT:  Ladies and gentlemen, it's 10:40.  Why

4   don't we take our morning recess.

5          Well, before we do that, I want to make sure that

6   there's some cross-examination because I might -- if there's no

7   cross-examination, I can let Officer Smith Weir go.

8          MR. BERNDT:  Your Honor, I do have a couple questions.

9   I could promise the Court it would probably be 5 minutes or

10  less for myself.

11         THE COURT:  Thank you, Mr. Berndt.

12         MR. GATTERDAM:  I have questions.  I'm not sure

13  exactly how long.

14         THE COURT:  All right.  We'll take our recess now.

15  It's 10:40.  We'll stand in recess until 10:55.

16     (Jury out at 10:44 a.m.)

17     (Recess taken from 10:40 a.m  to 10:55 a.m.)

18         THE COURT:  Mr. Berndt, are you ready to proceed?

19         MR. BERNDT:  Yes, I am, Your Honor.  Thank you very

20  much.

21         THE COURT:  Please proceed.

22                        - - -

23                   CROSS-EXAMINATION

24   BY MR. BERNDT:

25   Q.   Lieutenant Weir, good morning.

TRIAL ONE – VOL. 20 – 3838

1    A.   Good morning, sir.

2    Q.   My name is Jeff Berndt.  I represent Robert Ledbetter.

3  Can you hear me okay?

4    A.   Yes, I can.

5    Q.   Thank you.  I just have a couple of questions for you.

6  You had indicated a sign that you affiliated with the Short

7  North and/or what's been roughly referred to as the Short North

8  Posse, some type of four down?

9    A.   It's usually four up, sir.

10   Q.   Four up?

11   A.   Yes, sir.

12   Q.   And is it possible for somebody to make that sign

13  without being a member of a gang?

14   A.   Yes, sir.

15   Q.   And it's the Short North is a neighborhood, too,

16  correct?

17   A.   Yes.

18   Q.   Okay.  And I recognize that you associate that sign with

19  some type of gang affiliation.  But that sign, in and of

20  itself, and/or the use of that sign, does not necessarily mean

21  that you're affiliated with that other group, correct?

22   A.   That's correct, sir.  However, I've never seen anybody

23  not associated with the gang pose with that sign in a picture.

24   Q.   Okay.

25        MR. BERNDT:  Could you bring up the -- I think it's

TRIAL ONE – VOL. 20 – 3839

1    1-2-112?

2         Could we go with the one in front of the house?

3         Thank you, Erick.

4    BY MR. BERNDT:

5    Q.    Lieutenant, do you see the picture in front of you?

6    A.    I do, sir.

7    Q.    Do you know where this picture was taken?

8    A.    I do not.

9    Q.    So you don't know whether this picture was taken in the

10   Short North?

11   A.    No, sir.

12   Q.    And that's Mr. Ledbetter in the front, correct?

13   A.    That is correct.

14   Q.    Do you know the people standing behind Mr. Ledbetter?

15   A.    I do not.

16   Q.    Do they appear to be gang affiliated?

17   A.    Sir, I don't know who they are so I wouldn't be able to

18   speculate on that.

19   Q.    I'm talking about in this picture.  Do they appear to be

20   gang affiliated?

21   A.    Sir, I don't know who the people are so I wouldn't be

22   able to speculate.

23   Q.    You saw other pictures of people dressed in Cut Throat

24   outfits, people holding money, people in front of fancy cars,

25   things like that.  When you compare this photo to those, does

TRIAL ONE - VOL. 20 - 3840

1  this appear to be of the same ilk?

2  A.  Off the top of my head, sir, it does not.  However, like

3  I said, I'm not calling those people gang members because

4  their -- based on appearances.  It's because I know who they

5  are and --

6  Q.  Would you agree with me that this picture is unique

7  among the pictures that you've been shown today in regard to

8  people throwing up signs?

9  A.  Yes, sir.  It's different than that.

10  Q.  Thank you.

11      MR. BERNDT:  No further questions, Your Honor.

12      THE COURT:  Thank you, Mr. Berndt.

13  Mr. Berndt, do you need that picture?

14      MR. BERNDT:  No, I do not.

15      THE COURT:  You may take it down, Ms. Clark.

16  Mr. Gatterdam?

17      MR. GATTERDAM:  Thank you, Your Honor.

18                      - - -

19              CROSS-EXAMINATION

20  BY MR. GATTERDAM:

21  Q.  Lieutenant, good morning, again.

22  A.  Good morning, sir.

23  Q.  Just following up where Mr. Berndt left off.  So you're

24  saying that throwing down a sign does not make you a gang

25  member, correct?

TRIAL ONE – VOL. 20 –  3841

1    A.    Not necessarily.

2    Q.    Okay.  Because, for example, I'm going to do something

3  right now.  (Indicating.)  You've seen this before?

4    A.    I have.

5    Q.    What is it?

6    A.    Well, it's you're pinky and index finger --

7    Q.    I asked the question.  You're answering.  I appreciate

8  it.

9    A.    I've seen it pointed down like an H for Homicide Hit

10  Squad, yes.

11    Q.    How about this for Hook'em Horns, Texas Longhorns?

12    A.    I have seen that on ABC Sports or ESPN.

13    Q.    It doesn't mean I'm part of the Texas Longhorns gang

14  because I did that, does it?

15    A.    Not that I know of, sir.

16    Q.    Now, you talked about graffiti and you've looked at some

17  pictures.  To be clear, you've never seen Christopher Harris

18  putting graffiti out on buildings, correct?

19    A.    I've never seen that.

20    Q.    The graffiti that you saw on there, correct me if I'm

21  wrong, you didn't actually see who put it on there?

22    A.    No, sir.

23    Q.    And you don't know actually when it got put on there,

24  correct?

25    A.    No.  We know general time frames by a building -- side

TRIAL ONE – VOL. 20 – 3842

1  of a building might not have anything on it, and then a week or

2  two later, I see graffiti on it.  So I know general time

3  frames.  But I don't know exactly per se date and time or who.

4  Q.   And you don't know whether Christopher Harris ever put

5  any graffiti up, correct?

6  A.   No, sir.

7  Q.   You don't know whether he approved of any graffiti or

8  disapproved of any graffiti, correct?

9  A.   No.

10  Q.   And you said you're familiar with Mr. Harris.  Are you

11  familiar with other members of his family?

12  A.   I met Demetrius, Antonio.  I've met Brandon.

13  Q.   Have you met Alandice?

14  A.   I believe so.

15  Q.   And do you have any reason to doubt that Antonio is not

16  a brother but a cousin of Mr. Harris?

17  A.   I'm not sure.  Like I said, I've met both of them.  I've

18  talked to both of them.  But I never asked them per se their

19  relationship.

20  Q.   And fair to say that Chris was around his brothers quite

21  often?

22  A.   I believe I've seen him with Demetrius.  I can't say

23  that I've -- the majority of times that I've talked to Chris

24  that he's been in the company of his family.

25  Q.   And during this time period, you're aware that he was

TRIAL ONE - VOL. 20 - 3843

1    living down off Bucher?

2    A.    I am aware that I think 1904 Bucher was the address that

3    was always listed as his address with Columbus Division of

4    Police.  But I've never seen him down on Bucher.

5    Q.    Have you gone to do surveillance on Bucher?

6    A.    Yes, I have.

7    Q.    And that is in what part of town?

8    A.    It's 13 precinct which is the south end, down at South

9    High and around Barthman area.

10   Q.    And during this period of time, you never arrested

11   Mr. Harris with a gun on his person, correct?

12   A.    No.

13   Q.    Never arrested him for drugs?

14   A.    No.

15   Q.    Never arrested him for committing a robbery?

16   A.    No.

17   Q.    And when you talk with these gangs, is it fair to say -

18   Mr. Berndt asked you this question - they're based on

19   neighborhoods, correct, in your experience?

20   A.    Some gangs are, yes.

21   Q.    Like give us some other names that are based on

22   neighborhoods.

23   A.    Windsor Terrace Posse.

24   Q.    Anything else?

25   A.    The Deuce Deuce Bloods, Alane Gangster Crips, East Fifth

TRIAL ONE – VOL. 20 – 3844

1    Avenue Crips.

2      Q.    Each of those you just named, you could say they're all

3    from this area of town, correct?

4      A.    You can say that.  It's almost like home base, but it

5    doesn't necessarily mean that every member of that gang or

6    associate of that gang lives or spends a hundred percent of

7    their time or commits all their crimes in a certain

8    neighborhood.

9          Gangs, at least in my experience in Columbus, Ohio, for

10   the people that I've interacted with, are a little bit more

11   fluid than that.

12     Q.    But it starts out based on a neighborhood, and that's

13   where the name comes from?

14     A.    That's correct.

15     Q.    You were shown some photographs and -- of different

16   cars.  Do you remember that?

17     A.    Yes, sir.

18     Q.    And the cars with stripes on it, they were pretty

19   popular back at this time that you're talking about, weren't

20   they?

21     A.    Yes, that's correct.

22     Q.    And the Milo Boys had those kind of stripes, red car

23   with stripes on it, correct?

24     A.    Yes.

25     Q.    And you saw a number of different pictures that

TRIAL ONE - VOL. 20 - 3845

1  Mr. DeVillers showed you, appeared to be a bunch of friends who

2  were having a good time, correct?

3  A.   Which?

4  Q.   The pictures of people standing around together with a

5  beer like at a party, like any other picture, somebody at a

6  party, correct?

7  A.   Well, sir, I believe a lot of those pictures that we --

8  were taken at a memorial wake for Richard Willis, so I don't

9  know that it was exactly celebratory.

10  Q.   The ones with a beer, having a beer, appear to be people

11  at a party.  You've seen those kind of pictures before,

12  correct?

13  A.   Yes.  The photos he was showing me were from Richard

14  Willis's party, or some of them were.

15  Q.   And you never -- in the course of your investigation,

16  you never seized any documents that had a table of organization

17  or anything written other than this graffiti about the Short

18  North Posse, correct?

19  A.   No.  We did not seize any hierarchy or table

20  organization.

21  Q.   Or any ledgers, anything like that, correct?

22  A.   Drug ledgers, yes.

23  Q.   Understood.  Those would be separate for each drug

24  transaction.  I'm talking about a specific Short North Posse

25  rules-of-order-type thing?

TRIAL ONE – VOL. 20 –  3846

1    A.   No, I did not.

2         MR. GATTERDAM:  May I have a moment, Your Honor?

3         THE COURT:  Yes, you may.

4         MR. GATTERDAM:  Nothing further, Your Honor.  Thank

5    you, Lieutenant.

6         THE WITNESS:  Thank you, sir.

7         THE COURT:  Ms. Dixon, any examination?

8         MS. DIXON:  Thank you.

9                        -  -  -

10                  CROSS-EXAMINATION

11   BY MS. DIXON:

12   Q.   Good morning.

13   A.   Good morning, ma'am.

14   Q.   Lieutenant Weir, did you review any documents, listen to

15   anything in preparation for your testimony today?

16   A.   Yes.  I went through some of the old files from the -- I

17   read my overview from the Operation MTV Network investigation.

18   Q.   Okay.  Did you look at any of the investigative reports

19   prepared with respect to these folks, this case?

20   A.   No, I did not review any reports from the FBI case.

21   Q.   Well, when I say -- do you know what I mean, first of

22   all, when I say an investigative report?

23   A.   Yes.

24   Q.   Okay.  Did you look at any of those from Columbus

25   police?  Not FBI, from CPD.

TRIAL ONE – VOL. 20 – 3847

1    A.    I looked at reports that I had generated, you know, over

2    the years, proffer reports, reports that were associated with

3    the investigation I helped with with the VCIT Task Force.

4    Q.    Okay.  And do you know who Detective Pat Brooks is?

5    A.    Yes, I do.

6    Q.    And who is Detective Brooks?

7    A.    He is a former Columbus police officer.

8    Q.    Okay.  And did he prepare -- to your knowledge, did he

9    prepare any investigative reports with respect to gang

10   activity, Short North Posse?  Did he prepare any of those

11   reports?

12   A.    None of the reports that I have used or that were used

13   in the investigation that I worked under.  I have read

14   intelligence reports that he prepared, or wrote before, prior

15   to my time as an investigator.

16   Q.    Okay.  So he prepared reports, but you're saying you

17   didn't rely on any of those reports.  Is that fair?

18   A.    No.

19   Q.    No?

20   A.    No.  I didn't rely on those reports either during our

21   investigation for any probable cause or in preparation for this

22   testimony.

23   Q.    Okay.  And do you know whether or not any of those

24   reports are still in the files?  Do other people use them, do

25   you know?

TRIAL ONE - VOL. 20 - 3848

1    A.    I do not know what the retention schedule for any kind

2    of intelligence or investigator reports are for the Criminal

3    Intelligence Unit, no.

4    Q.    Okay.  Now, do you know who Robert Liston is?

5    A.    Yes, I do.

6    Q.    Who is Robert Liston?

7    A.    He is a relative of Rashad Liston.  I know him as RJ or

8    Big RJ.

9    Q.    Do you have him documented, associated with any groups?

10   A.    He is documented -- I'm sorry.  Excuse me.  He is a

11   known Short North Posse member or associate.

12   Q.    Okay.  And can you tell me about this document versus

13   associate?

14   A.    There are -- again, I'm not in the Criminal Intelligence

15   Unit so I'm not responsible for the quote/unquote documenting

16   the gang member versus whether a documented member or

17   associate.  However, I do know that there are certain criteria

18   that have to be met, whether it's -- if there's ten different

19   criteria of possible, you know, clues as to what could make a

20   gang member a gang member.  You have to reach a certain number

21   of them.  I believe it's three to document somebody as a gang

22   member.

23   Q.    You said there's three clues that you guys use?

24   A.    There's I think ten different criteria.

25   Q.    Ten different?

1    A.    There's different -- you know, documented associations,

2  criminal conspiracies, criminal activity, clothing,

3  self-admission, informant.

4    Q.    I'm sorry.  You're talking fast.

5    A.    I'm sorry.

6    Q.    One is criminal activity, right?

7    A.    That's correct.

8    Q.    In no certain order.

9    A.    Right.

10    Q.    Okay.  Criminal activity.  And what was the second thing

11  you said?

12    A.    Well, going back I don't know what order I said them in,

13  but criminal activity, you could have informant's tip --

14    Q.    Informant's tip.  Okay.

15    A.    -- that they're a gang member.  You could have

16  self-admission that somebody is a gang member, clothing,

17  repeated association with known members.  You see somebody

18  throwing a gang sign.  There's -- like I said, there's more.

19  That's just a handful of them.

20    Q.    So the ones that you are readily familiar with would be

21  an informant could tell you, right?  An informant could say

22  this person is in a gang?

23    A.    An informant tip by itself would not give you enough.

24    Q.    I understand.  I'm just saying just kind of doing an

25  overview of what you just told me.

TRIAL ONE – VOL. 20 – 3850

1    A.    Yes, ma'am.

2    Q.    Some of these criteria would be an informant saying this

3    person is in the gang, the person itself admits they're in the

4    gang, repeated association with the gang, making a hand sign,

5    right?  And criminal activity, right?  Those are --

6    A.    Yes.

7    Q.    And so you said that in order to be a documented member,

8    a person has to have at least three of these?

9    A.    I believe so.  I think the national -- there's a

10   national criteria.  I believe it's -- our division of police

11   policy is more stringent than the national average.  But like I

12   said, I'm not a member of the Criminal Intelligence Unit.  They

13   handle and they are the experts on that.  So I would ask them.

14   Q.    Okay.  And so these are your criteria, though, correct?

15   Not yours personally, but I think you named a national

16   organization, right?  And then you said the local is more

17   stringent than the national?

18   A.    That is correct.

19   Q.    And so when I say your criteria as opposed to the folks

20   who grow up in these neighborhoods, they don't get together and

21   say you have to have this, this, this and this.  It's you guys

22   who say once they do X, Y and Z, we're going to consider them a

23   member of this particular gang or we're going to label them a

24   certain way?

25   A.    I believe that's correct.

TRIAL ONE - VOL. 20 - 3851

1   Q.   And would it be fair to say that self-admission would

2   trump everything?

3   A.   That would still only count as one criteria.  I believe

4   that that's fairly convincing if somebody would come to you and

5   tell you that they are a gang member.

6   Q.   Okay.  And if you get the information by way of an

7   informant --

8   A.   Uh-huh.

9   Q.   -- would it be fair to say something else has to come

10  along with that, at least?

11  A.   Absolutely.  In my experience, we never relied solely on

12  the word of an informant.

13  Q.   Okay.  Because is it -- is it fair to say that a police

14  officer, for instance, a patrol officer, could just review

15  documents and based on reviewing documents make a conclusion

16  that somebody's a gang member or in a gang?

17  A.   They could make that -- they could come to that

18  conclusion but that still wouldn't be enough.  As a patrol

19  officer, you could forward information to the Criminal

20  Intelligence Unit and say, I believe John Doe is in a gang and

21  I believe he's in this gang.  But that wouldn't by itself be

22  enough to make it so.  The detectives assigned to review and to

23  investigate those claims would have to verify that and come up

24  with additional evidence.

25  Q.   So are you saying that if a patrol officer came and

TRIAL ONE – VOL. 20 – 3852

1    testified in court that all he did was review records, and

2    based on his reviewing records he determined that people were

3    in gangs, would you deem that that testimony is not sufficient

4    to conclude that the people he said are in gangs are in gangs?

5      A.   It depends on all the evidence that he reviewed and if

6    that information was vetted through the Criminal Intelligence

7    Unit.

8      Q.   But I'm saying so a person could review records, just

9    all they did is review records and draw that conclusion from

10   reviewing records and only reviewing records?

11     A.   I'm sorry.  When you say records, what kind of records

12   are you referring to?

13     Q.   Well, can I --

14          MS. DIXON:  Your Honor, may I approach the witness?

15          THE COURT:  Yes, you may.

16          THE WITNESS:  Do you want me to tell the jury what I'm

17   looking at?

18   BY MS. DIXON:

19     Q.   No, sir.  Just take a look at it.

20     A.   This is an investigative report -- I'm sorry.

21     Q.   Now, can you tell the ladies and gentlemen of the jury

22   what the document is that I showed you?

23     A.   It was a Columbus Division of Police at the time

24   Strategic Response Bureau Investigative Report.

25     Q.   Those reports, it's information compiled, correct, by

TRIAL ONE - VOL. 20 -  3853

1    various officers, investigators, documenting information that

2    they collect with respect to the subject matter at the top,

3    right?

4    A.    That's correct.

5    Q.    And the criminal activity, right?  And who they are, the

6    person who is actually doing the investigating?

7    A.    That's correct.

8    Q.    And it has to be signed off by somebody, right?

9    A.    Yes.

10   Q.    Okay.  And so if information in that kind of a report is

11   incorrect and someone else reads it, then that's how incorrect

12   information can be passed on through records, right?

13   A.    In a manner of speaking, that's correct.  But that's

14   what an investigation is, is a search for the truth.  And

15   sometimes you start off with information or incomplete

16   information and -- especially in the intelligence business, and

17   you work through it.

18         Obviously, in that specific report, the document --

19   contact Detective Seckman and Detective Brooks had with three

20   individuals in the Short North, they had an alias obviously

21   incorrect.

22         In the beginning of an investigation there are all

23   manner of things that you may not know.  And that's why you do

24   an investigation, is to search for the truth.  And hopefully by

25   the time that you complete your investigation, you've sorted

TRIAL ONE – VOL. 20 – 3854

1   all the facts out.

2   Q.   What's the incorrect information that you saw in that

3   report?

4   A.   On that report, it said that they talked to Robert

5   Liston.  And in there they said, AKA Buckwheat.

6   Q.   And that's incorrect?

7   A.   That's incorrect.

8   Q.   Do you know if there's any other document on down the

9   line correcting that?

10  A.   Off the top of my head, I do not know that.

11  Q.   You also talked about -- I think you made the statement

12  that you've never seen anyone not affiliated with Short North

13  Posse make the four sign?

14  A.   Four sign posing in a photo I believe is how I described

15  that.

16  Q.   You've never seen anybody not affiliated with Short

17  North Posse posing in a photo making that sign, right?

18  A.   That's correct, I haven't.

19  Q.   So you don't peruse through family photos from cookouts

20  of regular folks who live in the Short North, do you?

21  A.   Typically, in the -- during the investigation that I

22  took part in, we did not come across many family photos or

23  photos from cookouts or of, you know, different family members.

24  Most of the photos we saw were photos from parties involving

25  gang members or associates or photos taken at clubs.

TRIAL ONE - VOL. 20 - 3855

1    Q.   Well, so the point is when you say you've never seen

2    that, you've never looked for it, other than what's the focus

3    of your investigation, right?

4    A.   That's correct.  I have not gone looking through family

5    photo albums looking to see if anybody else was throwing fours

6    up.

7    Q.   And so based on what you just said in terms of, you

8    know, wrong information in this report, that it's all about a

9    search for the truth, wouldn't you think that at the very least

10   someone would go out there and say, you know what, let me just

11   see what else I can find to see if I'm right on this, because

12   maybe there's pictures out there where people are making this

13   four sign and it really is about a neighborhood and not about a

14   gang?

15   A.   That's always possible, ma'am.  However, the part that

16   gave us access to look at the photos was usually because we had

17   probable cause of a crime.  If the people aren't criminals, I

18   don't necessarily think that they would let me into their

19   living room to look at their family photos.  I'm not trying to

20   be smart about that.

21   Q.   I'm not taking it as smart at all.

22        MS. DIXON:  Thank you.

23        THE COURT:  Mr. Meyers.

24        MR. MEYERS:  Thank you, Judge.

25

TRIAL ONE – VOL. 20 –  3856

1                          – – –

2                   CROSS-EXAMINATION

3    BY MR. MEYERS:

4    Q.   Good morning, Lieutenant.

5    A.   Good morning, sir.

6    Q.   Around we go through the room, right?

7    A.   Yes, sir.

8    Q.   You joined the force in '99.  Did I hear you say that?

9    A.   That's correct.  December of 1999.

10   Q.   You're aware there was a big bust, so to speak, of the

11   Short North area folks back in the mid '90s?  Do you know that

12   generally?

13   A.   Yes.  I read some of the reports from back then.

14   Q.   And there was subsequently another one I think – when

15   was that? – the early 2000s?

16   A.   There was a state investigation I believe in 2001 or

17   2002.

18   Q.   Would it be correct that as things evolved over time, as

19   we reach and approach the mid 2000s, 2005, 2006, there was a

20   fair number of people, men, associated with the Short North who

21   had been put in prison?  It changed the culture a bit in the

22   Short North neighborhood area as we've discussed it.  Do you

23   know that?  Is that a fair characterization that, in a sense,

24   the older generation got locked up?

25   A.   Yes.

TRIAL ONE - VOL. 20 - 3857

1    Q.    And it fractured what was going on in that geographic

2    part of town.  It altered it to where different sets arose on

3    their own, correct?

4    A.    Seeing how I came into it in that early 2000s, the mid

5    2000s, it's hard for me to look at that and say this evolved

6    because of the '95 sweep or the 2001 investigation, because

7    those had occurred by the time that I started working in the

8    Weinland Park area.  So it's hard for me to make an educated

9    comment on that.

10   Q.    Let me fix a focus for a minute, then, on the photos you

11   talked about and the matters you described regarding the Cut

12   Throat Committee.  There was the one photo -- I forget the

13   number off the top of my head, but you identified the four

14   members of the Cut Throat Committee, right?

15   A.    That's correct.

16   Q.    And we saw the woman in one of the photos who was garbed

17   up with a white background top and pants upon which were

18   emblazoned repeatedly in red letters, CT?

19   A.    That's correct.

20   Q.    Which is understood to stand for Cut Throat, correct?

21   A.    That's correct.

22   Q.    Hold that aside.  Let me jump over here.  You have some

23   background knowledge and training, of course, just to do your

24   work, in general gang information, correct?

25   A.    That is correct.

TRIAL ONE – VOL. 20 – 3858

1    Q.    I mean, you talked about the signs and the Rollin 20s

2    and what have you, right?

3    A.    Yes, sir.

4    Q.    And am I correct that Crips traditionally do a couple of

5    things.  They favor the color blue as opposed to red, right?

6    A.    That is correct.

7    Q.    And they stand apart in contest, generally speaking,

8    certainly historically speaking, with another gang that began

9    out in Los Angeles called the Bloods?

10   A.    Traditionally, that's correct.

11   Q.    And the Bloods favor the color red, correct?

12   A.    That is correct.

13   Q.    And there have been times in different parts of our

14   nation where those two gangs, they can do violence upon each

15   other merely because of somebody's wearing the wrong color,

16   correct?

17   A.    That is correct.

18   Q.    Another feature, if I understand it correctly, that is

19   commonly associated with the Crips is if they're going to spell

20   a word that contains the letters C-K, like black, they'll steer

21   clear of using C-K in favor of double C, right?

22   A.    I've seen that before, right.

23   Q.    That's because in the gang lore C-K is understood for

24   being Crip killer, right?

25   A.    Yes, sir.

TRIAL ONE - VOL. 20 - 3859

1    Q.   So you wouldn't normally expect to find someone

2    affiliated with a Crip gang using C-K, true?

3    A.   Normally, no.

4    Q.   In the geographic location called Short North, there was

5    something you've described as the Cut Throat Committee, right?

6    A.   That is correct.

7    Q.   We've heard talk in this trial already about another

8    group called the Homicide Squad.  Is that something you're

9    familiar with, generally?

10   A.   Yes, sir.

11   Q.   And there were others within that same geographic

12   domain; is that right?

13   A.   Yes, sir.

14   Q.   Can you name me a few of them?

15   A.   There was the Nutty Block.  We had heard that term

16   before.  And that was mostly for individuals that we associated

17   with Stephen Austin who went by the street name Nutty.

18   Q.   Within the embrace -- if we had a map -- we had a map

19   earlier in the trial, a blowup map of the streets embraced

20   within what we know as the Short North neighborhood, not Short

21   North Posse or gang, but the neighborhood, right?

22   A.   Yes, sir.

23   Q.   And the Nutty thing was separate and apart as well,

24   existing within that geographic domain, correct?

25   A.   Yes, sir.  It was -- it's almost -- the Short North

TRIAL ONE - VOL. 20 - 3860

1    Posse was the parent organization.  And there were certain

2    factions within it, different divisions almost.

3        Q.    Did the parent organization die off, pass away of old

4    age?

5        A.    No, sir.

6        Q.    You've talked about some of the other areas in town, the

7    PTL.  That stands for what?

8        A.    Poindexter Thug Life.

9        Q.    And Willis -- Richard Willis went by the street name Le

10   Le?

11       A.    Le Le or Fee Fee.  As time evolved, he transitioned from

12   Le Le over to Fee Fee.

13       Q.    And it's amazing how those names pop up, by the way.

14   Who knows why.  But he was a Blood.  PTL is Poindexter Thug

15   Life Blood?

16       A.    Yes.

17       Q.    And many of those photos in which you identified

18   Mr. Ussury were at the anniversary of his death, the gathering

19   at the anniversary of his death, correct?

20       A.    Yes.

21       Q.    Many of those photos, by the way -- and maybe this is

22   somewhat in line with some of the questions Ms. Dixon was

23   posing.  Do you understand correctly that a lot of those

24   photos -- by "those photos," I mean, many of which you

25   described with Mr. DeVillers today that appeared to be folks in

TRIAL ONE – VOL. 20 –  3861

1   their own world gathering at an anniversary of the death of

2   someone they knew and loved?

3      A.   Uh-huh.

4      Q.   Some of those taken at any rate, am I correct, were

5   photos that law enforcement picked off or found on public

6   domains like Facebook or Instagram on computer networking

7   services, correct?

8      A.   Those specific photos I do not believe were off social

9   network.  I believe those photos were seized either in search

10  warrants or traffic stops.

11     Q.   Or on phones, right?

12     A.   On or phones.

13     Q.   There's been all kind of talk – and there will be more

14  to come – about phones in this case, the modern cell phones,

15  just to state an obvious point into a record of a trial, as a

16  camera capacity, right?

17     A.   Yes, sir.

18     Q.   So some of the photos were intentionally taken or they

19  were found in connection with a lawful acquisition of

20  somebody's personal cell phone, right, some of them?

21     A.   Possibly.

22     Q.   Those ones that you talked about today especially in the

23  series in the one-dash-two series, did those -- do you know,

24  did they come from like the Facebook or the Instagram captures?

25     A.   I believe those photos were taken in 2006.  I believe

TRIAL ONE - VOL. 20 - 3862

1   they were seized either in 2006 or 2007.  And I'm not an

2   expert, but I don't even know if Facebook or Instagram were

3   around at that time.

4    Q.   I'm not even sure I know what Instagram is.  But we'll

5   let it go at that.

6        They do not appear -- they're -- those are almost

7   certainly not pictures where a uniformed officer said pose for

8   the camera, right?

9    A.   Correct.

10   Q.   Whereas some of the other ones, they really were, that

11  you would approach somebody on the street, they're out in the

12  public, you're allowed to take our picture.

13   A.   That's correct.  I believe there was one picture in

14  particular of Freddie Johnson that was taken by law

15  enforcement.  I believe the picture, obviously, of Ms. Allen

16  was taken by law enforcement.  Some of those other photos,

17  obviously were I think found or seized through investigative

18  means.

19   Q.   And over time as the case evolves where there is an

20  investigation with some suspicion, some probable cause into

21  what can erupt into this big gathering in a courtroom, not all

22  the pictures seized on any given phone were reviewed by you in

23  this courtroom today.  That's just an obvious fact.  Is that

24  true?

25        Let me put it a clearer way.  Take the Richard Willis

TRIAL ONE - VOL. 20 - 3863

1  memorial gathering.  Do you know -- first, you've mentioned he

2  was Poindexter Thug Life Blood, correct?

3  A.  Originally, yes.  Later on into that 2004, 2005, he was

4  consistently at Fourth and Eighth.  And we believe he was a

5  member of the Short North Posse.

6  Q.  "We believe."  I mean, he is a Blood and it's

7  geographic -- for those not familiar with Columbus, Poindexter

8  is out there on the east side.  It's across the freeway, I-71.

9  And it's across the tracks that tend to bound the east side

10  boundary of the Short North area of Columbus, fair?

11  A.  Yes.  Poindexter Village is, I guess the easiest

12  description is just west, or was just west of OSU Hospital.

13  Q.  On the near east side of Columbus?

14  A.  Near east side.  Mount Vernon Avenue, East Long Street

15  were the north/south boundaries of Poindexter Village.

16  Q.  You were involved with the ATF and the task force in

17  investigations related to that Mount Vernon area?

18  A.  That's correct.

19  Q.  And that if we say the Mount Vernon sweep, would I be

20  correct that that meant law enforcement's focus on Poindexter

21  Thug Life Bloods and 218?

22  A.  That's correct.

23  Q.  And 218 is that geographic locale, 21st and 18th?

24  A.  When the gang originated in the late '90s, that was

25  their area of -- their base of operations, so to speak.  As

TRIAL ONE - VOL. 20 - 3864

1   time evolved, obviously, individuals got older, the base of

2   operations wasn't really applicable.

3   Q.    But maybe similar I think to some of Mr. Gatterdam's

4   questions, it was initially, primarily, this is our

5   neighborhood, this is 218 for 21st and 18th?

6   A.    Initially, yes.

7   Q.    And Poindexter was a big low-income housing area in

8   town, right?

9   A.    That is correct.

10  Q.    And some of the other ones you clicked off -- I think

11  you were talking to Mr. Gatterdam about there's pockets of

12  neighborhoods that have different names associated throughout

13  our urban area, correct?

14  A.    That is correct.  May I?

15  Q.    Yes.

16  A.    One of the -- the interesting things about the group,

17  almost the group within the group of the Short North Posse that

18  became what we were to learn was the Cut Throat Committee, was

19  that they were able to move from neighborhood to neighborhood.

20  And they could be in Poindexter with members of the PTL Bloods

21  and be accepted as a PTL Blood, and then the same day be at

22  Fourth and Eighth and be with the Short North Posse.

23        The intertwining -- I don't know what the word I'm

24  looking for --

25  Q.    You used the word fluid in your earlier testimony.

TRIAL ONE - VOL. 20 - 3865

1   A.   Yes.  It was a very fluid group within the group that

2   was involved with these gangs.  So there was that Richard

3   Willis situation where he could -- you could see a picture of

4   him, you know, on Phale D Hale throwing a Poindexter PTL sign,

5   and the next photo you turn over he is at Fourth and Eighth

6   with members of the Short North Posse.

7   Q.   Is it correct that one way to think of fluidity is the

8   affiliations?  There's no clear demarcation in terms of some

9   sense of -- I think Mr. Gatterdam was questioning -- we

10  certainly know there's no roster of membership list like in the

11  Kiwanis Club or Rotarian.  That type of structure does not

12  exist with these groups, does it?

13  A.   I wouldn't say structure is the right word.  However,

14  there are roles.

15  Q.   Within the street life, not -- looking down from the law

16  enforcement perspective, the fluidity suggests, if not defines,

17  one for all -- they're all in it for whatever they can get in

18  any given moment without an affiliation or loyalty to a subset

19  or a group?

20  A.   Sir, I would concede there's certainly not the structure

21  like there is -- you could look at the police department

22  roster, or structure, and there's certain lines and everybody

23  has a job title.  I understand -- or you can see that's not the

24  same situation in what we would call the criminal street gangs.

25  However, there are roles people play.  There are defined limits

TRIAL ONE – VOL. 20 –  3866

1    to what –– the street rules, I guess.

2         But there's no rule book, per se, anywhere that I've

3    read or that I found –– we found during the case that I took

4    part in back in '06 to 2010.  But there were individuals that

5    had roles within the network and the organization.

6    Q.   Generally –– very generally, there are certain gangs

7    much more highly structured than what you're calling a street

8    gang that you know of just generally.  Like some of the prison

9    gangs are very highly structured, correct?

10   A.   Yes, sir.  What we refer to as the Chicago-based gangs

11   are typically more structured than the LA-based gangs.

12   Q.   There was a time, if I understand it right, when in the

13   Crip-Blood kind of conflict, if you had the colors, if you had

14   the red bandanna or blue bandanna and put it in your pocket,

15   that was basically declaring I'm ready to fight you if need be,

16   or you could become a target.  The blue became the target of

17   the red, and the red became the target of the blue; sometimes

18   lethally so, correct?

19   A.   Correct.

20   Q.   Here in our urban area, certainly in the mid 2000s, if a

21   guy like Le Le, Fee Fee, Willis could wake up on a Saturday

22   morning and be wearing red and being a member of the Blood

23   world at Poindexter and come to Fourth and Eighth for a little

24   afternoon activity, whatever the boundaries are, they weren't

25   that sharp, were they?

TRIAL ONE – VOL. 20 – 3867

1    A.    I wouldn't apply –– what was true about Mr. Willis was

2    not true city wide.  We definitely have had throughout the city

3    instances of, you know, feuds, based on the blue versus red.

4    Both historically through the 2000s and even today, we've

5    had –– or obviously not today, but in current times we have

6    issues with that.

7         But what was unique about Mr. Willis and some of his

8    friends was not true necessarily of, you know, throughout the

9    city itself.

10    Q.    The –– but in the end, I should say, overall, I think

11    trying to sort of capture in sum what you've been saying, using

12    your word fluidity, that wherever those geographic boundaries

13    or –– wherever the boundaries are, they're fluid.  I guess we

14    could leave it at that.  To some extent, they're fluid?

15    A.    Yes, sir.

16         MR. MEYERS:  One moment, if I may.

17         THE COURT:  Yes.

18         MR. MEYERS:  Your Honor, I have nothing further.

19    Thank you, Lieutenant.

20         THE COURT:  Thank you, Mr. Meyers.

21         Mr. Nolder, any cross?

22         MR. NOLDER:  No, Your Honor.

23         THE COURT:  Mr. DeVillers, any redirect?

24         MR. DEVILLERS:  Thank you, Your Honor.

25

TRIAL ONE – VOL. 20 –  3868

1                        – – –

2                 REDIRECT EXAMINATION

3   BY MR. DEVILLERS:

4   Q.   Okay.  Lieutenant, we talked about Richard Willis being

5   a PTL member?

6   A.   Yes.

7   Q.   Was Lance Green a PTL member?

8   A.   Yes.

9   Q.   Did Lance Green and Richard Willis associate with the

10  Short North Posse?

11  A.   Absolutely.

12  Q.   Were they members of the Cut Throat Committee?

13  A.   Yes.

14  Q.   Were the other members of the Cut Throat Committee also

15  members of the Short North Posse?

16  A.   Some.

17  Q.   Okay.  Who weren't?

18  A.   Kinyatta Glass.

19  Q.   Was he PTL?

20  A.   He was PTL.  And because he was in prison for a robbery

21  during our investigation into Cut Throat, we never saw him or

22  heard of him associating with members of the Short North Posse.

23  Q.   Was Tommy Coates a member of the Short North Posse?

24  A.   Yes.

25  Q.   Was he a member of Cut Throat?

TRIAL ONE - VOL. 20 - 3869

1    A.    Yes.

2    Q.    Was Freddie Johnson a member of the Short North Posse?

3    A.    Yes.

4    Q.    Was he a member of Cut Throat?

5    A.    Yes.

6    Q.    Was Allen Wright a member of the Short North Posse?

7    A.    Yes.

8    Q.    Were these guys all Crips as well?

9    A.    Yes.

10   Q.    Were they members of Cut Throat?

11   A.    Yes.

12   Q.    What did Cut Throat do?

13   A.    Cut Throat Committee was basically a team of individuals

14   that conspired to commit robberies and shootings often by

15   contract of drug dealers or rival gang members.

16   Q.    If I was a Deuce Deuce Blood and I wasn't associated

17   with the Short North Posse, could I just go to Fourth and

18   Eighth and start selling crack?

19   A.    No.

20   Q.    What would happen to me?

21   A.    I'm sure they would ask you politely to leave.

22   Q.    You were asked about neighborhoods and gangs.  Do you

23   recall being asked about that?

24   A.    Yes.

25   Q.    And Windsor Terrace, is that an area of Columbus?

TRIAL ONE - VOL. 20 - 3870

1    A.    It used to be.  That was a housing project located east

2    of Cleveland Avenue that is now called Rosewind.  But the gang

3    itself initiated when Windsor Terrace was there, and they still

4    use the name.

5    Q.    Were all the people that lived in Windsor Terrace, or

6    Rosewind now, are they members of the Windsor Terrace Posse?

7    A.    No.

8    Q.    The area of Twenty-Second Street and Livingston, are all

9    the people in the area of Twenty-Second and Livingston Deuce

10   Deuce Bloods?

11   A.    No.

12   Q.    The people in the Short North, are all those people

13   members of the Short North Posse?

14   A.    No.

15        MR. DEVILLERS:  May I have a moment, Your Honor?

16        THE COURT:  Yes, you may.

17        MR. DEVILLERS:  Nothing further.

18                            - - -

19   (The following proceeding was held at side-bar.)

20        THE COURT:  There was a point in Officer Smith Weir's

21   examination that was being conducted by you, Ms. Dixon, that

22   when I heard it and looked at it on the screen, I had some

23   concerns that it was a misrepresentation of the state of the

24   law.  And nobody objected and nobody cleaned it up, and I

25   wanted to look back at the answer before I interjected anything

TRIAL ONE – VOL. 20 – 3871

1   and before the jury.  Here was the answer.

2        The answer is this, "That's always possible, ma'am.

3   However, the part that gives us access to look at the photos

4   was usually because we had probable cause of a crime.  If the

5   people aren't criminals, I don't necessarily think that they

6   would let me into their living room to look at their family

7   photos.  I'm not trying to be smart about that."

8        And what struck me was that probable cause and criminals

9   are not equal.  I mean, probable cause, obviously, is probable

10  cause that a crime has been committed and/or that the person

11  accused, like a grand jury circumstance, is the person who

12  committed the crime.  But that doesn't necessarily mean that

13  they're criminals.  But looking back at this, it may not have

14  the connotation that first struck me when I heard it.  Because

15  when it first struck me, I was concerned that it undermined the

16  presumption of innocence and it gave a somewhat distorted

17  concept of probable cause.  But looking back on it, it's -- I

18  think it's susceptible to a more correct interpretation, and so

19  I'm content to leave it be.  I don't know that it needs to be

20  cleaned up because I don't want to confuse the jury any more

21  than necessary.

22        MS. DIXON:  And if you look at my question --

23        THE COURT:  Here is the question, "And so based on

24  what you just said in terms of, you know, wrong information in

25  this report, that it's all about a search for the truth,

TRIAL ONE - VOL. 20 - 3872

1    wouldn't you think that at the very least someone would go out

2    there and say, you know what, let me just see what else I can

3    find to see if I'm right on this, because maybe there's

4    pictures out there where people are making this four sign, it

5    really is about a neighborhood and not about a gang?"

6         MS. DIXON:  And so that was his answer.  And if you

7    notice that's when I kind of back away, because when he pulled

8    out that probable cause mumbo jumbo in there -- which I know

9    that's how they do -- I was like, you know what, let me just

10   leave this alone because this man is not -- or maybe my

11   question wasn't clear to him.

12        THE COURT:  I don't want to make a legal mountain out

13   of a molehill.  I don't want to confuse the jury.  I don't

14   think he conflated improperly probable cause and those

15   suspected of a crime as criminals.  Because he said, If the

16   people aren't criminals, I don't necessarily think they would

17   let me into their living rooms to look at their family photos.

18        I think that as a general proposition, that's not true

19   and it's not a legal matter.  And I think that the jurors

20   probably can sort that out.  I don't see a compelling reason at

21   this point for me to comment on that.

22        And then he says, I'm not trying to be smart about that.

23        MS. DIXON:  I know.  That's why I backed away from it

24   because I didn't want to get any further into -- your point is

25   well taken.

TRIAL ONE - VOL. 20 - 3873

1    THE COURT:  That's what I was looking at and that's

2    what I was considering.  But I'm going to let that sleeping dog

3    lie.

4        MR. BERNDT:  I appreciate the Court's concern.

5      (The following proceeding was held in open court.)

6                        - - -

7                RECROSS-EXAMINATION

8    BY MR. GATTERDAM:

9    Q.   Lieutenant, everyone that lives in the Short North can

10   validly consider themselves a member of the Short North

11   neighborhood, correct?

12   A.   Sir, in this context, are we talking about Weinland Park

13   or the actual Short North?

14   Q.   Anybody that lives in the Short North area that's

15   bounded by the Fourth -- all the streets you talked about, can

16   say "I'm from the Short North neighborhood," correct?  It's not

17   a trick question.

18   A.   No.  I would say they would say they're from Weinland

19   Park.

20   Q.   But they could say, and correctly say, "I'm from the

21   Short North area or Short North neighborhood"?

22   A.   Sir, they can say that.  I think the neighborhood is

23   technically called Weinland Park.  The Short North is south of

24   East Fifth Avenue.

25   Q.   So you've never heard anybody say "I'm from the Short

TRIAL ONE – VOL. 20 – 3874

1    North neighborhood"?

2      A.    I've heard people say it.  But you asked me that they

3    could correctly say that they're from the Short North

4    neighborhood.  And I'm just not trying to be difficult, sir.  I

5    would say that if they wanted to correctly say it, they would

6    say they're from Weinland Park.

7      Q.    So they could say "I'm from the Weinland Park area."

8    They could say "I'm from the Short North area."  They could say

9    "I'm from Fourth and Eighth area," correct?

10          THE COURT:  I want to clear up something, Officer.

11   Are you saying that the Weinland Park and Short North area are

12   synonymous?

13          THE WITNESS:  I'm saying they're separate.

14          THE COURT:  Are there residents of the Short North

15   neighborhood?

16          THE WITNESS:  Yes.

17          THE COURT:  Are there residents of Weinland Park?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And residents of Weinland Park would say

20   they're from Weinland Park, correct?

21          THE WITNESS:  I would imagine so, yes.

22          THE COURT:  So residents from the Short North would

23   say they're from the Short North?

24          THE WITNESS:  Yes, sir.

25          MR. GATTERDAM:  Thank you, Your Honor.

TRIAL ONE – VOL. 20 –  3875

1          MS. DIXON:  Nothing, Your Honor.  Thank you.

2          MR. MEYERS:  Nothing further.

3          MR. NOLDER:  I have no questions.

4          MR. DEVILLERS:  Nothing, Your Honor.

5          THE COURT:  Thank you, Mr. DeVillers.

6      Thank you very much, Lieutenant.  You may be excused.

7      Your next witness.  We're going to go until 12:30.

8          MR. DEVILLERS:  I understand, Your Honor.

9      James Howe.

10                          - - -

11                      JAMES HOWE

12  Called as a witness on behalf of the Plaintiff,

13  being first duly sworn, testified as follows:

14                  DIRECT EXAMINATION

15  BY MR. DEVILLERS:

16  Q.   Good morning, Detective.

17  A.   Good morning.

18  Q.   How are you this morning?

19  A.   I'm well.

20  Q.   State your full name and spell your last name.

21  A.   James Howe, H-O-W-E.

22  Q.   Are you employed?

23  A.   Yes.

24  Q.   Who do you work for?

25  A.   City of Columbus.

TRIAL ONE - VOL. 20 - 3876

1    Q.   What do you do for the City of Columbus?

2    A.   I'm a detective in the homicide unit on third shift.

3    Q.   How long have you been with the police department?

4    A.   Almost 15 years.

5    Q.   How long have you been with the homicide department?

6    A.   I've been in the homicide unit for the last three years.

7    I've been in the detective bureau for the last eight.

8    Q.   As a detective, have you been ever asked to work on some

9    cell phones?

10   A.   Yes.

11   Q.   What is it you're often asked to do, as far as cell

12   phones?

13   A.   I do mobile device exams, cell phone examinations,

14   forensics, and I also do historical cell tower analysis.

15   Q.   Phone forensics, what is that?

16   A.   Phone forensics is you're making an image of a mobile

17   device in order to recover any digital evidence that might be

18   on that to present to court.

19   Q.   And you go through some training for that?

20   A.   Yes.

21   Q.   Is there software that assists?

22   A.   Yes.

23   Q.   Can you name some of the software that assists?

24   A.   The software that we primarily use -- a company named

25   Cellebrite makes it.  It's a piece of equipment and software

TRIAL ONE – VOL. 20 –  3877

1   called a UFED.  It's a Universal Forensic Extraction Device.

2   Q.   I want to show you Government's Exhibit 158-5.  Do you

3   see that, Detective?

4   A.   Yes.

5   Q.   What is that?

6   A.   That is the extraction report that the software

7   generates after the exam is completed.

8   Q.   Is this an extraction report that you did?

9   A.   Yes.

10      MR. DEVILLERS:  Can you blow that up?

11  BY MR. DEVILLERS:

12  Q.   When you do an extraction report, what does it typically

13  come up with?

14  A.   It will give you the date and time that you started the

15  extraction, the type of extraction that you did, because

16  there's different types depending on what the mobile device is.

17  With each phone, you can get different types of information

18  depending on what is supported through the software.

19  Q.   Are older phones harder or easier to extract information

20  from?

21  A.   Usually harder because they're not well supported,

22  because they're not in the population anymore.  The newer

23  devices like the smart phones are the ones you can get the most

24  detailed information from.

25  Q.   If you were to do an extraction report on my

TRIAL ONE – VOL. 20 –  3878

1   government-issued phone – it's an iPhone – what would you

2   expect to be able to get off this?

3   A.   Typically with iPhones, you can get a lot of

4   information.  You can recover deleted items that are no longer

5   visible on the phone, call logs, text messages, multimedia

6   messages with attachments, photographs, videos.

7   Q.   What about contact lists?

8   A.   Yes.

9   Q.   As far as an older phone, you would be able to get

10  contact lists off those?

11  A.   Usually with older phones, that's typically about all

12  you can get is maybe a call log and some contact lists.

13  Q.   As far as my phone is concerned, as far as my text

14  messages, can you get every text message I've ever texted from

15  this phone?

16  A.   It just depends.  It depends on when it was deleted, how

17  full the device memory is.  Usually, if you can see it on the

18  phone, you can do a logical-type exam and you'll recover

19  everything that's visible on the phone.  As you get into the

20  higher-level exams, like the file system extractions and the

21  physical extractions, then you can get into some of the deleted

22  material.

23  Q.   With this particular report that we're looking at

24  158-5 -- strike that.  I'm going to hand you something

25  different here in a second.

TRIAL ONE – VOL. 20 – 3879

1          MR. DEVILLERS:  May I approach, Your Honor?

2          THE COURT:  Yes, you may.

3    BY MR. DEVILLERS:

4    Q.   I'm going to hand you what's been marked as Government's

5    Exhibit 55-16.  For the record, it's in a Manila bag.  Can you

6    pull that out for me, Detective?  What is that?

7    A.   This is a Motorola Nextel flip phone.

8    Q.   Were you asked to do something with that flip phone?

9    A.   Yes.

10   Q.   What were you asked to do?

11   A.   To recover any of the material that was supported on

12   this one.

13   Q.   And is that exhibit, that 55-16, is that the phone that

14   is subject to your extraction report 158-5?

15   A.   Yes.

16   Q.   And what were you able to get from this phone, as far as

17   contact lists, texts?

18   A.   Would you be able to take it to the next page?

19         MR. DEVILLERS:  Sure.  If you would, Agent.

20         THE WITNESS:  On this phone, I recovered 70 contacts,

21   four application files, 17 audio files, 11 images, 16 what's

22   referred to as text documents.  That's not text messages.  It's

23   just things that are in the file system, and one video.

24         MR. DEVILLERS:  And I'd like you -- can you go to the

25   bottom of that same page?  This is Government's Exhibit 155-51

TRIAL ONE – VOL. 20 – 3880

1   dash two?  Dash 002.  Can you blow up the bottom part?

2     BY MR. DEVILLERS:

3     Q.   What are we looking at here, Detective?

4     A.   This is the contact list that was on the phone.

5     Q.   And before you came in this morning, did I ask you to

6   look through this to see if this is what you downloaded from

7   Government's Exhibit 155-16?

8     A.   Yes.

9     Q.   And was it true and accurate?

10    A.   Yes.

11        MR. DEVILLERS:  May I publish this to the jury?

12        THE COURT:  Yes, you may.

13    BY MR. DEVILLERS:

14    Q.   I'd like you to look down -- we're looking at contact

15  list, number 14 of that contact list, do you see a name

16  associated with that?

17    A.   Yes.

18    Q.   What is that?

19    A.   It is Buck.

20    Q.   I'd like to go to the next page of the same exhibit.

21        MR. DEVILLERS:  If you kind of blow up from line 25

22  down a little bit, Agent.

23    BY MR. DEVILLERS:

24    Q.   And if you could -- could you read line 25 for me?

25    A.   Line 25 is fat one.

TRIAL ONE - VOL. 20 -  3881

1    Q.   Can you spell it for me?

2    A.   It is F-A-T-T-O-N-E.

3    Q.   Could it also be known as Fat Tone?

4    A.   It could.

5    Q.   For each one -- just for a contact list, each one of

6    these contacts has a phone number associated with it in this

7    document?

8    A.   Yes.

9    Q.   I'd like you to read line 28.

10   A.   Line 28 is Freeze Pop.

11   Q.   Okay.  Line 31?

12   A.   Thirty-one is H-O-V.

13   Q.   Line 33?

14   A.   And 33 is Jannika.

15   Q.   How about line 40?

16   A.   Line 40 is Kiko.

17   Q.   Can you go down to the bottom of the page?

18        Could you read line 53?

19   A.   Line 53 is RJ.

20   Q.   And line 62?

21   A.   And 62 is Tone.

22        MR. DEVILLERS:  Can you go to the last page, the next

23   page?  I'm sorry.

24   BY MR. DEVILLERS:

25   Q.   Do you see the number of contacts you were able to pull

TRIAL ONE – VOL. 20 –  3882

1    up from this exhibit, from this phone?

2    A.   I believe it was 70.

3    Q.   Now I'd like to direct your attention to Government's

4    Exhibit 54-13 -- 84-13.  Do you know what we're looking at

5    here, Detective?

6    A.   Yes.  That's the extraction report that the software

7    generated on a Samsung phone that I did an exam on.

8         MR. DEVILLERS:  May I approach, Your Honor?

9         THE COURT:  Yes, you may.

10   BY MR. DEVILLERS:

11   Q.   I'll hand you what's been marked as Government's Exhibit

12   55-14.  Can you take a look at that?

13   A.   Yes.

14   Q.   Government's Exhibit 84-13, is that the extraction

15   report for the phone you have in your hand?

16   A.   Yes.

17   Q.   All right.  And what were you able to pull from this

18   phone?  Would it be easier to go down to the next page?

19   A.   Could you please?

20        I believe it's one more.

21   Q.   Is that what you want?

22   A.   One more page.

23   Q.   One more page.

24   A.   Contents.

25   Q.   Can you see that, Detective?

TRIAL ONE - VOL. 20 - 3883

1    A.    Yes.

2    Q.    Do you recall what you were able to pull from that?

3    A.    Yes.    There was a lot more detailed information on this.

4    There were three Bluetooth device connections, three calendar

5    events, 1,455 call logs.    That included a thousand fifteen of

6    them that were deleted.    There were a hundred and it looks like

7    54 Facebook messages, 86 contacts, 565 cookies, 4 e-mails, 36

8    installed applications, 9 journeys, which is sort of a mapping

9    software.    There were 333 locations on the device, 291 MMS

10   messages and 31 of those were deleted.    There were 13 notes on

11   the phone, 29 passwords, 92 searched items, 3,316 text messages

12   and 206 of those were deleted.

13   Q.    Okay.    I think that will do.

14         A little bit more than from the first phone?

15   A.    Yes.

16   Q.    I want to hand you Government's Exhibit 48-13 -- I'm

17   sorry, 84-13 through 84-13-986.    Did I hand you the paper,

18   complete document of the extraction you did on that phone?

19   A.    Yes.

20   Q.    Did I ask you to look through that earlier this morning?

21   A.    Yes.

22   Q.    Is that a true and accurate depiction of what you were

23   able to pull off from that phone?

24   A.    Yes, it is.

25         MR. DEVILLERS:    I'd like to admit that into evidence

TRIAL ONE – VOL. 20 – 3884

1    as well.

2              THE COURT:  That is 84-13 through 84-13-986?

3              MR. DEVILLERS:  Yes, Your Honor.

4              THE COURT:  Any objection, Mr. Berndt?

5              MR. BERNDT:  No.

6              MR. DURKIN:  No, Your Honor.

7              MS. DIXON:  No, Your Honor.

8              MR. MCVAY:  No, Your Honor.

9              MR. NOLDER:  No, Your Honor.

10             THE COURT:  It will be admitted, and the respective

11   exhibits from that series of exhibits you may publish,

12   Mr. DeVillers.

13             MR. DEVILLERS:  I won't publish all of them, Your

14   Honor.

15             THE COURT:  I would hope not.

16    BY MR. DEVILLERS:

17    Q.   Just to be clear, Government's Exhibit 84-15, the phone

18   you have, is that the phone you have in your hand now, the

19   phone you have on the side?

20    A.   Yes, sir.

21    Q.   Is 84-15 the phone that you extracted subject to 84-13?

22    A.   Yes.

23    Q.   Okay.  I only want to show you one page of this exhibit,

24   okay?

25             MR. DEVILLERS:  I'd like to pull up, Agent Lauber, if

TRIAL ONE – VOL. 20 – 3885

1    you could, 84-13-926.

2              THE DEPUTY CLERK:  Would you like this published?

3              MR. DEVILLERS:  I would.

4      BY MR. DEVILLERS:

5      Q.   Okay.  Do you see that, Detective?

6      A.   Yes.

7      Q.   I'd like to direct your attention to line 311.  Do you

8    see that, Detective?

9      A.   Yes.

10     Q.   And is there a name associated with line 311?

11     A.   Tiger Woods.

12     Q.   And is there a photograph of an individual within line

13   311?

14     A.   Yes.

15             MR. DEVILLERS:  May I have a moment, Your Honor?

16             THE COURT:  Yes, you may.

17             MR. DEVILLERS:  No further questions, Your Honor.

18             MR. BERNDT:  No questions, Your Honor.

19             THE COURT:  Mr. Durkin?

20             MR. DURKIN:  No, Your Honor.  Thank you.

21             THE COURT:  Ms. Dixon?

22             MS. DIXON:  Can I have one second?

23             THE COURT:  Certainly.

24             MS. DIXON:  Just one question, Your Honor.

25

TRIAL ONE – VOL. 20 –  3886

1                       – – –

2                    CROSS-EXAMINATION

3    BY MS. DIXON:

4    Q.    Good afternoon.

5    A.    Good afternoon.

6    Q.    Is it Detective Hodge [sic]?

7    A.    Yes, ma'am.

8    Q.    Detective Hodge, you've testified previously to I

9    believe it's Government's Exhibit 155-16.  Is that it?

10         As you see that on your screen, line 14.

11   A.    Yes.

12   Q.    And the name is?

13   A.    Buck.

14   Q.    And how is Buck spelled?

15   A.    B-U-C-K.

16         MS. DIXON:  Thank you.  Nothing further.

17         THE COURT:  You no longer need this on the screen, I

18   take it?  Never mind.

19         MR. MCVAY:  No questions, Your Honor.

20         THE COURT:  Mr. Nolder, any questions?

21         MR. NOLDER:  No questions, Your Honor.

22         THE COURT:  Mr. DeVillers, any redirect?

23         MR. DEVILLERS:  Nothing further, Your Honor.

24         THE COURT:  All right.  Thank you, Detective Howe.

25         Your next witness, Mr. DeVillers.

TRIAL ONE - VOL. 20 -  3887

```
1          MR. DEVILLERS:  Darren Smith.

2                          - - -

3                        DARREN SMITH

4     Called as a witness on behalf of the Plaintiff,

5     being first duly sworn, testified as follows:

6                     DIRECT EXAMINATION

7     BY MR. DEVILLERS:

8     Q.    Good morning, Detective.

9     A.    Good morning.

10    Q.    Good afternoon, Detective.

11    A.    Good afternoon.

12    Q.    State your full name and spell your last name for the

13    record.

14    A.    Darren Smith, S-M-I-T-H.

15    Q.    Who do you work for?

16    A.    City of Powell Police Department.

17    Q.    In what capacity do you currently work for the City of

18    Powell?

19    A.    I work for the FBI.

20    Q.    How long have you worked with the FBI?

21    A.    Since 2004.

22    Q.    And did I ask you to do something to some phones,

23    Detective?

24    A.    Yes, you did.

25    Q.    What did I ask you to do?
```

TRIAL ONE – VOL. 20 –  3888

1    A.   To forensically analyze two phones.

2    Q.   I want to start you -- well, let me ask you this.  Have

3   you had training to analyze phones?

4    A.   Yes.

5    Q.   And you use a particular software to do so?

6    A.   Yes, I do.

7    Q.   In this particular case, what software did you use?

8    A.   Secure View 3 forensic software.

9    Q.   I want to show you Government's Exhibit 158-10.  Can you

10   tell me what that is?

11   A.   That's the forensic report.

12   Q.   And now I'm going to show you -- hand you a paper bag

13   that has a phone in it that's marked Government's Exhibit

14   20-17.  Look at that for me.

15   A.   Yes.

16   Q.   Is that the phone I asked you to do a report on?

17   A.   Yes, you did.

18   Q.   And is Government's Exhibit 158-10 a true and accurate

19   depiction of that report?

20   A.   Yes, it is.

21        MR. DEVILLERS:  Your Honor, may I enter Government's

22   Exhibit 158-10 into evidence?

23        THE COURT:  Yes, you may.  Any objection, Mr. Berndt?

24        MR. BERNDT:  No.

25        THE COURT:  Mr. Durkin?

TRIAL ONE – VOL. 20 – 3889

1     MR. DURKIN:  No, Your Honor.

2     THE COURT:  Ms. Dixon?

3     MS. DIXON:  No, Your Honor.

4     THE COURT:  Mr. McVay?

5     MR. MCVAY:  No, Your Honor.

6     THE COURT:  Mr. Nolder?

7     MR. NOLDER:  No, Your Honor.

8     THE COURT:  You may publish it, should you choose,

9  Mr. DeVillers.

10     MR. DEVILLERS:  Yes.  We'll publish it, Your Honor.

11  BY MR. DEVILLERS:

12  Q.    How many pages of this document are there?

13  A.    There's 16 pages of that specific phone.

14  Q.    I want to show you what's been marked as Government's

15  Exhibit 158-11.  What are we looking at here, Detective?

16  A.    That's another forensic report, again from Secure View,

17  for another phone I analyzed for you.

18  Q.    Hand you a paper bag that contains a phone marked

19  Government's Exhibit 20-15.  Can you take a look at that for

20  me, Detective?

21  A.    Yes.  That's the same phone.

22  Q.    Is that the phone that you analyzed subject to the

23  report of Government's Exhibit 158-11?

24  A.    Yes, it is, sir.

25  Q.    Did I ask you to look at this earlier this morning?

TRIAL ONE – VOL. 20 –  3890

1    A.   Yes, you did.

2    Q.   And how many pages are to Government's Exhibit 158–11?

3    A.   Twenty-two for that specific phone.

4    Q.   Is that a true and accurate depiction of what you

5    downloaded from that phone?

6    A.   Yes, it is.

7         MR. DEVILLERS:  May I publish this for the jury, Your

8    Honor?

9         THE COURT:  Yes, you may.  Any objection, Mr. Berndt?

10        MR. BERNDT:  No, Your Honor.

11        THE COURT:  Mr. Durkin?

12        MR. DURKIN:  No, Your Honor.

13        THE COURT:  Ms. Dixon?

14        MS. DIXON:  No, Your Honor.

15        THE COURT:  Mr. McVay?

16        MR. MCVAY:  No.

17        THE COURT:  Mr. Nolder?

18        MR. NOLDER:  No, Your Honor.

19        THE COURT:  It will be received, Mr. DeVillers.  You

20   may publish it.

21        MR. DEVILLERS:  No further questions, Your Honor.

22        THE COURT:  Thank you, Mr. DeVillers.

23      Mr. Berndt, any questions?

24        MR. BERNDT:  No questions, Your Honor.

25        THE COURT:  Mr. Durkin, any questions?

TRIAL ONE – VOL. 20 –  3891

1           MR. DURKIN:  No, Your Honor.

2           THE COURT:  Ms. Dixon, any?

3           MS. DIXON:  No, sir.

4           THE COURT:  Mr. McVay?

5           MR. MCVAY:  No, Your Honor.

6           THE COURT:  Mr. Nolder?

7           MR. NOLDER:  No, sir.

8           THE COURT:  Detective Smith, thank you very much, sir.

9    You may be excused.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Mr. DeVillers, do you have another witness

12   who is about as long in length as Detective Smith?

13          MR. DEVILLERS:  I believe I do.  Unfortunately,

14   the 12:30 rule just came today, so he was coming at one.

15          THE COURT:  That's all right.  You had no way of

16   knowing.  Not an issue.

17          Ladies and gentlemen, it's about 12:24 now.  We will

18   stand in recess until 1:30.  Ladies and gentlemen, enjoy your

19   lunch.

20          (Jury out at 12:25.)

21          THE COURT:  Mr. DeVillers, anything further from the

22   government --

23          MR. DEVILLERS:  No, Your Honor.

24          THE COURT:  -- before we break for lunch?

25          Mr. Berndt?

TRIAL ONE – VOL. 20 –  3892

1       MR. BERNDT:  No, Your Honor.  Thank you.

2       THE COURT:  Mr. Gatterdam?

3       MR. GATTERDAM:  No, Your Honor.

4       THE COURT:  Ms. Dixon?

5       MS. DIXON:  No, Your Honor.

6       THE COURT:  Mr. McVay?

7       MR. MCVAY:  No, Your Honor.

8       THE COURT:  Mr. Nolder?

9       MR. NOLDER:  No, Your Honor.

10      THE COURT:  Enjoy your lunch, everyone.

11    (Lunch recess taken from 12:27 p.m. to 1:30 p.m.)

12                         - - -

13                   THURSDAY AFTERNOON SESSION

14                   MAY 12, 2016

15                         - - -

16    (Thereupon, the following proceeding was held in open court

17  with all defendants and counsel present.)

18    (Jury in at 1:42 p.m.)

19      THE COURT:  Your next witness, Mr. Kelley?

20      MR. KELLEY:  Thank you.  We'd call Kenneth Kuebler.

21      COURTROOM DEPUTY CLERK:  Sir, come forward.

22      THE COURT:  Officer Kuebler, please come forward and

23  be sworn.

24    (Witness sworn.)

25      COURTROOM DEPUTY CLERK:  Please be seated, sir.

TRIAL ONE – VOL. 20 – 3893

1          MR. KELLEY:  May we have a moment, Your Honor?

2          THE COURT:  Yes.

3       (Whereupon, there was a brief interruption.)

4          MR. KELLEY:  May I proceed, Your Honor?

5          THE COURT:  Please proceed, Mr. Kelley.

6                         - - -

7                   KENNETH KUEBLER

8     Called as a witness on behalf of the Plaintiff,

9     being first duly sworn, testified as follows:

10                        - - -

11                 DIRECT EXAMINATION

12    BY MR. KELLEY:

13    Q.   Would you please state your name and spell your last

14    name for our jury?

15    A.   My name is Kenneth Kuebler.  The last name is spelled

16    K-U-E-B-L-E-R.

17    Q.   And what job do you currently hold?

18    A.   Currently, Deputy Chief of Police for the Columbus

19    Division of Police.

20    Q.   And how long have you been Deputy Chief?

21    A.   For just over three years.

22    Q.   We've heard from a lot of CSSU people and patrol

23    officers.  We haven't heard from a Deputy Chief.  Give the jury

24    an idea, what is the Deputy Chief responsible for?

25    A.   In my current role, I oversee about 700 of the

TRIAL ONE – VOL. 20 – 3894

1    Division's patrol officers, sergeants and lieutenants,

2    primarily the south half of Columbus from about Hilliard, all

3    the way out to the Reynoldsburg lines.

4        Q.    I'll draw your attention back to September of 2010.

5    What job were you performing at that time?

6        A.    At that time, I was the third-shift lieutenant on what

7    we call Zone 5, which would be the central City of Columbus.

8        Q.    And if I get specific as to the early morning hours of

9    September 5, 2010, did you become involved in a chase

10   situation?

11       A.    I did.

12       Q.    Can you explain to the jury how that occurred?

13       A.    We were having issues with a particular nightclub in the

14   downtown area.  My officers would respond there and assist what

15   are called special duty officers at that club.  I was called,

16   to the Karma Nightclub, about Front and Main Street, 303, I

17   think, South Front.

18           Sometime early that morning, one of the special duty

19   supervisors, Sergeant Bob Forsythe, aired that a vehicle, with

20   a person onboard, had displayed a firearm and fled the scene.

21           I was in the area, watching the club, and watching it.

22   He gave a description of the vehicle.  I saw the vehicle

23   traveling northbound on South Front Street as it cleared past

24   Broad Street, up towards Nationwide Boulevard.  And I caught up

25   to the vehicle about Nationwide Boulevard.

TRIAL ONE – VOL. 20 – 3895

1    Q.    What happened, then, at Nationwide Boulevard?

2    A.    It proceeded eastbound on Nationwide Boulevard to High

3    Street, got stopped in traffic, if I recall, was getting ready,

4    maybe, to turn left to go northbound on High Street from

5    Nationwide Boulevard.

6          Another cruiser was behind me, and one of our prisoner

7    transport vehicles -- well, a van, if you will -- was in front

8    of us on High Street.  We aired that we had the vehicle at that

9    intersection of Nationwide and High Street.

10         One sixty eight, the prisoner vehicle, the prisoner van,

11   and myself and the other officer attempted to block the vehicle

12   in at Nationwide and High Street to stop its progression and

13   travel.  It took off from us, breaking the red light at High

14   Street, continued eastbound, Nationwide Boulevard.

15         The other officers and I began a very short pursuit

16   eastbound on Nationwide, passing the Convention Center, coming

17   up to North Fourth Street.

18         Nationwide Boulevard, eastbound there at North Fourth,

19   becomes Naghten Boulevard, I believe it is, which at the time

20   was under heavy construction, not open for vehicle traffic.  So

21   it had barricades and piles of gravel, deep grade changes, and

22   was very rough and very difficult to traverse.

23         The driver of that vehicle continued eastbound into

24   Naghten, into the construction area, began bouncing wildly as

25   it bounced off of construction debris or changes in the grade

TRIAL ONE – VOL. 20 –  3896

1    or whatever else.  We weren't able to keep up close because of

2    that condition of the roadway.

3        I believe I aired it was probably coming up towards

4    Cleveland Avenue, where it was going to maybe crash out on

5    Cleveland Avenue.  Made it to a street about Neilston, which is

6    about halfway between Fourth and Cleveland Avenue, where it

7    eventually came to rest.  And we eventually made our way over

8    to the vehicle.

9    Q.   During the chase itself, were lights and sirens being

10   used by any of the vehicles?

11   A.   Yes, sir, all of us.

12   Q.   And, then, can you describe the scene as the car goes

13   through the construction area, when it first enters it?

14   A.   When it first enters it, I almost kind of lose sight of

15   it from the dust cloud.  There was just a cloud of dirt and

16   debris, whatever, from the ground-up roadway.  You could see,

17   yeah, just lots of dust and debris being kicked up from the

18   vehicle.

19   Q.   And how far away does the car get from you and the other

20   officers that have to stop?

21   A.   It eventually comes to rest about a block east of North

22   Fourth Street.  I imagine it was -- Always -- Once it hits that

23   intersection, it's always a quarter of a block, half a block,

24   beyond us before we can ever try to get any closer than that.

25   Q.   Can you describe the vehicle?  Did you have a chance to

TRIAL ONE - VOL. 20 -  3897

1    see it?

2    A.    Yes.  It was a full-size '60s -- I believe it was a

3    Chevrolet -- full-size, dark bluish, bluish grayish, full-size

4    '60s vehicle.

5    Q.    Did you then approach the vehicle after it had come to a

6    stop?

7    A.    We did.

8    Q.    Can you explain how that happened?

9    A.    As we pulled up to it, found the car crashed up, or

10   crashed out, just kind of -- just sort of off the roadway, or

11   what used to be the roadway -- It was all tore up -- I could

12   see a single person running about a block away, kind of a

13   southeasterly direction, the only person out in that area,

14   which I presumed to likely be the person running from the

15   vehicle.  The vehicle was unoccupied when we found it.  And we

16   aired a direction of travel where we last saw that person

17   running.

18   Q.    Did you find anything of significance anywhere around

19   the scene?

20   A.    We recovered a firearm within a few short paces of the

21   vehicle.

22   Q.    And can you describe where that firearm was in relation

23   to both the vehicle and the man running away?

24   A.    It would have been, basically, in the line of travel.

25   If the -- If the person I saw running ran directly from the car

TRIAL ONE - VOL. 20 - 3898

1    to where I saw him, it was in that line of travel.

2    Q.   What did you do with the firearm, then, at the scene, if

3    anything?

4    A.   We recovered the firearm and turned it into the property

5    room, essentially, as abandoned property.

6         MR. KELLEY:  Your Honor, if I may show the witness

7    Government's Exhibit 84-12-132?

8         THE COURT:  You may.

9    BY MR. KELLEY:

10   Q.   Chief, I want you to take a look at this photograph, if

11   you can.  First off, have you seen this photograph before?

12   A.   I saw it shortly -- about a half hour ago.

13   Q.   Okay.  Does that appear to be something that you

14   recognize, though?

15   A.   It appears to be the vehicle we saw that night.

16   Q.   And what is it that makes you believe that that is the

17   same vehicle?

18   A.   Specifically, the damage.  It didn't -- The car didn't

19   appear to so much as crash into large objects as it just seemed

20   to bound crazily across the changes in grade, or maybe even

21   some of the gravel and piles and stuff like that.

22        If you notice, the vehicle is kind of almost more like

23   bent, as if it had done lots of bouncing, as opposed to

24   specifically crashing into a large object.

25   Q.   Are you aware of what ultimately happened to the firearm

TRIAL ONE – VOL. 20 – 3899

1   after it was recovered by officers?

2     A.   One of our officers turned it into the property room.

3   I'm not familiar with what happened to the gun after that.

4     Q.   Okay.

5            MR. KELLEY:  If I may have a moment, Your Honor?

6            THE COURT:  Yes.

7        (Whereupon, there was a brief interruption.)

8            MR. KELLEY:  Your Honor, if I could, also, then, move

9   this exhibit into evidence and publish it for the jury?  It's

10  84-12-132.

11           THE COURT:  You may.

12         Any objection, Mr. Berndt?

13           MR. BERNDT:  No, Your Honor.  Thank you.

14           THE COURT:  Mr. Gatterdam?

15           MR. GATTERDAM:  No, Your Honor.

16           THE COURT:  Ms. Dixon?

17           MS. DIXON:  No, Your Honor.

18           THE COURT:  Mr. McVay?

19           MR. McVAY:  No, Your Honor.

20           THE COURT:  Mr. Nolder?

21           MR. NOLDER:  No sir.

22           THE COURT:  Mr. Kelley, it may be admitted.  And you

23  may publish it if you wish.

24           MR. KELLEY:  We would like to publish it for the jury,

25  Your Honor.

TRIAL ONE - VOL. 20 -  3900

1    BY MR. KELLEY:

2    Q.   And, again, Chief, if you would, just so -- The jury,

3    now, is seeing it for the first time, can you describe this

4    vehicle and how it's consistent with the vehicle you chased

5    that night?

6    A.   The vehicle we chased that night was a large, '60s,

7    full-size, American automobile, dark blue or bluish gray in

8    color, which is similar to the vehicle in this photograph.  The

9    damage is very similar to what would be expected from a car

10   bounding and bouncing violently across a torn-up roadway.

11        MR. KELLEY:  I have no further questions, Your Honor.

12   Thank you.

13        THE COURT:  Thank you.

14        Any questions, Mr. Berndt?

15        MR. BERNDT:  Your Honor, just a couple.  Thank you.

16        THE COURT:  All right.

17                         - - -

18                   CROSS-EXAMINATION

19   BY MR. BERNDT:

20   Q.   Good afternoon.

21   A.   Good afternoon, sir.

22   Q.   I apologize, but I don't recognize what we have here.

23   Is it like a Deputy Chief or a lieutenant or --

24   A.   Yes, sir, Deputy Chief of Police.

25   Q.   Deputy Chief?

TRIAL ONE – VOL. 20 –  3901

1    A.   Yes, sir.

2    Q.   Deputy Chief, my name is Jeff Berndt.  I represent

3    Robert Ledbetter.  Can you hear me okay?

4    A.   I can, sir.

5    Q.   Great!  I just have a couple of questions for you.

6         I would describe the offense committed by whoever was

7    driving this vehicle as a felony fleeing.  Would that be

8    accurate?

9    A.   That's not generally how we would charge that in

10   Columbus.

11   Q.   Okay.  How would you charge it in Columbus?

12   A.   Usually, like a reckless op type deal, or any other no

13   ops, if we had a no ops situation or any other underlying

14   offenses.  But, in Columbus, we don't generally charge a short

15   chase like that as a felony.

16   Q.   Okay.  So it would actually be a misdemeanor violation?

17   A.   Yeah.

18   Q.   And a traffic violation?

19   A.   Correct.

20   Q.   Okay.  You didn't see who was driving the vehicle,

21   correct?

22   A.   I did not.

23   Q.   Okay.  And when you saw what you believed was the person

24   fleeing the scene, did you see that person drop anything?

25   A.   I did not.

TRIAL ONE - VOL. 20 -  3902

1    Q.    The vehicle was, there at the scene, disabled, correct?

2    A.    Correct.

3    Q.    Are you aware of whether or not -- Well, certainly, law

4    enforcement went through that vehicle; did they not?

5    A.    I believe so.  I didn't do it personally, I don't

6    believe, but I believe it was done.

7    Q.    And are you aware of there being anything of a

8    contraband nature found in that vehicle after the Columbus

9    Police Department searched that vehicle?

10   A.    Not that I'm aware of.

11   Q.    Okay.  So, basically, we have the misdemeanor traffic

12   violation, nothing in the vehicle, and a firearm being found, I

13   believe you stated 20 feet or so from where the vehicle came to

14   rest?  Would that be about right?

15   A.    Somewhere in there, yeah.

16   Q.    Okay.  Now, when you recover a firearm, it's taken to

17   the property room, correct?

18   A.    That's correct.

19   Q.    Okay.  And if you wanted to determine -- I mean, at that

20   point, you would have the authority, or somebody else who

21   turned it in would have the authority, to order laboratory

22   testing in regard to that firearm; would they not?

23   A.    The authority, yes.

24   Q.    Okay.  So, if it was something that law enforcement felt

25   was important enough to do at that point, they could have

TRIAL ONE - VOL. 20 - 3903

1  ordered forensic testing of the weapon, prints, DNA, things

2  like that, correct?

3  A.  We could certainly order those tests, correct.

4  Q.  Okay.  And are you aware of whether or not any of those

5  orders were requested?

6  A.  I'm unaware if they were or were not.

7  Q.  You said that, when you turned it in, you turned it in

8  as if it was abandoned property.  Does that have any special

9  meaning or --

10  A.  No.  I mean, it's a recovered firearm.  We don't have an

11  owner to return it to, if that would be appropriate, and don't

12  have charges against somebody.  And so we would have turned it

13  in.

14  Q.  And, to the best of your knowledge, there have been no

15  charges filed in regard to this incident traffic-wise?

16  A.  To my knowledge, that's correct.

17  Q.  Okay.  And it being turned in as abandoned property

18  doesn't forfeit the opportunity to have it tested

19  scientifically to determine whether or not you could determine

20  who was the possessor of that gun?

21  A.  That's correct.

22  Q.  Okay.  How would you describe this neighborhood?

23  A.  It's downtown, downtown Columbus.

24  Q.  All right.  And it's slightly east of downtown?

25  A.  Where the incident occurred would have been -- where the

TRIAL ONE – VOL. 20 –  3904

1    incident started, which was at the Karma Nightclub, which is

2    Main Street and South Front --

3    Q.    Right.

4    A.    -- is in the heart of downtown, if you will, down by the

5    --

6    Q.    It's down by the county court complex, right?

7    A.    Yeah.  Where it eventually came to rest would be

8    slightly east of the main downtown, over by the arts district.

9    Q.    And that's kind of an industrial kind of area?

10   A.    It's commercial, now residential.  And it's also fairly

11   close to the university, Columbus College of Art and Design,

12   and Columbus State.

13   Q.    Correct.  And downtown is kind of, going a little bit

14   east, in 2010, six years ago, still a commercial, kind of a

15   very urban setting, correct?

16   A.    Yeah.

17   Q.    Factories?

18   A.    I'm not familiar with the factories.  Maybe.  I don't

19   know the answer to that.

20   Q.    Okay.  And you're unaware of there being any tests, at

21   all, being conducted with regard to the firearm?

22   A.    Not that I'm aware of, sir.

23        MR. BERNDT:  Thank you very much.

24        Nothing further, Your Honor.  Thank you.

25        THE COURT:  Thank you.

TRIAL ONE – VOL. 20 –  3905

1          Mr. Gatterdam, any questions?

2              MR. GATTERDAM:  No questions.

3              THE COURT:  Ms. Dixon?

4              MS. DIXON:  No sir.

5              THE COURT:  Mr. McVay?

6              MR. McVAY:  No questions.

7              THE COURT:  Mr. Nolder?

8              MR. NOLDER:  No, Your Honor.

9              THE COURT:  Any redirect, Mr. Kelley?

10             MR. KELLEY:  No, Your Honor.  Thank you.

11             THE COURT:  Officer Kuebler, thank you very much, sir.

12    You may be excused.

13             MR. DEVILLERS:  Robert Lawson, Your Honor.

14             THE COURT:  Okay.

15             MR. DEVILLERS:  Your Honor, may I talk to Mr. Ussury's

16    counsel?

17             THE COURT:  Yes, please.

18        (Whereupon, there was a brief interruption.)

19             COURTROOM DEPUTY CLERK:  Come forward to be sworn,

20    please.

21      (Witness sworn.)

22             THE COURT:  Please proceed, Mr. Devillers.

23             MR. DEVILLERS:  Thank you, Your Honor.

24

25

TRIAL ONE – VOL. 20 – 3906

1                          – – –

2                       ROBERT LAWSON

3     Called as a witness on behalf of the Plaintiff,

4     being first duly sworn, testified as follows:

5                          – – –

6                    DIRECT EXAMINATION

7     BY MR. DEVILLERS:

8     Q.    Good afternoon.

9     A.    Good afternoon.

10    Q.    Could you please state your name and spell your last

11    name?

12    A.    My name is Robert Lawson, L-A-W-S-O-N.

13    Q.    What do you do for a living?

14    A.    I'm the supervisor of the Latent Fingerprint Section of

15    the Columbus Police Department.

16    Q.    Okay.  How long have you been with the Columbus Police

17    Department?

18    A.    I've been with the Department since 1990.

19    Q.    What is the Latent Lift Unit?

20    A.    Okay.  The word "latent" means hidden.  And what happens

21    is, usually, you cannot see a latent fingerprint with the naked

22    eye.  You need some kind of processing to bring it visible.  So

23    that's what we do, is, basically, we look at fingerprints

24    during the day at our job.

25    Q.    What kind of education and experience do you have to be

TRIAL ONE - VOL. 20 -  3907

1  able to do what you're doing?

2  A.   Actually, I worked in the Identification Unit for seven

3  years, or six years.  And then they did an evaluation, and they

4  made a few promotions then.  That's when I went into the Latent

5  Unit, in 1996.

6  Q.   Have you testified about latent lifts in the past?

7  A.   Yes, I have.

8  Q.   In state court?

9  A.   State, county, and federal, yes.

10  Q.   About how many times do you think you've testified?

11  A.   Probably about 45 times.

12  Q.   Okay.  If you would, could you -- teach us about

13  fingerprints.  What is a fingerprint?

14  A.   Okay.  A latent fingerprint is -- Most of the

15  fingerprints on your hands are made up of water.  It's waters

16  that secrete out the pores of your fingers or your palms.  When

17  you touch an item, sometimes you will leave a deposit of that

18  water onto the item you touch, which makes a fingerprint.

19      A lot of people -- Some people sweat more than others.

20  So, there is a better chance that they're going to leave a

21  print than somebody that doesn't secrete as much water.

22  Q.   So, if I touch an item, there is potential for me to

23  leave a fingerprint?

24  A.   Correct.

25  Q.   What if I'm wearing gloves?

TRIAL ONE – VOL. 20 – 3908

1    A.    No.

2    Q.    The potential for leaving a fingerprint -- Are there

3    certain factors -- I think you talked about individual factors.

4    Some people sweat more than others?

5    A.    Right.

6    Q.    Are there other factors that would determine whether you

7    may or may not leave a print?

8    A.    There's -- Basically, like I said, there's three

9    factors.  One, as I was talking about, some people secrete more

10   water out of the pores than other people.  Another factor would

11   be what item you're touching.  If you touched a piece of glass,

12   that would leave a good print, usually.  Well, then, if

13   somebody came along and wiped that print off of there, that

14   print would be gone.

15        An item like this, like on a piece of wood, you could

16   leave a fingerprint on this; but then, again, somebody --

17   because this wood is finished, somebody could come along and

18   wipe that off.

19        On paper, it's different.  On paper, the water from your

20   fingers and the pores soak into the paper.  And then, when it's

21   processed, the fingerprint will appear.  It's usually not going

22   to be destroyed by somebody touching it.

23        Another of the biggest factors is environmental

24   conditions.  It depends on -- has to do with humidity.  If a

25   fingerprint is outside and it rains, it can destroy that print.

1      So, there's a lot of environmental factors, the factors

2  of what item you touch, and then how much you secrete the water

3  out of your fingers.

4  Q.    What about how you touch an item?  Is a smudge a common

5  term that you hear?

6  A.    Yeah.  You see -- A lot of times you'll see smudges.

7  You also see, a lot of times, like, a streak.  Like, somebody

8  may touch something and drag their hand across it.  Sometimes

9  the prints are just like you would roll a print, just --

10  they're beautiful.  But most of the time -- We call latent

11  prints chance prints.  Usually, there is only a small piece, or

12  fragment, from that finger that's in a latent print.  It's not

13  like a rolled fingerprint.

14  Q.    How do you collect these prints?

15  A.    Okay.  We actually, in our offices, all we do is

16  actually look at fingerprints.  But we have evidence

17  technicians, Crime Scene Search Unit, and police officers that

18  actually will lift the prints at a scene.

19      Probably, just guessing -- well, 90 percent of

20  fingerprints we receive in our unit are black powder, used with

21  black powder.  And then they put tape over it.  They lift it up

22  and put it on, like, a white fingerprint card.  And that's the

23  best that we can view a print, is under those conditions.

24  Q.    Okay.  If the Crime Scene Search Unit or a detective

25  gives you a print, as you said, does that mean you're good to

TRIAL ONE - VOL. 20 - 3910

1    go, you're good to compare that to anything else?

2    A.   Yes.

3    Q.   Is every print that is supplied to you a print of value?

4    A.   No.  A lot of times -- The very first thing and the most

5    important job, really, in the Latent Unit, is for us to

6    evaluate the fingerprints that we receive.

7         We look at the prints.  We determine, A, if they're of

8    value, if they can be used, or are they of no value.  If there

9    is absolutely no way we can make an identification through our

10   office, the print's no value.

11        And then there's -- there is a third way.  There can be

12   a print that cannot be of value for identification purposes but

13   you can see the actual pattern area on that print.  So, if you

14   were actually -- if you were asked to compare it to somebody

15   and let's say they all have loops in their hands and this

16   fingerprint happens to be a whirl, we can't identify that

17   print; but we could tell, if that person has all loops, that we

18   can exclude that person.

19   Q.   What generally -- Is there some sort of standard that

20   you look for as far as -- Let's talk about identifying a print,

21   comparing prints, at this point.

22        How do you compare a known print -- Well, what is a

23   known print?

24   A.   A known print is somebody that is processed through the

25   Identification Unit, and that print is recorded under a

TRIAL ONE – VOL. 20 – 3911

1  controlled situation. The finger is rolled from side to side

2  from one end to the other. All ten fingers are recorded. And

3  then, at the bottom of the prints, we do what they call slaps,

4  where they'll do the four fingers here, the thumbs here

5  (indicating).

6  Q.  I want to show you something. I want to show you

7  what's been marked as Government's Exhibit 31-5-057.

8     Sir, what are we looking at here?

9  A.  That is what we called a Ten Print Fingerprint Card.

10  That is a known print of the name at the top there.

11  Q.  All right. I'd like to do this.

12     MR. DEVILLERS:  Your Honor, the parties have a

13  stipulation at this point.

14     THE COURT:  Would you want to read it at this point,

15  Mr. Devillers?

16     MR. DEVILLERS:  Yes, sir.

17     It's stipulated that Government's Exhibit 31-5-057 are

18  the known prints to the Defendant Deounte Ussury.

19     MR. McVAY:  So stipulated.

20     THE COURT:  Thank you, Mr. Devillers. Please

21  continue.

22     MR. DEVILLERS:  May I publish this, Your Honor?

23     THE COURT:  Yes, you may.

24  BY MR. DEVILLERS:

25  Q.  Okay, sir. Now that the jury can see this as well, tell

TRIAL ONE – VOL. 20 –  3912

1   us, again, what we're looking at.

2   A.   This is known fingerprints of Deounte Ussury.  It's

3   fingerprints where they had come into the Identification Unit,

4   and their fingerprints are rolled from side to side.  We used

5   to do it in ink, and we still do it in ink, but most of the

6   time it's done on a glass scanner, where it actually scans the

7   print from one side to the other.

8   Q.   And are these kept on file?

9   A.   Yes.

10  Q.   Okay.  Okay.  So, you have -- This is the known prints,

11  and then you have -- What would you call the print you're

12  looking for?  Is there a term for that?

13  A.   Just -- the latent print?

14  Q.   Yeah.  Latent print?

15  A.   Yeah.

16  Q.   Okay.  So, the goal is to see if you can compare the

17  latent print to the known print; is that right?

18  A.   Correct.

19  Q.   Okay.  What do you do as far as being able to do that?

20  A.   Well, first of all, when we identify a print at the

21  Columbus Police Department, our standard operating procedures

22  say that we have to have eight points.  And when I -- I say

23  "points."  And that's what we use in the office.  The actual --

24  probably the correct verbiage should be "ridge

25  characteristics."

TRIAL ONE - VOL. 20 -  3913

1          So, your fingerprint, we kind of call it like a map.

2     And the ridge characteristics are what make up your

3     fingerprint.

4          We have dots which make up your fingerprints, which

5     you'll be seeing -- like, in between two ridges, you'll see a

6     dot.  It's not large enough to call a ridge, or an ending

7     ridge, because it's just a small dot.

8          We also have what we call bifurcations.  A bifurcation

9     is a ridge that flows, and then it splits into two different

10    ridges.  That's called a bifurcation.

11         And then we also have what we call an ending ridge,

12    where -- A ridge will flow in a fingerprint and then stop

13    abruptly.  That's an ending ridge.

14         Those all make up fingerprints.  And with the Columbus

15    Police Department, we have to have eight matching ridge

16    characteristics to make an identification, but we're also

17    looking for dissimilarities, also.

18    Q.   Okay.  So, let's say you have a latent lift given to you

19    and it only has seven points.  Can you use that to compare?

20    A.   No.  The print could be of value, like I said earlier,

21    with somebody that had all loops and if it was a whirl.  But to

22    make an identification on that print, we would not make it.

23    Q.   Could you exclude somebody if you had seven?

24    A.   Yes.

25    Q.   I want to show you now what's been marked as

TRIAL ONE – VOL. 20 – 3914

1   Government's Exhibit 31-5-055.

2           MR. DEVILLERS:  And, Your Honor, I believe this has

3   already been admitted into evidence.

4           THE COURT:  Yes.

5           MR. DEVILLERS:  May I publish this, Your Honor?

6           THE COURT:  Yes, you may.

7    BY MR. DEVILLERS:

8    Q.   Okay.  So, what are we looking at here?

9    A.   Okay.  This is -- When I was talking, earlier, about the

10   Crime Scene Search Unit or the officers or evidence technicians

11   that go out and they take lifts off of items of evidence, this

12   is what this is.  It's a tape lift, with the black powder that

13   they used.  And it's off of a magazine from a Smith and Wesson

14   .40-caliber gun magazine.

15   Q.   There seems to be some sketch, kind of, at the bottom.

16   What is that?

17   A.   That's -- Whoever took these prints, that's what they

18   have done, is taken a sketch of what they removed that print

19   from, what item.

20   Q.   Is that the actual lift itself, that sketch?

21   A.   The Lift #1 and 2, yes, those are actual lifts.

22   Q.   Okay.  But not -- I'm talking about the sketch itself,

23   the little drawing.

24   A.   No.  The sketch, it's just to let us know what it came

25   from and where on the item it came from.

TRIAL ONE – VOL. 20 –  3915

1    Q.    Okay.  Let's look at -- So, they're basically two lifts,

2  latent lifts, from this magazine?

3    A.    Correct.

4    Q.    Were both of value?

5    A.    No.

6    Q.    Okay.

7    A.    The Lift #1 was of value.  Lift #2 was no value.

8    Q.    Okay.

9          MR. DEVILLERS:  I'd ask the agent to please blow up

10  Lift #1, then.

11          THE WITNESS:  I'm sorry?

12          MR. DEVILLERS:  I was talking to the agent.  I'm

13  sorry.

14          THE WITNESS:  All right.

15   BY MR. DEVILLERS:

16    Q.    Okay.  And, to be fair, is this the actual item that you

17  looked at; or is this a photocopy of that?

18    A.    I believe you took the original and made a copy of it.

19  So that -- It was the original, but we're looking at -- Was

20  this -- I don't know if this is off the copy or not, or whether

21  it's off the original.

22    Q.    Okay.  Do you have -- What you actually looked at, do

23  you have that with you?

24    A.    Yes, I do.

25    Q.    Could you take a look at that?

TRIAL ONE – VOL. 20 – 3916

1  A.   Yes.  Just a second, here.

2       Okay.  Here it is.

3          MR. DEVILLERS:  May I approach that, Your Honor?

4          THE COURT:  Yes, you may.

5  BY MR. DEVILLERS:

6  Q.   First off, is what you have in your hand -- Is

7  Government's Exhibit 31-5-055 a copy of what you have in your

8  hand?

9  A.   Yes, it is.

10  Q.   Okay.

11         MR. DEVILLERS:  May I approach the witness, Your

12  Honor?

13         THE COURT:  Yes.

14         MR. DEVILLERS:  All right.

15  BY MR. DEVILLERS:

16  Q.   And is this, actually, what you looked at when you made

17  the comparison?

18  A.   Yes, it is.

19  Q.   All right.

20         MR. DEVILLERS:  Betty, may I use the fancy Elmo?

21  BY MR. DEVILLERS:

22  Q.   Okay.  There appears to be some triangular pieces of

23  paper on this exhibit.  What are those?

24  A.   Those are actually a place where we put a starting

25  point.  The reason is because, a lot of times, the prints will

TRIAL ONE - VOL. 20 - 3917

1    be, like, turned awkward.  Or there could be what we call

2    slippage, where sometimes the print's not -- it's kind of

3    turned a little bit.  So that's just what we use to do a

4    starting point on where we start at, you know, with the print.

5    Q.   Okay.  I'm going to try to move in, the best I can, to

6    see if I see -- All right.  I think you said something about

7    ridge detail.  Do you see some ridge detail on this?

8    A.   Yes, I do.

9    Q.   All right.  Is there equipment you use to be able to see

10   close up?

11   A.   Yeah.  Actually, I have what I use with me in the bag

12   down here, if you would like me to show the jury.

13   Q.   Sure, with the Court's permission.

14        THE COURT:  Yes.

15        THE WITNESS:  Okay.  This is basically what I use.  I

16   use two of these.  It's a magnifier.  It's usually five times

17   what we look at, and we'll put one of these on top of the known

18   print and one of these on top of the latent print.  And then

19   we'll go back and forth.

20        Like I said, we move through the print, a lot of times,

21   like you'd look through a map.  You're kind of guiding your way

22   through, looking for the ridge characteristics.

23   BY MR. DEVILLERS:

24   Q.   Okay.  When you actually looked at this lift, were you

25   able to find at least eight points?

TRIAL ONE – VOL. 20 –  3918

1   A.   Yes.

2   Q.   Did you find any more than eight?

3   A.   No.  There was eight points.

4   Q.   Is that the absolute minimum you would use to compare?

5   A.   Correct.

6   Q.   Okay.  And did you take Exhibit 31-5-055 and compare

7   that to the known prints of Mr. Ussury on 31-5-057?

8   A.   I did.

9   Q.   And did you make an identification?

10  A.   Yes, I did.

11  Q.   Do you remember what known print of what known finger of

12  Mr. Ussury was identified?

13  A.   It would be the left thumb.

14  Q.   Left thumb.

15       MR. DEVILLERS:  Could we go back to the other screen,

16  Betty?  Thank you.

17       Your Honor, may I approach the witness?

18       THE COURT:  Yes, you may.

19  BY MR. DEVILLERS:

20  Q.   Sir, once that was -- Well, let me show you -- I want to

21  show you what's been marked as Government's Exhibit 31-5-056.

22  Do you see that, sir?

23  A.   Yes.

24  Q.   What is that?

25  A.   That is a report that I prepared from my findings.

TRIAL ONE – VOL. 20 –  3919

1     Q.   Okay.  And what were your findings?

2     A.   My finding was that Lift #2, indicated as being from a

3  magazine from a Smith and Wesson .40-caliber, contains a latent

4  impression which has been identified as an impression of the

5  left thumb of Deounte Ussury, ID #69060B, as in "boy."

6     Q.   And it goes on, later, to say there are latent prints of

7  value which remain unidentified in this case?

8     A.   Yes.  There were other submissions in this case.

9     Q.   And do you know what this case was about?

10    A.   On the offense card, it says "Felonious Assault."

11    Q.   Okay.  And is there a location on that as well?

12    A.   1701 Joyce Avenue.

13    Q.   And is there another location attached to that besides

14  Joyce Avenue?

15    A.   On the report, it says "1250 Fairwood Avenue."

16    Q.   Okay.  And, your findings, is that within a reasonable

17  degree of scientific or forensic certainty?

18    A.   Yes.

19         MR. DEVILLERS:  May I have a moment, Your Honor?

20         THE COURT:  Yes, you may.

21      (Whereupon, there was a brief interruption.)

22         MR. DEVILLERS:  No further questions, Your Honor.

23         THE COURT:  Thank you, Mr. Devillers.

24       Mr. Berndt, any cross-examination?

25         MR. BERNDT:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Gatterdam?

2          MR. GATTERDAM:  No, Your Honor.

3          THE COURT:  Ms. Dixon?

4          MS. DIXON:  No, sir.

5          THE COURT:  Mr. McVay?

6          MR. McVAY:  Yes, Your Honor.

7                       - - -

8                  CROSS-EXAMINATION

9    BY MR. McVAY:

10   Q.   Good afternoon, Mr. Lawson.

11   A.   Good afternoon.

12   Q.   Is it Mister, or do you have a rank?

13   A.   Mister.  And I'm a civilian --

14   Q.   Mister?  As are most of the employees of the Division of

15   Police that work in the police lab, correct?

16   A.   Most of them.  There are some, but most of them are

17   civilian.

18   Q.   Okay.  My name is Kirk McVay.

19   A.   Okay.

20   Q.   And Greg Meyers and I represent Mr. Ussury.

21   A.   Okay.

22   Q.   Okay.  I have a few questions for you about, first of

23   all, the process that you go through.

24        As I understand from your testimony, in order to obtain

25   a latent lift, somebody has to affix something to an area where

TRIAL ONE – VOL. 20 –  3921

1  you think a print might be, whether it be dust, powder?

2  A.   Correct.

3  Q.   And the other thing is ninhydrin?

4  A.   They do ninhydrin.  It's what they use on paper.

5  Q.   Okay.  And ninhydrin is what?

6  A.   Ninhydrin is a chemical that will bring forth a print,

7  to make it visible on, let's say -- Most of the time, it's,

8  like, paper.  We usually have ninhydrin used on demand notes,

9  prescriptions, items like that.

10  Q.   Okay.  Is it fair to say that the black dust that is

11  used, or the ninhydrin, is something that gives a fingerprint,

12  or a latent, a dimension, if you will, that can then be lifted

13  with a piece of tape?

14  A.   Correct.

15  Q.   Okay.  And that is, in fact, what is done; isn't it?

16  A.   Yes.

17  Q.   It's lifted with the tape once it's observed with -- is

18  it the naked eye at that point?

19  A.   Correct.

20  Q.   And it's lifted from the tape and placed on the

21  fingerprint card --

22  A.   Yes.

23  Q.   -- which went to you, and I believe it was listed in one

24  of the exhibits that Mr. Devillers had referred to?

25  A.   Okay.

TRIAL ONE - VOL. 20 -  3922

1    Q.   All right.  Then the process is that it's brought to

2    you, or brought to your office, correct?

3    A.   Yes.

4    Q.   And then you do a visual comparison?

5    A.   We do an evaluation, yes.

6    Q.   An evaluation.  And the process of the evaluation is to

7    take the known print, which you had, in this particular case,

8    of Mr. Ussury --

9    A.   Correct.

10    Q.   -- and you compare it to the lift card?

11    A.   We compare the latent print, which is on the lift card

12    --

13    Q.   Uh-huh.

14    A.   -- to the ten-print card of the known person.

15    Q.   Okay.  And is that done -- I know you showed a

16    magnifier; but is that done, initially, in your process of

17    doing this, with the naked eye?

18    A.   No.  Everything we look at, when we're actually looking

19    at the print, is done with the magnifier.

20    Q.   Okay.  And the magnifier that you displayed to the jury?

21    A.   Correct.

22    Q.   And that is a magnifier that gives you the capability,

23    essentially, to look at one or the other, correct?

24    A.   Correct.

25    Q.   Correct?

TRIAL ONE – VOL. 20 – 3923

1    A.   Correct.

2    Q.   It's not something that gives you the capability to look

3  at two at the same time, like is done frequently with comparing

4  tool marks on shell casings and things?

5    A.   Correct.

6    Q.   You're familiar with that process?

7    A.   Yes.

8    Q.   What I'm referring to there is a microscope?

9    A.   Right.

10   Q.   When looking through it, like we would in science class

11 in high school --

12   A.   Right.

13   Q.   -- but, looking through, you would see both images on

14 the microscope?

15   A.   Yes.

16   Q.   But that's not the way this is done?  It's kind of a

17 back and forth, back and forth?

18   A.   Correct.

19   Q.   And in that process, then, you try to meet your

20 standards, or do an exclusion by identifying that it doesn't

21 meet the standard of eight comparisons, correct?

22   A.   Correct.

23   Q.   Do you ever have an exact match in doing fingerprint

24 comparisons?

25   A.   Every -- Every print that I identify -- and it's also

TRIAL ONE – VOL. 20 – 3924

1    verified by a second examiner –– is, I would call, like an

2    exact match.

3         In other words, if we get enough points, we're confident

4    that person is the same person as the latent print we're

5    looking at.

6    Q.   Okay.  And I suppose, perhaps, it's a bit academic.  But

7    when I say "an exact match," is it fair to say that you never

8    have a situation where you look at the known print and you look

9    at the latent print on the print card and say there are no

10   dissimilarities in looking at these two things?

11   A.   Correct.

12   Q.   And that can be because of the manner in which they were

13   affixed to whatever it was lifted from, correct?

14   A.   Correct.

15   Q.   If it were a circular glass, obviously, you would not

16   have the complete fingerprint that you might get when anyone

17   who's ever had their fingerprints done, essentially, your

18   fingerprint, or thumb in this instance, would be rolled over

19   that card to make that known print, correct?

20   A.   Correct.

21   Q.   So, it would be virtually impossible to have anything

22   which would be an exact match, meaning no dissimilarities,

23   correct?

24   A.   Right.  There's a lot of times people have like –– maybe

25   have dirt on their fingers, stuff like that, where you know ––

TRIAL ONE – VOL. 20 – 3925

1    but some of those could be explained, dissimilarities.  What

2    we're also looking for is unexplained, you know, discrepancies

3    in a print.

4        Q.   Okay.  In looking at these two prints, you indicated

5    that you're looking to see that there are eight points of

6    comparison between the known print and the latent that you

7    compared in this case, correct?

8        A.   Correct.

9        Q.   Do you recall how many points of comparison you found?

10       A.   There was eight.

11       Q.   There were eight?

12       A.   Yes.

13       Q.   There were no more?

14       A.   No.

15       Q.   Okay.  And were there any dissimilarities that you

16   noted?

17       A.   No.  No.

18       Q.   Now, that's not to say there were none?

19       A.   There were no unexplained dissimilarities.

20       Q.   I'm sorry?

21       A.   I said, there were no unexplained dissimilarities in the

22   print.

23       Q.   Okay.  Now, in this case, we've talked in terms of

24   having a known print -- okay -- to compare against.  And are

25   there situations where latent prints -- Do you print cards, or

TRIAL ONE – VOL. 20 – 3926

1    are brought to you, where you don't have a known print to

2    compare it to?

3     A.    Yes.

4     Q.    Okay.  And, in that situation, do you utilize a system

5    generally referred to as AFIS?

6     A.    Correct.

7     Q.    What is AFIS?

8     A.    "AFIS" stands for Automated Fingerprint Identification

9    System.

10    Q.    Okay.  And how does that system work?

11    A.    What you try to do, like -- Eight points is what we have

12   to have to make an identification.  But, realistically, in the

13   AFIS computer, to have a better chance to match that print up,

14   we like to have, like, ten or eleven, at least.  But we have

15   tried with eight.

16         But what you do is, you go in, and you mark the ridge

17   characteristics in AFIS.  And then you send a search off to the

18   database.

19    Q.    Okay.  And the database is made up of what, as a

20   database?

21    A.    It has anything from police employees in it.  It has

22   people that have been processed through the Identification

23   Unit.

24    Q.    Anybody who's been arrested in this county?

25    A.    Correct.

TRIAL ONE – VOL. 20 –  3927

1    Q.    In this state?

2    A.    Yes.

3          We do have a remote work site that we can go to the

4    state computer.  But the actual computer we use on a daily

5    basis is pretty much Central Ohio.  It's the one we use most of

6    the time.

7    Q.    I presume that remote access gives you access to

8    whatever the Bureau of Criminal Identification and

9    Investigation has for the Attorney General's Office in the

10   State of Ohio, correct?

11   A.    Correct, and then on to the FBI.

12   Q.    And that would include, at least with regard to the Ohio

13   Attorney General, anyone who has been incarcerated in the State

14   of Ohio in any of the prisons, correct?

15   A.    Correct.

16   Q.    And then gone on to the FBI.  Then it essentially

17   becomes a nationwide database?

18   A.    Correct.

19   Q.    All right.  And the way that works is -- How does that

20   work?  Is it a process of scanning an image of the latent?

21   A.    It's done the same way we do ours, where we scan the

22   image.  You mark all the ridge characteristics.  Then you go

23   ahead and send the print off.

24          And, like I said, a lot of times, with a latent print,

25   you have less than what you would have on a rolled or

TRIAL ONE - VOL. 20 - 3928

1    controlled print.

2           So, a lot of times, you might have between ten or eleven

3    points.  Sometimes you have 25.  And then you mark those ridge

4    characteristics, and then you send it on to the database.

5    Q.   Okay.  And when it gets sent on to the database, then,

6    initially, then, the computer, somewhere, will make that

7    initial comparison?

8    A.   It makes a comparison on the whole database, and it will

9    bring you up a list of candidates.

10   Q.   Okay.  And when it says a list of candidates, that would

11   be -- I am assuming that that's a list of individuals where

12   there is enough similarity in their known prints, as taken in

13   the process of being incarcerated or whatever --

14   A.   Correct.

15   Q.   -- to say that these might be matches --

16   A.   Correct.

17   Q.   -- but it still requires the human involvement of making

18   that comparison visually, correct?

19   A.   Yes.

20   Q.   Okay.  And that would be done in a situation, again,

21   where there are -- it's not known whose known prints that you

22   might have on file to compare to the latent print that's

23   provided to you, correct?

24   A.   Correct.

25   Q.   Now, we've talked in terms of the points of comparison

TRIAL ONE - VOL. 20 - 3929

1    in your standard being eight as what you're looking for.  Is

2    that consistent through all law enforcement, through all

3    criminal labs?

4        A.    No.  Actually, most places do not have a standard.  They

5    say they judge each print on its own merits.  As long as I've

6    been with the Columbus Police Department, since 1990, their

7    point is eight -- points are eight, is what you have to have.

8    It's been -- Long before I came to the Police Department, that

9    was their SOP, standard operating procedure.

10       Q.    Do you know what the FBI standard is?

11       A.    I don't believe they have a standard.  I know that they

12   have made prints on seven, before, with the supervisor's -- you

13   know, maybe two examiners' and then a supervisor's signature.

14   But, as far as I know, they do not have a set standard.

15       Q.    Okay.  Now, when you examine the latent print as it

16   comes to you, is there any way for you to tell when that print

17   was placed on whatever object that was lifted from?

18       A.    No.

19       Q.    Is there any way for you to date, or age, that print?

20       A.    No.

21       Q.    Okay.  Is it fair to say that, if something were taken

22   from something that -- from an item that was protected against

23   elements or protected against individuals touching it, say, for

24   example, as in this case, a magazine and a gun, if it's

25   inserted in the grip of the gun, would any fingerprints on that

TRIAL ONE - VOL. 20 - 3930

1   magazine be likely to survive for examination-and-comparison

2   purposes longer than, say, a fingerprint that might be on the

3   barrel of the gun?

4   A.   It could.

5   Q.   Okay.  And, in this case, that's what we're talking

6   about here, is a fingerprint, or a latent, that was lifted from

7   a magazine of a gun, correct --

8   A.   Correct.

9   Q.   -- after it had been removed from the pistol, itself; do

10  you know?

11  A.   I don't know.

12  Q.   Okay.  Is it fair to say, also, you do not know where or

13  how this particular lift was recovered or from what item it was

14  recovered from?

15  A.   All I know is -- I'm going from the diagram that was on

16  the lift card, showing me from where it came from.

17  Q.   Okay.  Meaning it came from a magazine --

18  A.   Correct.

19  Q.   -- to -- I think a pistol was described on that, right?

20  A.   Correct.

21  Q.   The .40 Smith & Wesson?

22  A.   Yes.

23  Q.   Okay.  And you described that -- in looking at -- I

24  believe it was Exhibit 31-5-056.

25       MR. McVAY:  If we can pull that up for his review.

TRIAL ONE – VOL. 20 –  3931

1    BY MR. McVAY:

2    Q.    And to the best of your knowledge, the offense location,

3    in reviewing that, would be 1701 Joyce Avenue; and then it

4    says, slash, 1250 Fairwood Avenue?

5    A.    Correct.

6    Q.    Are you familiar with those addresses, at all?

7    A.    I believe, at one time, 1250 Fairwood, back then, was

8    actually the old property room.

9    Q.    And --

10   A.    I may be wrong on that, but --

11   Q.    I think you're correct.

12   A.    Okay.

13   Q.    Where, approximately, would that be located?

14         Well, let me ask it this way:  Are you familiar with

15   Joyce Avenue?

16   A.    No, I'm not.

17   Q.    Okay.

18   A.    I know where Joyce Avenue is, but not 1701.  I have no

19   idea.

20   Q.    Is it fair to say that Joyce Avenue and Fairwood aren't

21   close to one another --

22   A.    Okay.

23   Q.    -- in the sense that they're probably miles apart?

24   A.    Okay.

25   Q.    Is that correct?

TRIAL ONE – VOL. 20 – 3932

1    A.   Yes.

2    Q.   And, again, along the lines that you don't know under

3    what circumstances this item, the latent print, was taken from,

4    was recovered, by Columbus Police Department, you don't know

5    who or if anyone was arrested with regard to this particular

6    item being recovered, correct?

7    A.   Correct.

8    Q.   Okay.  Now, that latent comparison request, again,

9    31-5-056, as it's still in front of you on the screen there,

10   shows an offense date.  Is that November the 20th of 2006?

11   A.   Yes.

12   Q.   It was soon thereafter that you received this latent

13   print request, comparison request, right?

14   A.   I believe so, yes.

15   Q.   Okay.  And when did you actually, physically, do this

16   comparison?  What's the date of your report?

17   A.   The date of my report -- The date completed says 12-21,

18   2015.  It was sent out the same day.

19   Q.   Okay.  And is that --

20        MR. McVAY:  Just for the sake of clarity and

21   correctness, can we look at 31-5-055?  Well, 31.  I'm sorry.

22   And can we blow up the section that's in handwriting?

23   Mr. Lawson --

24        THE WITNESS:  Yes.

25        MR. McVAY:  I'm sorry.

TRIAL ONE – VOL. 20 –  3933

1       Near where the drawing is.

2       Do you have the original, Dave?

3         MR. DEVILLERS:  He does.

4    BY MR. McVAY:

5    Q.   Do you still have the original document in front of you?

6    A.   Yes.

7         MR. McVAY:  May I approach the witness, Your Honor?

8         THE COURT:  Yes, you may.

9    BY MR. McVAY:

10   Q.   Mr. Lawson, is there some what appears to me to be

11   handwriting in red-colored pencil, perhaps?

12   A.   Correct.

13   Q.   And if you review that handwriting in that colored

14   pencil, would that more accurately reflect the date that this

15   comparison was done?

16   A.   That's the date that I actually made the identification

17   on it.

18   Q.   And what was that date?

19   A.   10-20 of '15.

20   Q.   Just to be absolutely certain, we're talking about

21   October the 20th of the year 2015, correct?

22   A.   Correct.

23   Q.   Which is almost a full nine years after the date of

24   November the 20th, 2006, correct?

25   A.   Correct.  I just recently was asked, within the last

TRIAL ONE – VOL. 20 –  3934

1   year, to look at --

2      Q.    The question was, when did you do it?

3      A.    Okay.  10-20 of '15.

4      Q.    Okay.

5            MR. McVAY:  If I may have a moment, Your Honor?

6            THE COURT:  Yes, you may.

7         (Whereupon, there was a brief interruption.)

8      BY MR. McVAY:

9      Q.    Mr. Lawson, with regard to the print that was on

10   the -- that you have there in front of you --

11     A.    Uh-huh.

12     Q.    -- on that print card, I believe you said there were two

13   latents that were taken from that magazine?

14     A.    There were two latent lifts, correct, that were taken

15   from the magazine.

16     Q.    Is the latent that you examined, particularly #1, where

17   you made the identification, was that a fragment of a print, as

18   opposed to being a complete print?

19     A.    Correct.

20     Q.    Okay.  Is it fair to say that, being a fragment, that if

21   you had a complete print, you might have identified

22   dissimilarities?

23     A.    I mean, it's possible.  But, you know, I -- you know,

24   looking at what I have available on this, there are no

25   dissimilarities that are unexplained and eight matching ridge

TRIAL ONE - VOL. 20 - 3935

1  characteristics.

2  Q.  I understand.  But if you have a print which goes from

3  the top half of my thumb but doesn't include the bottom half of

4  my thumb, the top half could give you eight points of

5  comparison?

6  A.  Correct.

7  Q.  And if you had the bottom half, there could be

8  dissimilarities, correct?

9  A.  Correct.  You would never know unless you had that.

10  Q.  If you had the other half with the dissimilarities, then

11  you could have an exclusion, correct?

12  A.  Anything is possible.

13  Q.  Were there other prints of value on that magazine?

14  A.  No, there was not.

15  Q.  And, again, you've talked in terms of your minimum that

16  you're looking for is eight points of comparison?

17  A.  Correct.

18  Q.  But there are many instances, are there not, where you

19  would find many more than eight points of comparison?

20  A.  On other latent prints?

21  Q.  Correct.

22  A.  Correct.

23  Q.  And, on this one, you found eight?

24  A.  Correct.

25      MR. McVAY:  Thank you.

TRIAL ONE – VOL. 20 – 3936

1        No further questions, Your Honor.

2        Thank you, Mr. Lawson.

3          THE COURT:  Thank you, Mr. McVay.

4        Mr. Nolder?

5          MR. NOLDER:  No questions.

6          THE COURT:  Any redirect?

7          MR. DEVILLERS:  Thank you.

8                      - - -

9                  REDIRECT EXAMINATION

10   BY MR. DEVILLERS:

11   Q.   In 2006, this latent lift was put through AFIS based on

12   the amount of points that you had.  I believe you said it was

13   eight?

14   A.   I actually don't believe that was put through AFIS

15   because of the amount of matching ridge characteristics that

16   were on the print.

17   Q.   How many do you need to be able to put it through AFIS?

18   A.   We like to have ten or eleven, just to give us a better

19   chance of getting a hit.  We'll put in, sometimes, with eight,

20   but not -- it's not what we normally do on a daily basis.

21   Q.   So, back when you -- You were asked by detectives to

22   actually compare that print to Deounte Ussury's known prints?

23   A.   We were not asked, back then, to compare the prints of

24   Deounte Ussury.

25   Q.   When you actually did the comparison, you were asked by

TRIAL ONE – VOL. 20 –  3937

1  somebody to do it?

2   A.   Correct.

3   Q.   Okay.  This wasn't put in AFIS; this is a detective

4  actually asking you to compare known prints of Ussury to that

5  latent lift?

6   A.   Correct.

7        MR. DEVILLERS:  Okay.

8        Nothing further, Your Honor.

9        THE COURT:  Mr. McVay?

10       MR. McVAY:  Nothing further, Your Honor.  Thank you.

11       Mr. Lawson, thank you very much, sir.  You may be

12  excused.

13       MR. DEVILLERS:  Anthony Simon, Your Honor.

14       THE COURT:  Officer Simon, please come forward and be

15  sworn.

16       COURTROOM DEPUTY CLERK:  Sir, I need you to raise your

17  right hand, please.

18   (Witness sworn.)

19                        – – –

20                    ANTHONY SIMON

21   Called as a witness on behalf of the Plaintiff,

22   being first duly sworn, testified as follows:

23                        – – –

24                  DIRECT EXAMINATION

25   BY MR. DEVILLERS:

TRIAL ONE – VOL. 20 – 3938

1    Q.   Good afternoon, Officer.

2    A.   Good afternoon.

3    Q.   What do you do for a living?

4    A.   Police officer with Columbus, Ohio, Division of Police.

5    Q.   What do you do with -- What are your duties?

6         THE COURT:  Mr. Devillers, would you establish his

7    name first?  I didn't mean to interrupt you, but --

8    BY MR. DEVILLERS:

9    Q.   Officer, could you please state your name?  And spell

10   your last name for the record.

11   A.   Officer Anthony Scott Simon, S-I-M-O-N.

12   Q.   What are you duties with the Columbus Police Department,

13   Officer?

14   A.   Police officer with Columbus Division of Police,

15   currently assigned to the Motorcycle Unit.

16   Q.   How long have you been with the Motorcycle Unit?

17   A.   About four years.

18   Q.   I want to take you back to approximately 2008.  What

19   were you doing then?

20   A.   Computer forensics officer.

21   Q.   I'm going to show you what's been marked as Government's

22   Exhibit 158-6.  And if you look at your screen, Officer, do you

23   see that?

24   A.   Yes.

25   Q.   What is that?

TRIAL ONE – VOL. 20 –  3939

1     A.   This is a report cover sheet from the CellDEK.  It's a

2  tool that we used for computer forensics exams for cell phones.

3          MR. DEVILLERS:  May I approach the witness, Your

4  Honor?

5          THE COURT:  Yes, you may.

6   BY MR. DEVILLERS:

7     Q.   I'm now going to hand you what's been marked as 58-14.

8  Can you take a look at that?

9     A.   (Witness complies.)

10    Q.   And, Officer, did we meet earlier today?

11    A.   Yes.

12    Q.   And did we meet a month ago, maybe?

13    A.   Yeah, approximately.

14    Q.   And do you know if that phone -- What did I hand you?

15  Is it a phone?

16    A.   Yes, Nextel i880.

17    Q.   The report, 158-6, is that to that cell phone, 58-14?

18    A.   58-14?  Let's see.  Property #08.

19         Yes.  It took me awhile to find it.

20    Q.   Okay.  Understood.  And Government's Exhibit 158-6, is

21  that a 14-page report?

22    A.   It looks like 1 of 41.

23    Q.   No.  Could you look at that actual -- on the top of the

24  exhibit, to the right?

25    A.   Right.  It's 1 of 14, right.

TRIAL ONE – VOL. 20 –  3940

1    Q.   Page 1 of 14?

2    A.   Yes.

3    Q.   Okay.  Did you generate this report based on that phone?

4    A.   Yes.  This is -- This report did come from this phone.

5    Q.   Okay.  And is there a particular software you used?

6    A.   Well, this CellDEK is -- it's a self-contained unit.

7    You just hook up the phone to the unit; and it runs, generates,

8    a report.  It goes in and looks at all the contacts list and

9    phone calls and copies all that information out to the report.

10        So, yeah, that's one of the tools that was used.  It was

11   a pretty good tool to use for that.

12   Q.   Okay.  Is 158-6 a fair and accurate representation of

13   what you downloaded from that phone?

14   A.   158-6 -- What are you saying?  158- --

15   Q.   The report.

16   A.   The report, yes.

17   Q.   Okay.  I now want to show you what's been marked --

18        MR. DEVILLERS:  Your Honor, may I publish this to the

19   jury and enter it into evidence?

20        THE COURT:  Yes, you may.

21        Any objection, Mr. Berndt?

22        MR. BERNDT:  No, Your Honor.

23        THE COURT:  Mr. Durkin?

24        MR. DURKIN:  No, Your Honor.

25        THE COURT:  Ms. Dixon?

TRIAL ONE – VOL. 20 –  3941

1          MS. DIXON:  No, Your Honor.

2          THE COURT:  Mr. McVay?

3          MR. McVAY:  No, Your Honor.

4          THE COURT:  Or Mr. Nolder?

5          MR. NOLDER:  No, sir.

6          THE COURT:  It may be received, Mr. Devillers.  And

7    you may publish it.

8          MR. DEVILLERS:  May I retrieve the exhibit, Your

9    Honor?

10          THE COURT:  Yes, you may.

11     BY MR. DEVILLERS:

12     Q.   Okay.  Officer, I now want to show you what's been

13    marked as Government's Exhibit 158-7, page 30.

14          What are we looking at here, Officer?

15     A.   Okay.  This was generated on September of 2008, another

16    report that I did with CellDEK.

17     Q.   Okay.  I now want to show you the third page of that,

18    which is actually page 32 of 158-7.

19          What are we looking at here, Officer?

20     A.   This is the case information, for the exam, that I input

21    myself.  I actually hand typed it in for the report.

22     Q.   Okay.  I'm going to hand you --

23          MR. DEVILLERS:  May I approach the witness, Your

24    Honor?

25          THE COURT:  Yes, you may.

TRIAL ONE - VOL. 20 -  3942

1    BY MR. DEVILLERS:

2    Q.    I'm going to hand you a bag with phones in it.  First of

3    all what I would like you to do is tell me what's on that bag.

4    Is there a property number on that bag?

5    A.    Yes.

6    Q.    What's that property number?

7    A.    It's 0815796.

8    Q.    And does that property number match what we're looking

9    at here, Government's Exhibit 158-7?

10   A.    Yes, it does.

11   Q.    All right.  Now, in that bag -- What's in that bag?

12   A.    We've got two cell phones.

13   Q.    All right.  Is one of those phones marked 58-16?

14   A.    It is.

15   Q.    All right.  Is Government's Exhibit 58-16 the phone that

16   you downloaded and generated the report marked as 158-7?

17   A.    Yes, it is.  I entered that information under the --

18   where it says "Exhibit" and then property number, the same

19   property number.  And, the "i880," the "i880" corresponds to

20   the phone, itself.

21   Q.    And how many pages are to this report?

22   A.    Fifteen.

23   Q.    And is that a true and accurate depiction of what you

24   downloaded from the phone?

25   A.    Yes.

TRIAL ONE - VOL. 20 - 3943

1      MR. DEVILLERS:  Your Honor, may I publish this to the

2   jury and enter it into evidence?

3      THE COURT:  Yes, you may.

4      MR. BERNDT:  Your Honor, may we have a side-bar,

5   please?

6      THE COURT:  Before it's published, yes.

7                            - - -

8     (Thereupon, the following proceeding was held at side-bar.)

9      THE COURT:  Go ahead, Mr. Berndt.

10     MR. BERNDT:  Your Honor, I asked for this side-bar

11  because, when I was looking at this case information, I see the

12  extraction date is August 9, 2004, which, again, would precede

13  the date of the conspiracy.  If these are contacts or some type

14  of texts, whatever the information is, clearly, it had to have

15  been placed in that phone, I guess, before August 9, 2004.  It

16  just is disconcerting.  There may be an explanation.

17     MR. DEVILLERS:  I don't think it has anything to do

18  with the contacts, when they were put in there.  The extraction

19  date is wrong, quite frankly, on this.

20     THE COURT:  What is the true extraction date?

21     MR. DEVILLERS:  I can tell you, Your Honor.  Printed

22  off, looks like September 4, 2008 --

23     THE COURT:  Okay.

24     MR. DEVILLERS:  -- which makes me think -- yeah.  It's

25  09-04-08.

TRIAL ONE – VOL. 20 –  3944

1          THE COURT:  All right.  So it's just out of sequence?

2          MR. DEVILLERS:  Yes.  See what I'm saying?

3          MR. BERNDT:  I gotcha.  That's why I didn't object.

4     You're pretty comfortable with that?

5          MR. DEVILLERS:  Yeah.  The phone wasn't collected

6     until after that.

7          MR. BERNDT:  I gotcha.

8          MR. DEVILLERS:  And here is the property number that

9     matches that.

10          MR. BERNDT:  I'm satisfied.

11          THE COURT:  Okay.

12        Just a second.

13          MR. DURKIN:  Your Honor, maybe this witness is going

14     to address it, but the cover sheet has handwritten on it that

15     this is the phone for C. Harris.  I don't know whether the

16     witness put that there, but that's what -- well, that's,

17     obviously, what appears on the exhibit.

18          MR. DEVILLERS:  I won't display that at this time.

19          MR. DURKIN:  Thank you.

20          MR. DEVILLERS:  We'll do something to change that.

21          MR. DURKIN:  Okay.  Thank you.

22          MR. McVAY:  There was another one I saw that said "T.

23     Patterson," not that it applies to these guys, but to let you

24     know.

25        (The following proceedings were had in open court.)

TRIAL ONE – VOL. 20 –  3945

1         THE COURT:  Mr. Devillers, please continue.

2         MR. DEVILLERS:  May I publish this, Your Honor, to the

3    jury?

4         THE COURT:  Yes, you may.

5     BY MR. DEVILLERS:

6     Q.   Officer, I now want to show you what's been marked as

7    Government's Exhibit 158-7, page 47.  Do you see that, Officer?

8     A.   Yes.

9     Q.   All right.  And I'd like you to -- From that same

10   envelope, is there another exhibit?  Is there a phone marked

11   "58-15"?

12    A.   Yes.

13    Q.   This exhibit that we're looking at right now, is this

14   the report that you generated from that phone?

15    A.   Yes, it is.  And, like I said, also, this is information

16   that I hand typed in for this particular report.

17    Q.   And are there 30 pages to this report?

18    A.   Yes, 30.

19    Q.   And is this a true and accurate depiction of what you

20   downloaded from that phone?

21    A.   Yes.

22         MR. DEVILLERS:  Your Honor, may I publish this to the

23   jury?

24         THE COURT:  Yes, you may.

25         MR. DEVILLERS:  May I have moment, Your Honor?

TRIAL ONE – VOL. 20 –  3946

1      (Whereupon, there was a brief interruption.)

2           MR. DEVILLERS:  No further questions, Your Honor.

3           THE COURT:  All right.

4        Mr. Berndt, any cross?

5           MR. BERNDT:  No, Your Honor.  Thank you.

6           THE COURT:  Mr. Durkin, any cross?

7           MR. DURKIN:  No, Your Honor.  Thank you.

8           THE COURT:  Ms. Dixon?

9           MS. DIXON:  No, sir.

10           THE COURT:  Mr. McVay?

11           MR. McVAY:  No, Your Honor.

12           THE COURT:  And Mr. Nolder?

13           MR. NOLDER:  No, sir.

14           THE COURT:  Officer Simon, thank you very much, sir.

15  You may be excused.

16           THE WITNESS:  Thank you, Your Honor.

17           MR. DEVILLERS:  May we retrieve the exhibits, Your

18  Honor?

19           THE COURT:  Yes, you may.

20        Mr. Kelley, your next witness?

21           MR. KELLEY:  Thank you, Your Honor.  We would call

22  Thomas Clark.

23           THE COURT:  Mr. Clark, please come forward and be

24  sworn.

25           COURTROOM DEPUTY CLERK:  Would you raise your right

TRIAL ONE – VOL. 20 – 3947

1   hand, please?

2    (Witness sworn.)

3           THE COURT:  Mr. Kelley, please proceed.

4           MR. KELLEY:  Thank you, Your Honor.

5                       – – –

6                   CROSS-EXAMINATION

7    Called as a witness on behalf of the Plaintiff,

8    being first duly sworn, testified as follows:

9                       – – –

10                  DIRECT EXAMINATION

11   BY MR. KELLEY:

12   Q.   I'm going to start by asking your name.  What is your

13   name, sir?

14   A.   Thomas D. Clark.

15   Q.   Who do you work for, Mr. Clark?

16   A.   Columbus Division of Police.

17   Q.   How long have you worked with CPD?

18   A.   Over 25 years.

19   Q.   If I draw your attention back to August of 2007, what

20   job did you hold at that time?

21   A.   I was a detective in the Robbery Squad.

22   Q.   And, on August 3, 2007, were you asked to get involved

23   in a robbery report?

24   A.   I was notified of a robbery that had occurred in the

25   area of Fourth and Eighth.  And I was given some

TRIAL ONE - VOL. 20 - 3948

1    information -- I was being given information from an officer

2    about a robbery, yes.

3    Q.    Was one of the victims a Gregory Gray?  Does that sound

4    right?

5    A.    It sounds familiar, yes, sir.

6    Q.    What did you do in response to receiving this initial

7    information?

8    A.    As the officer briefed me, he told me there was a second

9    robbery at that location.

10              MR. DURKIN:  We would object.

11              THE COURT:  Just a second, Officer.

12         Go ahead.

13              MR. DURKIN:  I'm sorry, Your Honor.  I didn't mean to

14   interrupt the witness, but I believe he was not going -- he was

15   going to give an answer not responsive to the question and

16   talking not about what he did, but what someone else told him.

17              THE COURT:  I'm going to sustain that.

18         You may re-put your question.  Your question was proper.

19              MR. KELLEY:  Thank you, Your Honor.

20    BY MR. KELLEY:

21   Q.    Did you learn information from talking to the officers

22   at the scene?

23   A.    Yes, I did.

24   Q.    Did you have to take some steps in response to that

25   information?

TRIAL ONE – VOL. 20 –  3949

1   A.   Yes, I did.

2   Q.   What were some of the steps that you took after

3   receiving that information?

4   A.   After I was -- After I was told there was, potentially,

5   two at that initial location, I responded to the scene.

6   Q.   And what did you do next?

7   A.   I spoke with the victims of the robberies.

8   Q.   After speaking with the victims, did you conduct further

9   investigation?

10  A.   After I finished speaking with them, I returned to my

11  office.  The next morning, I had received information, from an

12  anonymous source, of a potential suspect.

13       MR. DURKIN:  Your Honor, I object as to what the

14  anonymous source told this witness.

15       THE COURT:  Sustained.

16       MR. KELLEY:  Thank you, Your Honor.

17  BY MR. KELLEY:

18  Q.   Did you receive anonymous information?

19  A.   Yes, I did.

20  Q.   Did you do something in response to that information?

21  A.   I followed up on that information.

22  Q.   And what did that cause you to then do?

23  A.   It aided me in identifying a possible suspect in the

24  cases.

25  Q.   And, in identifying that suspect, did you put together

TRIAL ONE – VOL. 20 – 3950

1   some kind of document?

2   A.   Yes, I did.

3   Q.   What did you put together?

4   A.   I created a photo array.  It's a series of six

5   photographs, including the one with the -- including the

6   suspect.

7   Q.   And had you developed a suspect in order to create an

8   array?

9   A.   Yes, I did.

10  Q.   Who was the suspect?  What was the name?

11  A.   Rashad Liston.

12  Q.   And how do you create an array once you have that name

13  and that suspect?

14  A.   I find the most current photograph of that person that I

15  can, and placing it in the -- The computer places it in a

16  random spot.  I find -- Using physical characteristics, sex,

17  race, hair, you know, hair color, hair length, mustaches and

18  goatees, it creates an array.  So I try to create, find, five

19  additional photographs that are similar to the suspect so that

20  I could show -- but I'm not trying to -- it's not like I had,

21  like, Sponge Bob Square Pants as my suspect and eight fishes.

22  Q.   Were you able to show that array to any of the victims

23  of this crime?

24  A.   I showed it to both victims, yes.

25  Q.   And were there positive identifications made?

TRIAL ONE - VOL. 20 - 3951

1    A.    Both made positive identifications, yes.

2    Q.    Ultimately, did you have some interaction with Rashad

3  Liston yourself?

4    A.    He was arrested several days later.  Yes.

5    Q.    How did you, then, become involved after he was

6  arrested?

7    A.    I conducted the interview with Mr. Liston.

8    Q.    And in conducting that and in interacting with Mr.

9  Liston, did you retrieve an item of evidentiary value?

10   A.    Yes, I did.

11   Q.    Could you tell the ladies and gentlemen of the jury what

12  that was?

13   A.    Each of the victims stated that the individual that had

14  robbed them with the handgun was wearing gold front teeth,

15  upper teeth.  When Mr. Liston was brought in, he was wearing

16  gold upper teeth.  I collected those as evidence.

17   Q.    Moving ahead to 2014, did you begin a new job with the

18  Columbus Police Department?

19   A.    Yes, I did.

20   Q.    What job is that?

21   A.    I became a digital forensics analyst.

22   Q.    And, briefly describe, what does that mean that you do?

23   A.    I take computers and cell phones and remove the data out

24  of those and analyze the data for detectives.

25   Q.    Were you asked to do that kind of work, also, for an

TRIAL ONE - VOL. 20 - 3952

1    ongoing investigation involving the Short North Posse?

2    A.   I was, yes.

3         MR. KELLEY:  Your Honor, if we could have the witness

4    view Government's Exhibit 158-14?

5         THE COURT:  Yes.

6         MR. KELLEY:  That should be on the screen in front of

7    you.  We just have this beginning page.  And if you'd take a

8    moment and look at that.

9         And if I could ask Agent Lauber to kind of pass through

10   the page and the next page, so that the officer can see what

11   we're looking at.

12        THE COURT:  All right.

13   BY MR. KELLEY:

14   Q.   And this document -- Well, first, what is this?

15   A.   This document is a report created by the Secure View 3

16   software system that does cell phone forensics.

17   Q.   Were you asked to conduct an examination, forensically,

18   of a cell phone?

19   A.   Yes.  I was given a search warrant by one of the

20   detectives that asked me to do the cell phones.

21        MR. KELLEY:  If I may approach the witness, Your

22   Honor?

23        THE COURT:  Yes, you may.

24   BY MR. KELLEY:

25   Q.   Handing you what's been marked as Government's Exhibit

TRIAL ONE – VOL. 20 – 3953

1    51-9, what is that item?

2    A.    It is a Motorola i205, old cell phone.

3    Q.    You had at least a few minutes earlier today to compare

4    that to your report.  Is that report the one you generated from

5    that cell phone?

6    A.    Yes, it is.

7    Q.    And what kind of information were you able to develop

8    out of that cell phone?

9    A.    It recovered the contact list, phone calls, out of this

10   phone.  That is what was recovered, I believe.

11   Q.    Okay.

12        MR. KELLEY:  Your Honor, I would ask to admit and, I

13   guess, publish Government's Exhibit 158-14, as well as 51-9.

14        THE COURT:  It will be admitted.

15        Any objection, Mr. Berndt?

16        MR. BERNDT:  No, Your Honor.  Thank you.

17        THE COURT:  Mr. Durkin?

18        MR. DURKIN:  No.

19        THE COURT:  Ms. Dixon?

20        MS. DIXON:  No, Your Honor.

21        THE COURT:  Mr. McVay or Mr. Nolder?

22        MR. McVAY:  No, sir.

23        MR. NOLDER:  No, sir.

24        THE COURT:  You may publish it if you so choose.

25        MR. KELLEY:  Just because of the way it is on the

TRIAL ONE – VOL. 20 – 3954

1    screen, Your Honor, if I could ask that Agent Lauber just give

2    us a flavor of things by reviewing the first few pages slowly?

3        THE COURT:  All right.

4     BY MR. KELLEY:

5     Q.   Then, ultimately, if we go to page 4 of this document,

6    what is our caption, or our heading, on this page?

7     A.   "Contacts."

8        MR. KELLEY:  Okay.  Then, if I may retrieve the phone,

9    Your Honor?

10       THE COURT:  Yes, you may.

11       MR. KELLEY:  I have no further questions, Your Honor.

12   Thank you.

13       THE COURT:  Any questions, Mr. Berndt?

14       MR. BERNDT:  Your Honor, I just have a couple.

15       THE COURT:  Sure.

16       MR. BERNDT:  Thank you.

17                           – – –

18                     CROSS-EXAMINATION

19    BY MR. BERNDT:

20    Q.   Good afternoon.

21    A.   Good afternoon, sir.

22    Q.   Is it Detective Clark?

23    A.   Yes, sir.

24    Q.   Detective Clark, my name is Jeff Berndt.  I just have a

25   couple of questions for you.  Okay?

TRIAL ONE – VOL. 20 – 3955

1    A.    Okay, sir.

2         MR. BERNDT:  Eric, could you bring up the first page

3    of that exhibit?

4    BY MR. BERNDT:

5    Q.    It looks like you did this exam November 24, 2014.  Do

6    you see that?

7    A.    Yes, sir.

8    Q.    At 8:22 and 15 seconds?

9    A.    Yes, sir, Eastern Standard Time, yes.

10   Q.    And then it was over a minute and 39 -- a minute and 41

11   seconds later, correct?

12   A.    That is correct.

13   Q.    So, is this kind of like when I get a new phone or one

14   of my kids gets a new phone and we go into the Sprint store and

15   they plug it into something and it just transfers it over to

16   the other phone, except, on this, it spit it out as paper?

17   A.    Basically, yes.

18   Q.    Okay.  So, the reliability of this is based upon the

19   reliability of the software that you're using to conduct this?

20   A.    Well, I do a verification, myself, and actually observe

21   the phone, not just take for granted what comes out.  I look at

22   each phone to make sure it matches what I see.  So, I do a

23   verification process of my own.

24   Q.    After the two-minute --

25   A.    Yeah.

TRIAL ONE – VOL. 20 –  3956

1    Q.   -- electronic transfer?

2    A.   Correct.

3    Q.   Thank you.  And, also --

4        MR. BERNDT:  If we could go down a little bit further,

5  Eric.  Thank you.  Keep going just a little bit more.  Okay,

6  right there.

7        COURTROOM DEPUTY CLERK:  I'm sorry.  Did you want this

8  published?

9        MR. BERNDT:  Sure.  Thank you, Betty.

10       Eric, could you go just a little bit further so the

11  contacts -- right there.  That's fine.

12  BY MR. BERNDT:

13   Q.   Do you see the bottom of the first page and the

14  beginning of the second page?

15   A.   Yes, sir.

16   Q.   Okay.  So what I'm seeing on that is that there were --

17  in the contacts, there were 75 entries?

18   A.   Correct.

19   Q.   Fifty-four phone numbers?

20   A.   Yes, sir.

21   Q.   No e-mail addresses?

22   A.   It did not recover e-mail, no.

23   Q.   And, also, it did not recover call history; is that

24  correct?

25   A.   You are correct.  It did not support the call history.

TRIAL ONE - VOL. 20 - 3957

1    Q.    Did not recover images and videos?

2    A.    Correct.

3    Q.    Did not recover files?

4    A.    Correct.

5    Q.    Messages?

6    A.    All the way down, yes, sir, didn't.

7    Q.    Calendar, ring tones, application data, deleted data,

8    correct?

9    A.    Correct.

10   Q.    And is that because it was just too old of a phone?

11   A.    The phone is -- yeah.  At this time, that phone had

12   probably been around for almost nine years, ten years.  That's

13   why, in some cases, I would actually screen-shot -- take a

14   camera.  And we have software for that camera that I can

15   actually take pictures of each.  And I took pictures of what I

16   could locate on the phone so that would be an accurate

17   depiction of what I saw.

18   Q.    Okay.  And so you're saying that you made a picture of

19   the call history?

20   A.    There should be a picture of the call history.  There

21   should be an entire report with all that.

22   Q.    Okay.

23         MR. BERNDT:  And can we go to just the first page of

24   the contacts list?

25   BY MR. BERNDT:

TRIAL ONE - VOL. 20 - 3958

1    Q.    Do you see the first page of the contacts list?

2    A.    Yes, sir, I do.

3    Q.    Now, does this give law enforcement the ability to --

4    much like when you verify the electronic transfer, you're

5    checking out the information that you got, correct?

6    A.    Yes, sir.

7    Q.    Okay.  And, so, for instance, this Location 001 -- 0001,

8    somebody by the name of Camel, and then a phone number,

9    correct?

10   A.    Correct.

11   Q.    Okay.  Are those phone numbers ever called?

12   A.    I would have to look back.  I can't tell you from this

13   form -- this actual one.  No, I can't honestly say.  But if I

14   had, you know, the other report where I screen-shotted what I

15   could find, I believe there was a call history recovered.

16   Q.    I understand that.  What I'm asking, though, is -- and I

17   apologize -- sometimes my questions aren't clear -- did

18   you -- were you requested to call any of these numbers?

19   A.    Oh, no.  That's not my job.

20   Q.    Okay.  So, do you know if anybody was requested to

21   verify whether these numbers actually come back to -- again,

22   just in the instance of 0001, Camel -- what that is and who

23   that is and --

24   A.    My job is to recover the data -- I don't -- and analyze

25   what I see.  My job -- I don't follow up.  That is up to the

TRIAL ONE - VOL. 20 -  3959

1   detectives.  So, I don't know.  Once I give them the data, it's

2   on them.

3    Q.   I see.  So, it could have happened, correct?

4    A.   It could have, but I don't know.

5    Q.   It's doable, correct?

6    A.   Yes, I assume, other than the fact that this phone is

7   six years old and phone numbers change pretty regularly and may

8   not, necessarily, be what it purports to today.

9    Q.   Right.  But if you really wanted to find out the source

10   of these numbers, that might be a way of determining that.

11   Would you agree with me?

12    A.   Yeah, I guess.  I'm not going to say it's not, but

13   it's -- like I said, the accuracy would be very questionable

14   because, in my experience, cell phone numbers change regularly.

15    Q.   Understood.  But you could make the effort, correct?

16    A.   Me?

17    Q.   Not you, but somebody down the line?

18    A.   I -- Like I said, that's not my responsibility.  My

19   responsibility is to recover data.

20        MR. BERNDT:  I understand.

21        Thank you very much.  You can take that down.

22        Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Berndt.

24        Mr. Durkin?

25        MR. DURKIN:  No, Your Honor.  Thank you.

TRIAL ONE - VOL. 20 -  3960

1          THE COURT:  Ms. Dixon?

2          MS. DIXON:  I believe, very brief.

3                    - - -

4               CROSS-EXAMINATION

5  BY MS. DIXON:

6  Q.   Sir, this phone, Government Exhibit 51-9 --

7  A.   Yes, ma'am.

8  Q.   -- are you saying that this is the phone that you

9  recovered from Rashad Liston in August of 2007?

10  A.   No, ma'am.  I don't -- I just was given a group of

11  phones.

12  Q.   Okay.  So this has nothing to do with that?

13  A.   Not that I know of.  I don't remember recovering a phone

14  from Mr. Liston.

15          MS. DIXON:  Thank you.

16          THE COURT:  Thank you, Ms. Dixon.

17     Mr. McVay, any questions?

18          MR. McVAY:  No, Your Honor.

19          THE COURT:  Mr. Nolder, any questions?

20          MR. NOLDER:  No questions.

21          THE COURT:  Any redirect, Mr. Kelley?

22          MR. KELLEY:  Just one, Your Honor.

23     Can we put up, again, Government's Exhibit 158-14?

24

25

TRIAL ONE – VOL. 20 – 3961

1                              – – –

2                   REDIRECT EXAMINATION

3    BY MR. KELLEY:

4    Q.   Page 4, I think, is what Mr. Berndt was asking you

5    about.

6    A.   Yes, sir.

7    Q.   Can you look at Line 9?  What is the name you recovered

8    from the contact list at Line 9?

9    A.   Santana, or Santa.  I'm sorry.

10   Q.   Santa?

11   A.   Santa.

12        MR. KELLEY:  Okay.  No further questions.

13        Thank you, Your Honor.

14        THE COURT:  Thank you.

15        Mr. Berndt, anything further?

16        MR. BERNDT:  Yes, Your Honor, just one question.

17                             – – –

18                   RECROSS-EXAMINATION

19   BY MR. BERNDT:

20   Q.   I know it may sound redundant; but, to your knowledge,

21   no effort was made to verify the identity of any of the people

22   on this contact list, correct?

23   A.   I can't -- I can't testify to that.  I don't know.

24        MR. BERNDT:  I understand.  Thank you.

25        THE COURT:  So, your answer, Officer, is, yes, to your

TRIAL ONE – VOL. 20 – 3962

1    knowledge, nobody was contacted?  You don't know, one way or

2    the other?

3            THE WITNESS:  Correct.  I don't know, one way or the

4    other, Your Honor.  I don't know.

5            THE COURT:  All right.  Thank you.

6            MR. DURKIN:  No questions, Your Honor.

7            THE COURT:  Ms. Dixon, did you have anything further?

8            MS. DIXON:  Just --

9            THE COURT:  Go ahead.  If you have a question, let's

10   ask it.

11           MS. DIXON:  Thank you.

12                              - - -

13                      RECROSS-EXAMINATION

14     BY MS. DIXON:

15     Q.    In looking at 9, #9 there --

16     A.    Yes, ma'am.

17     Q.    -- Santa has a 614 area code and a local number?

18     A.    Apparently.

19           MS. DIXON:  Thank you.

20           THE COURT:  Mr. Kelley?

21           MR. KELLEY:  No, Your Honor.  Nothing further.

22           THE COURT:  I was assuming that neither Mr. McVay, nor

23   Mr. Nolder, had any further questions, since they didn't ask

24   any cross-examination, or questions, in the first place.

25           MR. McVAY:  Yes, sir.

TRIAL ONE – VOL. 20 – 3963

1        MR. NOLDER:  Yes, sir.

2        THE COURT:  Officer Clark, thank you, sir.  You may be

3   excused.

4        THE WITNESS:  Thank you.

5        MR. KELLEY:  Your Honor, given our circumstances, we

6   have no further witnesses for the remainder of the day.

7        THE COURT:  Come forward for a moment.

8                              - - -

9      (Thereupon, the following proceeding was held at side-bar.)

10        THE COURT:  So, Mr. Hill --

11        MR. KELLEY:  -- is not going to testify.  That's

12   correct, Your Honor.

13        THE COURT:  As in "at all"?

14        MR. KELLEY:  Certainly not today, and I think it's

15   unlikely in the coming week or two.

16        THE COURT:  Okay.  All right.  I just wanted to

17   confirm.

18        MR. KELLEY:  That's the shorthand.

19        THE COURT:  Yeah.  I just wanted to confirm that that

20   was the issue.  I knew that there was some possibility of that,

21   but I didn't know whether that had been confirmed.

22        All right.  So, we're done for the week.  So, you'll

23   give them your list of witnesses for Monday tomorrow?

24        MR. KELLEY:  Yes, Your Honor, by noon tomorrow.

25        And so the Court is aware, we've been talking the last

TRIAL ONE – VOL. 20 – 3964

1 day or so. And I think we're probably about at the two-week

2 mark in terms of our case in chief. I think we probably --

3      THE COURT: You think, next week -- that will be the

4 week of the 16th and the week of the 23rd.

5      MR. KELLEY: We still have evidence, Your Honor, but

6 I'm not sure that we'll go beyond that.

7      THE COURT: Okay. All right.

8      Well, we will accelerate our efforts to complete the

9 jury instructions and try to get them to you, maybe by the end

10 of next week.

11      MR. KELLEY: We still have the defense case to make

12 time for, Your Honor.

13      THE COURT: Yeah, but I'm not -- Given the discovery

14 that came back your way and some of the other pleadings that

15 were filed on behalf of the defense, I'm not certain that their

16 case, collectively, will take us into the second week of June,

17 as we originally anticipated.

18      MR. KELLEY: Yes.

19      MR. NOLDER: Do you think it's realistic if I plan on

20 having witnesses, some, the 30th, because people have to

21 subpoena witnesses from outside the city?

22      MR. KELLEY: Sure. Yeah. That's why we wanted to let

23 people know. I mean, you know, we can't guess -- we have some

24 really significant witnesses that could bleed over. But I

25 think, to make plans, plan for that week.

TRIAL ONE - VOL. 20 -  3965

1          THE COURT:  It's a ballpark.

2          MR. KELLEY:  Right.

3          THE COURT:  That's what I wanted.

4          MR. KELLEY:  We'll keep revising, Your Honor, as we

5   move along.

6          THE COURT:  Based on what -- I'm not, obviously,

7   asking whether any of your clients intend to testify, or

8   whether you intend to have your clients testify.  But, aside

9   from that, as you project out, how long do you think that the

10  defense case, collectively, will take, Mr. Berndt?

11         MR. BERNDT:  Your Honor, I don't know, collectively,

12  how long it will take.  I may call a couple of witnesses.  I

13  wouldn't --

14         THE COURT:  Okay.  Your case won't take more than a

15  day, likely?

16         MR. BERNDT:  No, Your Honor.  If I had a day, that

17  would probably be more than enough.

18         THE COURT:  How about you, Mr. Gatterdam?

19         MR. GATTERDAM:  Right now, I have three potential

20  experts that I, potentially, could call.  I may not call them

21  at all, and maybe not any of them.

22         THE COURT:  At most, it would take two days?

23         MR. GATTERDAM:  At most, they would take half a day, I

24  think, depending on the cross-examination.

25         THE COURT:  Three experts.  Experts sometimes tend to

TRIAL ONE – VOL. 20 – 3966

1    take a little longer.  So I'll give the benefit of the doubt.

2    Between your direct and the government's cross, maybe a day and

3    a half for three experts?

4                MR. GATTERDAM:  I respect -- we always --

5                THE COURT:  Okay.  One day?  You think one day?

6                MR. GATTERDAM:  One day, at most.

7                THE COURT:  Ms. Dixon?

8                MS. DIXON:  I have a stipulation we're still going to

9    do about when my client was locked up.  That's it.

10               MR. McVAY:  I'm in a similar situation.

11               THE COURT:  As Ms. Dixon?

12               MR. McVAY:  Yes.

13               THE COURT:  So we're still up to about two days so

14   far.

15           Mr. Nolder?

16               MR. NOLDER:  I don't even have a stipulation, Your

17   Honor.  I don't expect to put on a case.

18               THE COURT:  Okay.

19               MR. GATTERDAM:  If I may, Your Honor, two of the

20   potential experts would be ballistics and cell phone.

21   Depending on what the government puts on in the next witness,

22   we may have zero, to one, expert.

23               THE COURT:  Your answers give me a good sense of,

24   we're talking, maybe, at the absolute outside, three days; and

25   that's if, you know, your experts -- I mean, if the

TRIAL ONE - VOL. 20 - 3967

1    government's witness, Mr. Gatterdam, would prompt you to call

2    your three, and then the possibility of other witnesses.

3           MR. BERNDT:  Your Honor, because the government has

4    been so kind as to keeping us informed, I'll make certain that,

5    if things change, I'll make sure the Court knows.  And I think,

6    if it would change, it would change in terms of being less

7    time.

8           THE COURT:  Okay.  All right.  Good enough.  That

9    tells me all that I need to know.  And I won't advise the jury

10   yet, but I want you all to think about it over the weekend.

11   And then maybe I can tell the jury, for planning, that we'll

12   probably be done the first week of June.  That's something I

13   can revisit with them on Monday.

14          MR. NOLDER:  The case will be to them?

15          THE COURT:  Yes, sometime the first week of June.

16          MR. KELLEY:  Sounds good.  Thank you, Your Honor.

17      (The following proceedings were had in open court.)

18          THE COURT:  Ladies and gentlemen, I'm going to intone

19   two famous words:  Wish granted.

20          I know one of the things we were going to work mightily

21   to do today was to make sure that you got out before the storms

22   were projected to roll in, and your wish has been granted.

23          We are done for today.  We will resume with the

24   government's case in chief on Monday.

25          Over the weekend, ladies and gentlemen, enjoy your time

TRIAL ONE – VOL. 20 – 3968

1  off, stay safe, and stay dry.

2      Take care, ladies and gentlemen.  And thank you for your

3  patience and attention.

4    (Jury out at 3:10 p.m.)

5      THE COURT:  Please be seated.

6     Mr. Devillers, anything further from the government?

7      MR. DEVILLERS:  Nothing, Your Honor.

8      THE COURT:  Mr. Berndt, on behalf of Mr. Ledbetter,

9  anything further?

10      MR. BERNDT:  No, Your Honor.  Thank you very much.

11      THE COURT:  Mr. Gatterdam, on behalf of Mr. Harris?

12      MR. GATTERDAM:  No, Your Honor.

13      THE COURT:  Ms. Dixon, on behalf of Mr. Liston?

14      MS. DIXON:  No, sir.

15      THE COURT:  Mr. McVay, on behalf of Mr. Ussury?

16      MR. McVAY:  No, sir.

17      THE COURT:  Mr. Nolder, on behalf of Mr. Robinson?

18      MR. NOLDER:  No, Your Honor.  Thank you.

19      THE COURT:  All right.

20      Everyone, have a good and safe weekend.  I'll see

21  everyone Monday morning at nine o'clock.

22      I was advised by Mr. Kelley, at side-bar, that defense

23  counsel will get its list of witnesses for Monday by noon

24  tomorrow.  And I believe that that pretty much concludes it.

25      Thank you very much, everyone.

TRIAL ONE – VOL. 20 –  3969

1          (Proceedings were concluded at 3:12 p.m.)

2                              – – –

TRIAL ONE – VOL. 20 – 3970

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF'S: | | | | |
| Latiesa McNeil | 3770 | 3774 | 3788 | 3789 |
| By Mr. McVay | | 3780 | | |
| Donald Paden | 3791 | | | |
| Smith Weir | 3800 | 3837 | 3868 | |
| By Mr. Gatterdam | | 3840 | | 3873 |
| By Ms. Dixon | | 3846 | | 3962 |
| By Mr. Meyers | | 3856 | | |
| James Howe | 3875 | 3886 | | |
| Darren Smith | 3887 | | | |
| Kenneth Kuebler | 3893 | 3900 | | |
| Robert Lawson | 3906 | 3920 | 3936 | |
| Anthony Simon | 3937 | | | |
| Thomas Clark | 3947 | 3954 | 3961 | 3961 |
| By Ms. Dixon | | 3960 | | |

– – –

INDEX OF EXHIBITS

– – –

| PLAINTIFF'S: | RECEIVED |
|---|---|
| 1-2-002 | 3809 |
| 1-2-004 | 3810 |
| 1-2-011 | 3812 |
| 1-2-014 | 3814 |
| 1-2-015 | 3815 |
| 1-2-017 | 3817 |
| 1-2-021 | 3819 |
| 1-2-055 | 3820 |
| 1-2-107 | 3828 |
| 51-9 | 3953 |
| 58-16 | 3943 |
| 84-13 THROUGH 84-13-986 | 3884 |
| 84-12-132 | 3899 |
| 135-2#-015 | 3798 |
| 158-10 | 3888 |
| 158-11 | 3890 |
| 158-6 | 3941 |
| 158-14 | 3953 |

TRIAL ONE – VOL. 20 –  3971

1                           C E R T I F I C A T E

2

3           We, Shawna J. Evans, Denise N. Errett, Darla J.

4    Coulter, do hereby certify that the foregoing is a true and

5    correct transcript of the proceedings before the Honorable

6    Algenon L. Marbley, Judge, in the United States District Court,

7    Southern District of Ohio, Eastern Division, on the date

8    indicated, reported by us in shorthand and transcribed by us or

9    under our supervision.

10

11

12                          s/Shawna J. Evans
                            Shawna J. Evans, RMR
13                          Official Federal Court Reporter

14

15                          s/Denise N. Errett
                            Denise N. Errett, RMR CRR
16                          Official Federal Court Reporter

17

18                          s/Darla J. Coulter
                            Darla J. Coulter, RMR, CRR
19                          Former Official Federal Court Reporter

20

21                          May 12, 2016

22

23

24

25