**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTOPHER A. HARRIS,**

    **Petitioner,**

    v.

**UNITED STATES OF AMERICA**

    **Respondent.**

**CASE NO. 2:20-CV-5902
CRIM. NO. 2:14-CR-127(5)
CHIEF JUDGE ALGENON L. MARBLEY
Magistrate Judge Kimberly A. Jolson**

**REPORT AND RECOMMENDATION**

Petitioner, a federal prisoner, brings this Motion to Vacate under 28 U.S.C. § 2255. This matter is before the Court on to its own motion to consider the sufficiency of the petition pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings. For the reasons that follow, it is **RECOMMENDED** that this action be dismissed pursuant to Rule 4.

**I.  BACKGROUND**

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case as follows:

> The Short North Posse gang—and its two subsidiaries, the Homicide Squad and Cut Throat Committee—wreaked havoc for the better part of a decade in the Short North neighborhood of Columbus, Ohio. To support its drug enterprise, the Short North Posse conducted brutal home-invasion style robberies and planned and executed the murder of rivals, high-value targets, and cooperating witnesses. After a two-month-long jury trial, four of the five appellants—Robert Ledbetter, Deounte Ussury, Rashad Liston, and Christopher Harris—were convicted of RICO conspiracy for their membership in the Short North Posse enterprise. All five, including Clifford Robinson, were convicted of various murders in aid of racketeering and other similar crimes. On appeal, defendants collectively raise more than fifteen claims, only two of which have merit. Ussury's conviction for the murder of Dante Hill in aid of racketeering must be vacated because there is insufficient evidence that Ussury acted with the necessary statutory purpose, and Harris's and Robinson's convictions for murder by firearm during a crime of violence must be vacated in light of *United States v. Davis*, No. 18-431, ––– U.S. –

——, ——, 139 S. Ct. 2319, —— L.Ed.2d ——, 2019 WL 2570623 at *13 (June 24, 2019).

I.

In 2014, a federal grand jury returned an indictment against seventeen defendants, including the five here. The overriding count alleged a RICO conspiracy from 2004 to 2014, in which the Short North Posse enterprise and its associates committed overt racketeering acts ranging from murder and robbery to drug distribution and witness tampering. The indictment alleged more than ten counts of murder in aid of racketeering. More indictments followed and eventually thirteen defendants pleaded guilty, one was convicted after a solo trial, and the five defendants here were tried together before a jury.

At trial the Government put on more than one hundred witnesses, several of whom were former Short North Posse members. The evidence showed that the Short North Posse, which identified itself as a local affiliate of the national Crips gang, was engaged in buying, selling, and distributing cocaine and marijuana. The gang protected its business and supplemented its income through robberies, often armed and regularly of the brutal home-invasion variety. The Short North Posse maintained its clout through violence and intimidation against those who meddled in its business or harmed or disrespected its members.

Apparently, Ledbetter was the de facto leader of the gang, and under his management the gang formed two sub-groups, known as the "Cut Throat Committee" and "Homicide Squad," specializing in murders and robberies of rival gang members, competing drug dealers, and other deep-pocket targets. Ledbetter often orchestrated these jobs, and any gang members and outside associates who participated would typically be paid or split the spoils. Former Short North Posse members identified Ledbetter, Liston, Harris, and Ussury as members or associates of the Homicide Squad.

At trial, the jury heard evidence about eight charged murders. . . . Those murders include the revenge killing of Alan Johnson for the death of Ledbetter's brother, the murder of Donathan Moon during a night-time raid of a target's house and business, and the assassination of Crystal Fyffe for her cooperation with police. In addition to those murders, the jury heard about many other criminal acts in furtherance of the enterprise conspiracy—like a 2006 gun-battle between the Short North Posse and its rival gang, D-Block, which saw more than three hundred rounds fired and several people shot. After two months of trial, each of the five defendants was convicted and sentenced to at least one mandatory life sentence for murder in aid of racketeering under 18 U.S.C. § 1959, and all but Robinson were convicted of RICO conspiracy, 18 U.S.C. § 1962(d), among several other convictions and sentences.

*United States v. Ledbetter,* 929 F.3d 338, 344-45 (6th Cir. July 26, 2019).  On June 9, 2016, Petitioner was found guilty on charges of conspiracy to commit racketeering, murder in aid of racketeering, and murder through the use of a firearm during and in relation to a crime of violence or a drug trafficking crime.  On March 29, 2017, the Court entered an Amended Judgment imposing two consecutive terms of life imprisonment. (Doc. 1493). On July 26, 2019, the Sixth Circuit reversed Petitioner's conviction on Count 6, for the murder of Donathan Moon through use of a firearm during and in relation to a crime of violence, but otherwise affirmed the Court's Amended Judgment. (Doc. 1612, PAGEID # 19393).  On November 12, 2019, the United States Supreme Court denied the petition for a writ of *certiorari.* (Doc. 1645).

On November 12, 2020, Petitioner filed this Motion to Vacate under 28 U.S.C. § 2255. (Doc. 1684).  He asserts that the Court improperly permitted opinion testimony by Detective Wayne Caffey and Lieutenant Smith Weir on gang culture and customs (claim one); and failed to declare a mistrial after two prosecution witnesses implied that Ledbetter's attorney had engaged in improper acts (claim two); that he was denied due process because the jury did not indicate on the jury form the finding of motive (claim three); and that he was denied the effective assistance of counsel because his attorney failed to object to testimony by Caffey and Weir on gang customs and the Short North Posse (claim four).

**II.    DISCUSSION**

The United States Court of Appeals for the Sixth Circuit addressed these issues on direct appeal as follows:

> Liston, Harris, and Ussury argue that the district court improperly allowed opinion testimony by L.A. Police Detective Wayne Caffey, on gang (and specifically Crips) culture and customs, and by Columbus Police Lieutenant Smith Weir, on Columbus gangs specifically (including the Short North Posse). They did not object on these grounds below, so their claims are subject to "plain error" review. There was no plain error here. The court properly followed the procedure set out in *United States*

*v. Johnson,* 488 F.3d 690 (6th Cir. 2007), for qualifying Detective Caffey as an expert, Detective Caffey's expert testimony on gang customs was relevant, and the Government's failure to properly notice Detective Caffey as an expected witness was harmless. As to Lieutenant Weir, the court did not abuse its discretion in permitting his lay-witness opinion testimony about the Short North Posse.

As an initial matter, these challenges are subject to "plain error" review because the defendants did not object below. *See Johnson*, 488 F.3d at 697. Defendants are conspicuously silent on this point as to Lieutenant Weir but contend that they did object to Detective Caffey's qualification as an expert. The transcript tells a different story. To be sure, defense counsel asked the court at sidebar whether Caffey "[had] been qualified and declared an expert," but the court responded by reminding counsel that an expert designation need not be made on the record in front of the jury under *Johnson,* 488 F.3d at 698. Asking whether Detective Caffey had been qualified is not the same as objecting to his qualification. The court identified the controlling qualification procedure under *Johnson,* but defendants failed to follow it.

*Detective Caffey*. Defendants first argue that the district court failed to properly assess Detective Caffey's qualifications or formally certify him as an expert. But that argument misunderstands the process that this court blessed in *Johnson* for qualifying law enforcement experts. To prevent the jury from drawing any implicit note of approval from a court's certification of a witness as an expert, *Johnson* held that a court should not qualify a witness before the jury at the outset of testimony. "Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose *voir dire* questions to the witness's qualifications if necessary and requested." *Id*. at 697–98. Had defendants objected after Detective Caffey testified about his background and qualifications, then the court would have been required to rule on Caffey's qualifications and perhaps allow for *voir dire*. But the defendants did not object— even after the court identified *Johnson* as the governing precedent. Defendants cannot now claim error, let alone plain error, because of their own failure to follow the proper procedure below.

Nor did the court abuse its discretion in admitting Detective Caffey's testimony as relevant expert opinion evidence under Federal Rule of Evidence 702. Detective Caffey was highly qualified: (1) he had served as an L.A. police officer for thirty-five years; (2) had spent most of his career working gang assignments, including twelve years in a gang surveillance unit; (3) had taken several specialized gang training courses; (4) had taught gang-related topics to law enforcement officials and others for twenty-five years; and (5) had testified about gangs and gang culture five times in federal court and something like five hundred times in state court. The district court sensibly noted that it "[could not] imagine too many people having more credentials."

4

Moreover, Detective Caffey's testimony about gang, and particularly Crip, culture was relevant and helpful to the jury in understanding the evidence about the Short North Posse, which the Government alleged to be a local "set" of the national Crips gang. Detective Caffey testified about the Los Angeles origins of the Crips and the proliferation of "Crip sets," or independent, neighborhood-specific offshoots, which though independent would often share a certain culture. He also reviewed and opined on photographs of graffiti found in the Short North area, which he identified as incorporating common Crips gang signs. At the same time, Detective Caffey made clear that he was not familiar with any gang sets in Columbus and was testifying "just generally [about] what you see nationally." In other words, Detective Caffey equipped the jury with an understanding of general Crips culture to help it determine whether the Short North Posse was a criminal enterprise.

As we said in *Johnson*,

> [c]ourts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable. ... There are innumerable trades and practices that employ their unique devices, feints, and codes that may mean nothing to the untrained observer but may speak volumes to a maven qualified by experience or training.

*Id.* at 698. Testimony "regarding the inner-workings of organized crime" fits squarely within this category and thus is a "proper subject of expert opinion." *See United States v. Tocco,* 200 F.3d 401, 419 (6th Cir. 2000).

Notwithstanding Detective Caffey's general qualifications, defendants argue that his testimony was irrelevant and unreliable because he lacked specific knowledge about Columbus gangs. True enough, "a gang expert's testimony ... is reliable only insofar as it is based on significant experience with the gang about which the expert is testifying." *See United States v. Rios*, 830 F.3d 403, 414 (6th Cir. 2016) (emphasis omitted). Thus, Detective Caffey would not have been a reliable expert on the Short North Posse itself. But he did not purport to be. Detective Caffey opined about the national Crips gang, on which he was qualified, and the Government used other testimony to show that the Short North Posse fit the description of a Crip set. This exact approach—eliciting expert testimony on a national gang and separately drawing a link to the local set—was approved of in *Rios. See id.* at 415. Arguments that this link was too tenuous go to the weight of Detective Caffey's testimony and not its admissibility. *See id.* at 415 n.1.

Finally, defendants argue that the Government violated Federal Rule of Criminal Procedure 16(a)(1)(G) by failing to provide a pre-trial summary of Detective Caffey's intended testimony. Defendants are correct that the Government breached its disclosure obligation, but that breach does not warrant relief. First, defendants did not object on these grounds below, so their claim is reviewed only for plain error. *See United States v. Faulkenberry*, 614 F.3d 573, 590 (6th Cir. 2010). Second,

5

by failing to object below, defendants prevented the district court from curing the procedural notice violation with a less drastic remedy than requiring a new trial or precluding the evidence. The court could have, for instance, merely granted a continuance so that defendants had sufficient time to prepare for Detective Caffey's testimony. *See* Fed. R. Crim. P. 16(d). Finally, the Government's error did not seriously affect the fairness of the proceedings—and thus is not cognizable on "plain error" review—because defendants were on constructive notice that the Government intended to put on evidence of this sort. The court had indicated that gang-related expert testimony would be permissible from an appropriate witness, the Government stated on the record the day before his testimony that it would be calling Detective Caffey as an expert, and the Government's witness list named him as a witness. Because defendants had constructive notice of Detective Caffey's testimony, the Government's failure to provide a summary of that testimony under Rule 16 was not plain error.

*Lieutenant Weir*. Defendants also argue that the district court abused its discretion in permitting gang-related opinion testimony by Lieutenant Weir. But again defendants failed to object on this ground below; thus, we review only for plain error. The bulk of Lieutenant Weir's challenged testimony was permissible testimony about his own observations of gang-related activity in the Short North. A review of the transcript pages that defendants cite shows that Lieutenant Weir testified about his own observations of gang graffiti in the Short North, gang signs thrown by members of that community, and photos of defendants and others wearing clothes or tattoos suggesting gang affiliation. Lieutenant Weir's testimony arguably strayed into the realm of opinion—such as when he opined that the Short North Posse is a set of the national Crips gang—but permissibly so. A non-expert witness is permitted to testify "in the form of an opinion" that is "rationally based on the witness's perception." Fed. R. Evid. 701(a).

Lieutenant Weir's opinions about the Short North Posse were rationally based on his perception of the Short North Posse's activities and use of Crips-related gang signs during his time as a Columbus police officer.

On this record, defendants have not shown that it was plain error to admit Lieutenant Weir's lay-witness testimony on these subjects. Lieutenant Weir's testimony was reasonably considered lay-witness opinion testimony, and much of his opinion testimony linking the Short North Posse to the Crips was duplicative of other testimony—including by former Posse members. Defendants make much of the fact that the district court had previously ruled that Lieutenant Weir was unqualified to give expert testimony on national gang culture. But that exclusion does not undercut the value of Lieutenant Weir's testimony stemming from his own experiences with the Short North Posse. If anything, that the district court allowed this testimony despite its earlier order suggests that Lieutenant Weir's testimony was admitted and understood as proper lay-witness testimony, not improper expert testimony.

6

\*\*\*

Ledbetter and Liston contend that the district court abused its discretion by not declaring a mistrial after two prosecution witnesses implied on the stand that Ledbetter's attorney had engaged in improper (and, in one case, even criminal) acts. Although these statements were inappropriate, the court reasonably determined that a mistrial was not necessary and instead issued appropriate curative instructions.

The first statement came out during the Government's direct examination of Earl Williams, a cooperating codefendant. Williams testified that Ledbetter's attorney had, at Ledbetter's direction, visited Williams in prison to encourage him to fire his attorney (for whom Ledbetter was paying) and hire Ledbetter's own attorney instead (also on Ledbetter's dime). Williams stated that Ledbetter's attorney "question[ed him] like a detective ... to figure out what [he had] shared with [his] lawyer already." Reading between the lines, Williams's testimony suggested Ledbetter might have been using his attorney to learn whether Williams was talking to police. Defendants objected and, out of the jury's presence, argued that the testimony insinuated that Ledbetter's counsel was improperly doing Ledbetter's bidding. The court concluded that the testimony was probative of Ledbetter and Williams's membership in a conspiracy. Appreciating, however, that the testimony might also be construed to implicate Ledbetter's attorney in wrongdoing, the court instructed the jury

> to disregard that portion of Mr. Williams' testimony wherein he testified that [Ledbetter's counsel] had questioned him like a detective. I'm excluding that because I find that that testimony is more prejudicial to the defendants than probative ... of any of the issues in this case under the applicable federal laws under which this case is being tried. I will further advise the jury that you are not to infer from the fact that [Ledbetter's counsel] spoke with Mr. Williams that [Ledbetter's counsel], himself, was either a co-conspirator or was acting in furtherance of any conspiracy. Finally, I will advise you that, as lawyers, we are required, in interviewing clients or p[ro]spective clients, to ask probing questions, and sometimes challenging questions, in properly discharging our responsibilities of zealous representation. And those probing questions can often appear to be detective-like in nature, because you're trying to probe to make sure that your client's rendition of the facts makes sense and would withstand scrutiny.

The second incident happened the following day, during cross-examination of Anthony Jones, another cooperating codefendant. In an attempt to discredit Jones's damning testimony, Ledbetter's attorney cross-examined Jones about his plea deal and also elicited a concession that Jones had lied to the grand jury about some details. Ledbetter's attorney punctuated his line of questioning by asking, "There's no reason any reasonable person would believe a word that you say, correct?"

7

Presumably upset, Jones responded, "Would they believe if I say that you gave information that probably got Crystal [Fyffe] murdered?" Harris's counsel objected immediately, and at sidebar everyone agreed that Jones's testimony was improper. Back before the jury, the court struck Jones's testimony as unresponsive and instructed the jury "to disregard the previous answer as it has no basis in fact or otherwise." At the end of Jones's testimony, the court reaffirmed its prior instruction:

> Ladies and gentlemen, before we bring in the next witness, I want to reiterate to you, after Mr. Jones's testimony, that you are to completely disregard the answer that he gave to [Ledbetter's counsel] about some information somehow being related to Ms. Fyffe's murder. I want to emphasize to the court that [Ledbetter's counsel] has never, in this Court's opinion and the evidentiary record will reflect, engaged in improper conduct and that any inference to that effect that was created by Mr. Jones's testimony must be completely disregarded by you as a matter of law.

The following morning, the court orally denied defendants' motions for a mistrial. The court found that any prejudicial comments about Ledbetter's attorney were isolated and unlikely to mislead the jury; that there was no evidence of bad faith by the Government; that the strength of the evidence against defendants was substantial; and that the limiting instructions cured any risk that defendants' rights were impaired.

Although both statements were improper, defendants have not shown that the testimony was so clearly prejudicial that any risk of harm was not cured by the court's thorough limiting instructions. To determine whether improper testimony causes incurable prejudice, the court considers five factors: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate,* 336 F.3d 478, 485 (6th Cir. 2003).

For both improper statements, all five factors weigh against a mistrial. First, both remarks were unsolicited. Second, Jones's improper testimony came out on cross-examination by defense counsel (not direct by the Government), and the court reasonably found that the Government's questions to Williams about his interactions with Ledbetter's counsel were relevant (and thus reasonable). Third, the court immediately instructed the jury to disregard both statements and later reiterated those instructions in clear and forceful language. These instructions were especially curative because the court not only told the jury to disregard the evidence but explained that the stray comments had no basis in fact. Fourth, the court found no evidence of bad faith by the Government, and defendants have offered none. Fifth, defendants give no reason to disregard the court's finding that the statements

8

were isolated and thus unlikely to cause prejudice in light of the substantial evidence of guilt adduced over two months of trial.

In sum, defendants have not shown that the improper statements were so clearly prejudicial that any risk of harm was not cured by the district court's forceful limiting instructions.

\*\*\*

Harris, Liston, and Ussury were each convicted on at least one count of murder in aid of racketeering, which, again, requires that the murder was committed either as consideration for anything of pecuniary value from a racketeering enterprise or to gain entrance to or maintain or increase position in a racketeering enterprise. 18 U.S.C. § 1959(a). Due process requires that a federal jury "unanimously find[ ] that the Government has proved each element" of a crime, *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), which the parties understand to mean that, for each conviction, the jury's verdict had to be unanimous as to which purpose was proven. The district court agreed and instructed the jury that "[t]he government need only prove that the [murder in aid of racketeering] was committed by the defendant for either one of two stated purposes, but your verdict must be unanimous as to which purpose."

The defendants were satisfied with that instruction below but now argue that due process required that the jury specify on a special verdict form which motive they unanimously found. Otherwise, defendants postulate, the jury may not have unanimously found one statutory purpose. Defendants fail, however, to cite a single case suggesting that a special verdict form is required in these circumstances. Because their claim is reviewed only for plain error, that failing is fatal.

The one case that defendants do point to, *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999), is distinguishable. Dale was convicted by general verdict of conspiracy to distribute drugs. *Id.* at 430. The government's theory was that Dale distributed both cocaine and marijuana, but the jury needed to find only that he distributed at least one of the two. As here, the jury had to find unanimously which drug (or drugs) Dale conspired to distribute. The jury returned a general guilty verdict, which did not specify whether the jury based its conviction on Dale's distribution of cocaine or marijuana. *See id.* at 431. The district court then took it upon itself to find that Dale conspired to distribute cocaine and sentenced Dale above what would have been the statutory maximum for a marijuana-based conviction. We held that it was plain error to sentence Dale beyond the marijuana-based statutory maximum when it was impossible to know, without a special verdict, whether the jury found Dale guilty of conspiring to distribute marijuana or cocaine. *See id.* at 434. The *Dale* court relied by negative inference on language in *Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998), indicating that *Edwards* would have come out differently if "the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only [as opposed to crack] conspiracy."

9

> The difference between *Dale* and *Edwards* marks the rule: a special verdict is required when a finding of one alternative element over another is used to enhance a sentence beyond what would otherwise be the statutory maximum. This makes sense when the district court must determine which of two facts the jury found in order to determine the maximum sentence. That is not the case where, as here, it makes no sentencing difference which statutory purpose the jury found. Accordingly, the district court did not err.

*United States v. Ledbetter*, 929 F.3d at 348-65.

"A § 2255 motion may not be used to relitigate an issue that was raised on direct] appeal absent highly exceptional circumstances." *Dupont v. United* States, 76 F.3d 108, 110–111 (6th Cir. 1996) (citing *United States v. Brown*, 62 F.3d 1418 (6th Cir. 1995)); *see Jones v. United States,* 178 F.3d 790, 796 (6th Cir. 1999) ("It is well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law."). The record reflects no such exceptional circumstances here. The Sixth Circuit has already determined that Petitioner's claims are without merit and no error occurred from the admission of the complained of testimony, the Court's refusal to grant a mistrial, or the lack of special verdict forms. This Court will not now again address these issues here. In view of the foregoing, Petitioner also cannot establish the ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* requires a movant claiming ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. 466 U.S. at 687. To show deficient performance, a petitioner must demonstrate that his counsel's representation "'fell below an objective standard of reasonableness.'" *Richardson v. Palmer*, 941 F.3d 838, 856 (6th Cir. 2019) (quoting *Strickland*, 466 U.S. at 688). "Regarding prejudice," a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.'" *Richardson,* 941 F.3d at 856 (quoting *Premo v. Moore*, 562 U.S. 115, 121 (2011)). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 689). Petitioner cannot meet this standard.

### III. DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED**.

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

Date:  February 8, 2021                                             s/Kimberly A. Jolson
                                                                   KIMBERLY A. JOLSON
                                                                   UNITED STATES MAGISTRATE JUDGE